IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

| | |
|---|---|
| THE ANDERSON GROUP, LLC and GAIL ANDERSON,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF SARATOGA SPRINGS; MICHAEL LENZ, individually and in his official capacities as Mayor of Saratoga Springs and Saratoga Springs City Council member; SARATOGA SPRINGS CITY COUNCIL; THOMAS CURLEY, MATTHEW MCCABE, THOMAS MCTYGUE, and STEPHEN TOWNE, individually and in their official capacities as Saratoga Springs City Council members; SARATOGA SPRINGS PLANNING BOARD; and LEWIS BENTON, ROBERT BRISTOL, ROBERT ISRAEL, WILLIAM MCTYGUE, NANCY OHLIN, and LOU SCHNEIDER, individually and in their official capacities as Saratoga Springs Planning Board members,<br><br>    Defendants. | Civil Action No. _____ |

**COMPLAINT**

## INTRODUCTION

1. This action arises out of a pattern of discrimination on the basis of race, ethnicity, and familial status by Defendants City of Saratoga Springs, Saratoga Springs City Council, Saratoga Springs Planning Board, Saratoga Springs Mayor Michael Lenz, in his individual and official capacities, Saratoga Springs City Council members Thomas Curley, Michael Lenz, Matthew McCabe, Thomas McTygue, and Stephen Towne, in their individual and official capacities, and Saratoga Springs City Planning Board members Lewis Benton, Robert Bristol, Robert Israel, William McTygue, Nancy Ohlin, and Lou Schneider, in their individual and official capacities, in disallowing, delaying, blocking, and otherwise interfering with Plaintiffs' attempts to construct a housing development with affordable housing units in Saratoga Springs, New York.  Plaintiffs seek a declaratory judgment, permanent injunctive relief, and damages for Defendants' unlawful behavior.  This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C § 3601, *et seq.* and N.Y. Exec. L. § 296.

2. The Anderson Group is a real estate developer based in Albany, New York that specializes in commercial real estate development and property management.  In late 2004, the Andersons attempted to develop a 300-unit residential housing community with sixty affordable rental units called Spring Run Village on a parcel of property owned by Gail Anderson in Saratoga Springs, New York.  The development, which would have included the first meaningful number of affordable housing units constructed in Saratoga Springs in decades, would have been occupied by a disproportionate number of minorities and families with children.

3. Saratoga Springs officials recognize that providing affordable housing is the "highest priority" to the city and initially expressed support for Spring Run Village and its affordable housing component. Prospective neighbors and other Saratoga Springs residents, however, began a campaign to stop the development of Spring Run Village, expressing opposition to the type and number of families that would move to the community. Their opposition was explicitly based at least in part on the belief that the people who would move into Spring Run Village would interfere with the "character" of Saratoga Springs.

4. Succumbing to the views of the opposing neighbors, Saratoga Springs city officials reversed their initial position and "down-zoned" the Spring Run Village parcel and surrounding area to a "rural residential" classification, which precluded development of any multi-family development, including Spring Run Village.

5. The Saratoga Springs officials' conduct in interfering with and blocking the construction of Spring Run Village prevented racial and ethnic minorities and families with children from obtaining housing in Saratoga Springs and perpetuates segregation in the city. Saratoga Springs remains a predominantly white, highly segregated community with little affordable housing for the families that make up the City's workforce. Defendants' actions have the purpose and effect of violating the federal and New York fair housing laws.

## PARTIES

I. **Plaintiffs**

6. Plaintiff The Anderson Group is a limited liability corporation duly organized and existing under the laws of the State of New York with its principal place of business

in Albany, New York. Plaintiff The Anderson Group is in the business of developing, owning, and managing commercial real estate. The Anderson Group designed and applied to develop, and would have owned and managed, Spring Run Village.

7. Plaintiff Gail Anderson is a resident of Saratoga Springs, New York. At all times relevant to the allegations in this Complaint, Ms. Anderson was president of The Anderson Group and was the owner of the subject property where she and The Anderson Group (collectively, the "Andersons") sought to develop Spring Run Village.

## II.     Defendants

8. Defendant City of Saratoga Springs, New York, is a municipal corporation organized and operating by virtue of and under the laws of the State of New York.

9. Defendant Michael Lenz is the Mayor of Saratoga Springs. The Mayor of Saratoga Springs functions as the chief executive officer of the city with, *inter alia*, the authority to enforce the city's zoning ordinances. Defendant Lenz is sued in his individual capacity and in his official capacity as the Mayor of Saratoga Springs.

10. Defendant Saratoga Springs City Council is elected by the residents of Saratoga Springs. The City Council is the chief legislative authority in the city. Defendant Saratoga Springs City Council has authority for approving and establishing zoning classifications and permitted uses for land parcels within Saratoga Springs. The City Council also has authority for approving Saratoga Springs Comprehensive Plans, which outline the preferred uses of parcels of land within Saratoga Springs.

11. Defendants Thomas Curley, Michael Lenz, Matthew McCabe, Thomas McTygue, and Stephen Towne are members of the City Council of Saratoga Springs.

They are sued in their individual and official capacities as members of the City Council of Saratoga Springs.

12. Defendant Saratoga Springs Planning Board is a seven-member board appointed by the Mayor of Saratoga Springs. Defendant Planning Board has oversight responsibility for development activities in the City, including reviewing site plans for multi-family and commercial projects and issuing special use permits for certain types of land uses within existing zoning districts.

13. Defendants Lewis Benton, Robert Bristol, Robert Israel, William McTygue, Nancy Ohlin, and Lou Schneider are members of the City of Saratoga Springs Planning Board. They are sued in their individual and official capacities.

## JURISDICTION AND VENUE

14. The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 and 42 U.S.C. § 3613(a). Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because the claims arose in this District and in Saratoga County, the parties are incorporated in, and/or reside, in this District and Division, and a substantial part of the events giving rise to this action occurred in this District and in Saratoga County.

## FACTUAL BACKGROUND

### I. The City of Saratoga Springs

15. Saratoga Springs is located in Saratoga County and at the last census, had 26,186 residents and 10,777 households. Approximately 94% of Saratoga Springs households are white and only approximately 3% are African-American. In contrast, the neighboring cities of Albany, Troy, and Schenectady have substantially larger minority

populations. Saratoga Springs officials have explicitly recognized that Albany, Schenectady, Troy, and Saratoga Springs are economically and demographically interrelated; yet Saratoga Springs has a vastly smaller percentage of African-American residents.

16. Saratoga Springs officials and citizens promote Saratoga Springs as an exclusive community where potential residents need to "understand the rules before they come." Saratoga Springs has a long history of excluding African Americans. Of all the incorporated cities and towns in the Northeast with more than 25,000 residents, Saratoga Springs is the only one that has seen a consistent 20-year trend of white population growth and African-American population decline. The cities and towns surrounding Saratoga Springs have all experienced an increase in the African-American population over this same period.

17. Most of the African Americans that do live in the Saratoga Springs are segregated in a small area of the downtown section of the city. This area, which is home to approximately 70% of Saratoga Springs' African-American families, is also where Saratoga Springs has concentrated virtually all of its subsidized and affordable housing.

18. The subsidized housing that exists in Saratoga Springs is inadequate to accommodate the city's low-income population. Less than 10% of Saratoga Springs' housing stock is affordable, and the majority of that housing was constructed in the 1970s or earlier and is in disrepair. Nearly three thousand Saratoga Springs families are overburdened by their housing expenses, and hundreds of families remain on waiting lists for subsidized housing. A substantially greater percentage of African-American households are overburdened by housing costs than are white households.

19. Saratoga Springs officials have consistently recognized that affordable housing is the city's "greatest community development need" and "highest priority." However, fewer than twenty affordable housing units have been constructed in the city over the past fifteen years.

20. A substantial portion of the families that make up the Saratoga Springs workforce, particularly in the service and hospitality sectors, which are both expanding rapidly, lives outside Saratoga Springs because they cannot afford the housing available in the city. These families, which are disproportionately minority families, have been excluded from Saratoga Springs by the city's ongoing policies and practices of preventing the construction of affordable housing in the city.

21. Saratoga Springs has prevented the construction of new affordable housing in part by adopting and implementing zoning ordinances and classifications that severely restrict development of most land in the city. Approximately 15% of the total land area in Saratoga Springs remains vacant and potentially developable. Most of that land, however, has been restricted to low-density residential development, *e.g.*, a maximum of one single-family home for every two acres in a parcel.

22. Saratoga Springs officials have explicitly recognized that the combination of the small amount of developable land and restrictive zoning has left relatively little available land for new high-density development. However, Saratoga Springs has generally precluded development of multi-family housing outside the center of the city, which has led to the concentration of affordable multi-family housing in the already developed downtown. This has left most African-American families segregated in small sectors of the city's downtown area.

## II.     Plaintiffs' Plans for Developing Spring Run Village

23. In 2004, Plaintiffs began plans to develop a parcel of property they own in Saratoga Springs. The proposed development—Spring Run Village—was a well-planned and modern mixed-income community designed to achieve the laudable goals of Smart Growth and New Urbanist Design, which include mixed land uses, walkable neighborhoods, preservation of open space and natural beauty, and proximity to varied shopping and recreational amenities.

24. The Spring Run Village site is conveniently located near Interstate 87 and is adjacent to two of the main arteries into Saratoga Springs. The site, which would occupy approximately forty-four acres of the Andersons' property, is adjacent to more than two thousand six hundred nearly contiguous acres of undevelopable, environmentally constrained lands. Ten of the forty-four acres within the Spring Run Village development would have been preserved as wetland habitat, and sixty percent of the parcel would have been left as greenspace.

25. Spring Run Village was designed to have three hundred units of housing, including rowhouse condominiums, townhouse-style apartments, and small buildings with multiple apartment units. Sixty of the rental units—forty-six two-bedroom units and fourteen three-bedroom units—were designed to be "workforce affordable" units. The workforce affordable units would have been available only to households earning no more than 80% of the area median income and would have been rented at the United States Department of Housing and Urban Development's fair market rents for the area. Under the terms of the Low Income Tax Credit funding that the Andersons were planning

to seek for the affordable units, the income and rent controls would have kept the units affordable for at least thirty years.

26. The Spring Run Village proposal had other features that would benefit Saratoga Springs and its residents, including realigning existing roads to eliminate the notoriously dangerous intersection between Gilbert Road and Route 29—nicknamed "Hail Mary corner" because of the lack of visibility for drivers turning from Gilbert Road onto Route 29.

27. Local business representatives and affordable housing advocates, including the Workforce Housing Partnership of Saratoga County, all supported the Spring Run Village proposal as a viable solution to help address the "near-crisis" situation of the lack of affordable housing in Saratoga Springs.

28. The demographics of Saratoga Springs and surrounding areas demonstrate that Spring Run Village, and in particular the affordable housing units, would have been disproportionately occupied by African Americans and families with children. The percentage of African-American families in the area likely to qualify for and able to afford the affordable Spring Run Village units is approximately 50% greater than the percentage of white families in the area likely to qualify for and able to afford the affordable Spring Run Village units.

29. Spring Run Village would have helped integrate and otherwise deconcentrate African Americans in Saratoga Springs. Currently, the vast majority of African Americans live in a single small area in the center of the city. Virtually no African-American families live in the area where Spring Run Village would have been constructed.

9

30. Spring Run Village presented a unique opportunity for the construction of affordable housing units, which would create greater ethnic and racial diversity and would allow more families with children, many of whom already work in Saratoga Springs, to live in the city outside of the segregated downtown.

### III. Plaintiffs' Attempts to Obtain Zoning Approval for Spring Run Village

31. In Saratoga Springs, approval of proposed developments rests with the Saratoga Springs City Planning Board and the Saratoga Springs City Council. The City Council periodically approves a Comprehensive Plan that outlines the city's general land use policies. The city's zoning ordinances, including the rezoning at issue here, are also adopted by the City Council, typically in conformance with the Comprehensive Plan.

32. The City Planning Board generally reviews and approves or denies specific development activities in the city, and its authority includes reviewing development plans and issuing special use permits in conformity with the zoning ordinances. Special use permits issued by the City Planning Board allow the development of "preferred uses" in particular areas. The City Planning Board also issues advisory opinions regarding zoning classification changes.

33. The forty-four acre plot of land for the Spring Run Village proposal was within an "impact area" known as the Southern Weibel Avenue District ("SWAD"), which was comprised almost entirely by the Andersons' property. The City Council created the SWAD in 1999 as part of a comprehensive assessment of the city's present and future development needs. The assessment, which was conducted by the City Council, citizen boards, and the public, was designed to encourage a greater diversity of creative land uses in specific areas of the city.

34. The 1999 Comprehensive Plan recognized a need to develop affordable housing, and subsequent zoning amendments established new mixed use "impact areas," including the SWAD. Particular "preferred uses" were identified for the SWAD and other impact areas. The preferred uses included high-density residential development, which would allow for an affordable multi-family development.

35. Neighbors and other residents of Saratoga Springs immediately objected to the zoning classification, claiming that permitting high-density uses would diminish the quality of life and would attract lower-income families and "transients." The City Council yielded to this public pressure and rezoned the SWAD to RR-1—a "rural residential" classification that only allowed one single-family residence for every two acres of the Andersons' property.

36. Plaintiffs challenged the City Council's reclassification as violating established procedures under New York law. On May 12, 2004, the New York Supreme Court found that the City Council had improperly made the zoning change and reinstated the high-density use classification.

37. After the court decision, the Andersons informed Saratoga Springs officials that they would seek to construct Spring Run Village. The Andersons identified their property in the SWAD as the location for the development and noted that a significant percentage of the units in the developments would be affordable under federal guidelines.

38. The City Council initially supported the development and voted to propose an ordinance that would allow Spring Run Village to be designated as a preferred use and would downzone the rest of the Andersons' property and remaining areas of the SWAD

to ensure that no further high-density developments would be constructed in the immediate area.

39. On October 26, 2004, Plaintiffs applied to the City Planning Board for a special use permit to develop Spring Run Village, which was originally designed as a mixed-use project that consisted of 259 residential units, including 52 affordable housing units, and 38,000 square feet of office space.

40. When the Andersons submitted their application for Spring Run Village, neighbors and other residents of Saratoga Springs launched a campaign to stop the development. They included a group called the "City in the Country Land Protection Committee," which began a campaign of contacting Saratoga Springs officials and the press to protest the development. The Spring Run Village opponents asserted that they wanted to control who could live in their community and direct where people could live. The opponents objected to the effect the prospective residents would have on the current residents' quality of life and their school-age children.

41. On November 3, 2004, the City Planning Board declined to support a proposal for maintaining a zoning classification that would allow Spring Run Village as a preferred use and instead suggested that the City Council consider down-zoning the entire SWAD to RR-1, which would effectively prevent the construction of any multi-family housing. The City Council subsequently met to consider the proposals for down-zoning part, or all, of the SWAD. Succumbing to the opponents' discriminatorily driven opposition, the City Council proposed that the entire SWAD be down-zoned and sought another advisory opinion from the City Planning Board on the proposal.

42. The City Council's meeting to consider down-zoning the Spring Run Village site was timed to coincide with City Planning Board's public review of the Spring Run Village proposal. The moment the City Council made its decision to request a second advisory opinion from the Planning Board, Assistant City Attorney Tony Izzo interrupted the City Planning Board's public review of Spring Run Village and reported the City Council's decision to consider the proposal for down-zoning the SWAD. Robert Bristol, the City Planning Board Chairman, immediately terminated the public hearing on the Spring Run Village proposal.

43. On December 8, 2004, the City Planning Board met to discuss their advisory opinion on down-zoning the SWAD. The Office of the City Engineer declared that down-zoning was not a good use of the SWAD property and that the proposed down-zoning would prevent the construction of any multi-family dwellings on this land, one of the few remaining developable plots of property in the city. Nevertheless, the City Planning Board voted to recommend that the entire SWAD be down-zoned to RR-1.

44. The City Planning Board also reviewed the Spring Run Village application during the December 8, 2004 meeting and noted that they would not support the Spring Run Village application while it had a commercial office space component. The Andersons immediately revised the Spring Run Village application to accommodate the Planning Board's position by eliminating the office space and proposing an entirely residential development with three hundred residential units and sixty units designated as affordable housing units.

45. On January 31, 2005, the Saratoga County Planning Board reviewed the City's proposal to down-zone the SWAD. The County opposed the proposal with

members of the County Planning Board calling the City's proposal "unrealistic" and criticized the proposal for failing to meet "community and countywide needs."

46. On February 1, 2005, the City Council, ignoring the recommendations by the County and its own Engineer, and reversing its initial support for Spring Run Village, voted to down-zone the entire SWAD to RR-1.

47. The new zoning classification of the SWAD precluded construction of Spring Run Village, and the City Planning Board denied the Spring Run Village application the following day.

48. At the same meeting where the City Council blocked the construction of sixty units of affordable housing at Spring Run Village, the City Council formed a so-called "Inclusionary Zoning Ordinance Development Committee" as a means to cover its discriminatory rejection of the Spring Run Village affordable housing units. In the eight months since it was formed, the Committee has taken no concrete actions to construct affordable housing in Saratoga Springs. Not even the plans the Committee has publicly considered for encouraging affordable housing would meaningfully increase the number of units of affordable housing in Saratoga Springs.

49. Since the denial of the application for Spring Run Village, two more proposals for affordable housing communities have been brought before the City Council and City Planning Board. One of these proposals received a negative advisory opinion from the City Planning Board and was withdrawn by the applicant. The other proposal now faces similar obstacles erected by opposition groups with stereotypical notions about the people most likely to occupy affordable housing and by city officials who yield to the opposition's discriminatory demands. Saratoga Springs is in the process of approving an

14

affordable housing development with approximately thirty-seven units, but that development is again located in the segregated downtown area where the vast majority of the city's minority residents live.

50. Although Defendants denied the Spring Run Village proposal and changed the zoning classification of the Andersons' property ostensibly to protect the rural character of the area, Defendants have approved several large commercial, mixed use, and recreational developments adjacent to, or near, the Spring Run Village site, including two office buildings and a large commercial/residential development that has a similar number of residential units as proposed for Spring Run Village. None of the approved developments around the Spring Run Village site, however, contains affordable housing. Nor will any of the approved developments around the Spring Run Village site likely be occupied by a disproportionate number of minorities or families with children.

## INJURY TO PLAINTIFFS

51. Defendants' down-zoning of the Andersons' property, precluding the development of multi-family housing, and rejecting the Andersons' proposal to construct Spring Run Village have the purpose and effect of limiting housing opportunities for racial minorities and families with children and perpetuating racial segregation in housing in Saratoga Springs.

52. Plaintiffs continue to seek to develop Spring Run Village on their property in Saratoga Springs. Defendants' actions continue to prevent Plaintiffs from developing Spring Run Village or a similar development on their property in Saratoga Springs.

53. Through the actions described above, Defendants have acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing laws.

54. As a proximate result of the acts and practices described above, Plaintiffs have suffered and continue to suffer, and will suffer in the future, great and irreparable loss and injury, including but not limited to economic losses, a deprivation of Plaintiffs' right to develop racially integrated affordable housing for individuals and families with children free from discrimination based on race and familial status, and frustration of Plaintiffs' attempts to provide safe affordable housing to residents in the Saratoga Springs area.

55. Defendants acted intentionally and maliciously and with callous and reckless disregard for the rights guaranteed by state and federal fair housing laws.

## CLAIMS

### First Claim
(Violation of 42 U.S.C § 3604)

56. Plaintiffs reallege and incorporate the facts and allegations contained in Paragraphs 1 through 55, as fully set forth herein.

57. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C § 3604.

### Second Claim
(Violation of N.Y. Exec. Law § 296.5)

58. Plaintiffs reallege and incorporate the facts and allegations contained in Paragraphs 1 through 57, as fully set forth herein.

59. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the New York fair housing law, N.Y. Exec. L. § 296.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant them the following relief:

(a)  enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 3604 and N.Y. Exec. L. § 296.5.

(b)  enter an injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c)  award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

(d)  award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

(e)  award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2).

(f)  order such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable as of right.

Dated: October 27, 2005

_____
Peter A. Lynch (Bar No. 105131)  
LYNCH & LYNCH  
111 State Street, First Floor  
Albany, NY 12207  
(518) 463-1252

John P. Relman  
Reed N. Colfax  
Mary Hahn  
RELMAN & ASSOCIATES  
1225 Nineteenth Street, #600  
Washington, D.C. 20036  
(202) 728-1888

**Attorneys for Plaintiffs**