# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
### ALBANY DIVISION

THE ANDERSON GROUP, LLC and GAIL
ANDERSON,

        Plaintiffs,

        v.

CITY OF SARATOGA SPRINGS, *et al.*,

        Defendants.

Civil Action No. 1:05-CV-1369, GLS/DRH

Judge Gary L. Sharpe

Magistrate Judge David R. Homer

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'
DISPARATE IMPACT CLAIMS**

---

Reed N. Colfax
Mary J. Hahn
John P. Relman
RELMAN & DANE, PLLC
1225 19th Street, Suite 600
Washington, DC 20036
(202) 728-1888

Peter A. Lynch
LYNCH & LYNCH
111 State Street, First Floor
Albany, NY 12207
(518) 463-1252

**ATTORNEYS FOR PLAINTIFFS**

Dated: July 17, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... vii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 4

I.     Saratoga Springs, New York ........................................................................ 4

     A.    Saratoga Springs Is a Nearly All-White City With an Affordable Housing
           Crisis ............................................................................................... 4

     B.    Saratoga Springs Has Pursued and Implemented Policies That Have
           Precluded and Discouraged the Construction of Affordable Housing
           Opportunities .................................................................................. 6

II.    The Andersons' Spring Run Village Proposal ............................................... 7

     A.    The Andersons' Spring Run Village Proposal Presented A Unique
           Opportunity to Create Affordable Housing Opportunities in Saratoga
           Springs. ........................................................................................... 7

     B.    When The Andersons Began Plans to Build Spring Run Village, It Was A
           "Preferred" and "Encouraged" Use .................................................. 9

     C.    The City Rezones the Andersons' Property In Response to Their Proposal to
           Include Affordable Housing Units in Spring Run Village. ................ 10

     D.    When the New York Supreme Court Reversed Saratoga Springs' Last-
           Minute Rezoning, the Andersons Restarted Efforts to Design and Build
           Spring Run Village .......................................................................... 12

     E.    The Saratoga Springs City Council Moves to Downzone the Andersons'
           Again Immediately After the Anderson Family's Presentation on the
           Affordable Housing Component of Spring Run Village. ................... 13

     F.    The Saratoga Springs Planning Board Made Every Effort to Ensure That the
           Anderson Family's Spring Run Village Proposal Would
           Not Be Approved ............................................................................. 15

LEGAL STANDARD ............................................................................................. 17

ARGUMENT ........................................................................................................ 18

I.   The Anderson Group Has Standing to Bring Its Fair Housing Act Claims Under
     Controlling Supreme Court Precedent. ...................................................................18

     A.   Standard for Establishing Standing Under The Fair Housing Act. ...............19

     B.   The Anderson Group Readily Meets the Standing Standard Under the Fair
          Housing Act. .........................................................................................19

     C.   Defendants' Focus on The Anderson Group's Legally Enforcable Rights is
          Misplaced. ............................................................................................20

II.  Plaintiffs' Fair Housing Act Claims Are Amply Supported by the Facts Adduced in
     Discovery...............................................................................................................21

     A.   A Violation of the Fair Housing Act May Be Established By Showing
          Disparate Treatment or Disparate Impact. ................................................21

     B.   Standard for Considering Plaintiffs' Disparate Treatment Claims................21

     C.   The Evidence Supports an Inference of Discrimination .................................22

          1.   The Standard for Determining Whether a Plaintiff Can Meet the
               Burden of Establishing an Inference of Discrimination......................22

          2.   Plaintiffs Have Presented Substantial Statistical Evidence of
               Discrimination ..........................................................................23

               i.   The Statistical Evidence Establishes A Significant Racial
                    Disparity among those Affected by Defendants' Actions.........24

          3.   The Evidence Shows that The City Capitulated to Discriminatory
               Opposition to the Affordable Housing Component of Spring Run
               Village.....................................................................................26

               i.    Every Relevant City Decision Was Made in the Context of
                     Discriminatory Opposition...........................................27

               ii.   The City Council and Planning Board Bowed to the
                     Community's Discriminatory Opposition. .................29

               iii.  When City Officials Bowed to Community Opposition, They
                     Knew it Was Based on Discriminatory Animus Towards the
                     Likely Residents of Affordable Housing. ...................30

iv.    **The City Has Consistently Yielded to Community Opposition to Affordable Housing that is Based on Stereotyped Notions of the Likely Residents.**................................................................31

v.    **The City Has Stymied Various Initiatives to Promote Affordable Housing in the City.**....................................................33

4.    **The City's SWAD Area and Spring Run Village Decisions Were a Product of a Suspect Sequence of Events and Numerous Departures from Normal Procedures.**.......................................................34

i.    **Departing from Its Own Process, the City Rezoned the SWAD in 2003 in Immediate Response to the Andersons' Plans to Build A Development With Affordable Housing.**......................34

ii.    **The City Initiates a Second Process to Rezone the SWAD Area Again Immediately After Learning of the Andersons' Affordable Housing Plans.**..........................................................36

iii.    **The Planning Board Departed from Its Normal Procedures to Delay Consideration of the Spring Run Village Application.**..................................................................................39

D.    **The Evidence Establishes that the City's Sole Explanation for Downzoning the SWAD Area and Denying the Spring Run Village is Pretextual.**.............42

1.    **The Comprehensive Plan Did Not Require the Rezoning of the SWAD Area or the Denial of the Spring Run Village Application.**.................42

i.    **The Comprehensive Plan Only Requires that the SWAD Area Be Studied.**...................................................................44

ii.    **Historically, the City Has Not Required Absolute Consistency Between the Comprehensive Plan and the Zoning Ordinance.**.........................................................46

iii.    **The City Has Regularly Considered Amending the Comprehensive Plan Where Necessary for A Particular Project or Proposal.**..................................................................46

iv.    **The City Council's Rezoning of the SWAD Area Was Contrary to the Comprehensive Plan's Guidelines for Promoting Affordable Housing Opportunities.**.............................................47

2.    **The Rezoning of the SWAD Area Was Not Mandated by Any "Consistent" Land Use Treatment of the Area.**....................................48

E.   The Undisputed Facts Establish that Defendants' Land Use Policies Used to Justify Rezoning of the SWAD Area and Denying the Spring Run Village Application Have A Disparate Impact on African Americans. ......................49

   1.   Standard for Proving A Disparate Impact Claim Under the Fair Housing Act. .................................................................................50

   2.   The City Admits That Its Land Use Policies Limit the Creation of Affordable Housing in General and Particularly in the Exclusively White Areas Outside of Downtown. ........................................................51

   3.   The Undisputed Evidence Establishes that The City's Land Use Policies That Prevent and Discourage the Construction of Affordable Housing Have an Adverse Impact on African Americans. ..................53

   4.   Defendants' Responses to Plaintiffs' Undisputed Showing of the Adverse Racial Impact Are Meritless. ....................................................55

      i.   Plaintiffs' Appropriately Analyze the Effect of Excluding Affordable Housing on African Americans. ...............................55

      ii.   Plaintiffs Appropriately Rely on 2000 Census Data. ................56

      iii.   Plaintiffs' Analysis of the Predicted Percentage of African-American Residents in Spring Run Village is Consistent With Controlling Precedent. ..................................................................56

      iv.   The Factual Findings in the *Eastampton* Case Have No Relevance to the Actual and Predictable Impact of Saratoga Springs' Land Use Decisions. ......................................................57

   5.   The City's Policies Limiting The Construction of Affordable Housing, Particularly in the Outer Areas, Perpetuate Segregation. ...................58

      i.   Saratoga Springs is Highly Segregated. ......................................58

      ii.   Limiting the Scant Affordable Housing Opportunities to the Downtown Area Perpetuates Segregated Living Patterns. ......60

   6.   Defendants Have Made No Showing That No Less Discriminatory Alternatives Would Achieve Their Land Use Purposes. ......................61

   7.   The Remaining Arlington Heights Factors Support A Finding In Plaintiffs' Favor on Their Disparate Impact Claims. ..........................63

III.     The Individual Defendants Are Not Entitled to Immunity..........................................64

          A.      Legislative Immunity Does Not Attach to the City Officials' Actions. ............64

          B.      The Individual Defendants Are Not Entitled to Qualified Immunity.............67

IV.      Defendants are Liable Under the New York Human Rights Law for Making
          Housing Unavailable on the Basis of Race....................................................................69

CONCLUSION .......................................................................................................................70

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20 (1st Cir. 1992)...........................….........66, 67

*Allen v. Coughlin*, 64 F.3d 77 (2d Cir. 1995)…………………………………………………………17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)………………………………….…...…...17, 22

*Assisted Living Assoc. of Moorestown v. Moorestown Township*, 996 F. Supp. 409
(D.N.J. 1998)……………………………………………………………………………………....…...35

*Association of Relatives and Friends of AIDS Patients v. Regulations and Permits
Administration*, 740 F. Supp. 95 (D.P.R.1990)……………………....…………………….…......27

*Atkins v. Robinson*, 545 F. Supp. 852 (E.D. Va. 1982)……………………………………………..29

*Barnes v. GenCorp. Inc.*, 896 F.2d 1457 (6th Cir. 1990)…………………………………………..24

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305 (4th Cir. 2001)……………………59

*Blissett v. Coughlin*, 66 F.3d 531 (2d Cir. 1995)………………………………………………..67

*Brennan v. Straub*, 246 F. Supp. 2d 360 (S.D.N.Y. 1995)…………………………………64, 65, 66

*Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148 (S.D.N.Y. 1989)…54, 56

*Catanzaro v. Weiden*, 140 F. 3d 91 (2d Cir. 1998)…………………………………………….....68

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)………………….………………………………17

*Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729 (8th Cir. 2005)……………...53, 57

*Cmty. Hous. Trust v. Dep't of Consumer and Regulatory Affairs*,
257 F. Supp. 2d 208 (D.D.C. 2003)……………………………………………………………...27

*Crymes v. DeKalb County*, 923 F.2d 1482 (11th Cir. 1991)……………….…………………….69

*Dister v. Cont'l Group, Inc.*, 859 F.2d 1108 (2d Cir. 1988)……………………………………..18

*Eastampton Center, L.L.C. v. Township of Eastampton*, 155 F. Supp. 103 (D.N.J. 2001)….58, 63

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978)………………………….………………23

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1224 (2d Cir. 1994)................................21

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979)..............…...……...…….....19

*Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165 (2d Cir. 2006)…...…………17

*Harhay v. Town of Ellington*, 323 F.3d 206 (2d Cir. 2003)..........................................64

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)..................................................................67

*Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995).....................................................65

*Hope v. Pelzer*, 536 U.S. 730 (2002).........................................................................67

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 937 (2d Cir. 1988)..........*passim*

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)......................................23

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997)..................26

*Jim Sowell Const. Co. v. City of Coppell*, 82 F. Supp. 2d 616 (N.D. Tex. 1998)..................65

*Johnson v. Ganim*, 342 F.3d 105 (2d Cir. 2003)…….............................................68

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988).......................…...............................54, 57

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir.1998)………….....................................18

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)…...................................23, 67

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)..........................................22

*Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985)................................................42

*Moore v. Trippe*, 743 F. Supp. 201 (S.D.N.Y. 1990)..............................…......65, 66, 67

*Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772 (D. Md. 2001)….......67

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982)....................................................22

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000).......................................42

*Resid. Adv. Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977)..........................................29, 50

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)…...23

*Schmitz v. St. Regis Paper Co.*, 811 F.2d 131 (2d Cir. 1987)...........................................43

*Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983).............................................66

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)...........................................................18

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984)......................................................24

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982)...........................................29

*Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Com'n of Town of Fairfield,*
790 F. Supp. 1197 (D. Conn.1992)............................................................27

*Sunrise Development, Inc. v. Town of Huntington,*
62 F. Supp. 2d 762 (E.D.N.Y. 1999)...... .......................................................*passim*

*Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,*
808 F. Supp. 120 (N.D.N.Y. 1992)...........................................................27

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)..........................................22

*Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565 (2d Cir. 2003)...............................23

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983)................................22

*United States v. City of Birmingham*, 538 F. Supp. 819 (E.D. Mich. 1982)....................... 29

*United States v. City of Black Jack*, 508 F.2d 1179  (8th Cir. 1974)................................50

*Village of Arlington Heights v. Metro. Hous. Dev't Corp.*, 429 U.S 252 (1977)
*(Arlington I)*...........................................................................*passim*

*Village of Arlington Heights v. Metro. Hous. Dev't Corp.*, 558 F.2d 1283 (7th Cir. 1977)
*(Arlington II)*.......................................................................... *passim*

**State Cases**

*DiScala v. Facilities Development Corp. for Office of Mental Retardation*, 691 N.Y.S.2d 229
(N.Y. City Civ. Ct. 1998).................................................................70

*McMinn v. Town of Oyster Bay*, 105 A.D.2d 46 (N.Y. App. Div. 1984).............................70

**Federal Statues**

42 U.S.C. § 3610……………………………………………………………………………70

Fed. R. Civ. P. 56(c)……………………………………………………………………...17

**State Statutes**

N.Y. Exec. L. § 296.5(a) …………………………………………………………………...70

N.Y. Exec. L. § 300……………………………………………………………………...70

**INTRODUCTION**

This case is about the Anderson family's attempts to build Spring Run Village, a residential development in Saratoga Springs that would provide much-needed affordable housing to low-income families in the City. The Andersons never got the chance to build Spring Run Village because the City blocked the project as part of a continuing discriminatory policy of excluding and segregating African Americans by manipulating its zoning and land use rules to ensure that what little affordable housing is built in the City is contained in a small downtown area. In Saratoga Springs, keeping affordable housing out of the City means keeping African Americans out of the City because African-American families make up a disproportionate percentage of residents in need of affordable housing. Indeed, the lack of affordable housing in the City has contributed to a decline in the City's African-American population while the rest of the City grows. Those few African Americans that remain, live primarily in two segregated downtown areas where affordable housing opportunities exist and the outer areas of the City remain virtually all white.

When the Anderson family sought to build Spring Run Village, a development with fifty to sixty affordable units, on property they own outside the downtown area adjacent to the Northway, they encountered the usual discriminatory opposition and the City predictably bowed to that opposition and blocked the development. The City rejected the Anderson's application and rezoned the site from a classification where high-density residential and commercial uses were "preferred" and "encouraged" to a classification where such a development was prohibited. Under the fair housing laws, a municipality may not allow illegal prejudices of the majority to influence its decisions, but that is precisely what occurred here.

The Supreme Court has created a framework for considering whether discrimination motivated a municipality's decisions. Under that framework, a court may examine the impact of the decisions, the historical context of the decisions, the sequence of events leading up to the decisions, and departures from normal procedures and considerations.

Each of these factors suggests discrimination here.  The impact of the decision is plain:  a significantly higher percentage of African Americans than whites are harmed when affordable housing opportunities are limited.  In Saratoga Springs, 56.7% of African Americans and only 26% of whites meet the income guidelines for affordable housing.  The historical context shows that each and every decision made by the City related to Spring Run Village occurred in the context of virulent and, at times, explicitly discriminatory opposition.  City officials were constantly bombarded by vocal groups of residents who did not want affordable housing in their neighborhoods because it would bring, as described by residents, "Negroes," "spics," "too many children," "crime," "transients," "drug addicts," "undesirables," and "those people" to their neighborhoods and turn their City into an "Albany" or "New York City."  Even knowing that the community opposition was motivated by stereotypical and prejudicial views of the nature of the residents likely to move into affordable units, City officials capitulated to the opposition.

The sequence of events surrounding the Andersons' Spring Run Village application reveals a simple pattern:  the Andersons would raise the possibility of building affordable housing at the Spring Run Village site and the City would, within days and at times hours, respond by using its land use and zoning powers to block the proposal.  Throughout the process, the City blatantly departed from its usual procedures in its attempts to achieve its goals of stopping affordable housing.  The City scheduled different meetings related to Spring Run Village at the very same time to prevent supporters from participating in the process.  It changed procedures for addressing development proposals to avoid having to consider the Spring Run Village application and constantly delayed the process to allow time for a complete zoning change that would permanently block affordable housing in the area.

The City also ignored its own substantive criteria for considering Spring Run Village, including disregarding the recommendations of a committee created by the City specifically to study the Spring Run Village area.  Under the Supreme Court's framework this evidence easily allows an inference of discrimination.

In response to this evidence of discrimination, City officials present one explanation: that they were trying to ensure that the zoning ordinance complied with the City's Comprehensive Plan. This excuse is a pretext. As an initial matter, this explanation was contrived for this litigation and presented through form affidavits from Defendants that contradict their deposition testimony. Three months ago, Defendants could articulate no explanation for their actions, but now they have settled on a *post hoc* explanation and have neatly presented it by form affidavits. The explanation, however, does not work. The Comprehensive Plan, the document that sets forth the City's basic vision for its land use, did not direct that the Spring Run Village area be rezoned, but instead called for a study of the area. Further, even if it had called for a rezoning, in the past, the City has not been concerned about absolute consistency between the zoning ordinance and the Comprehensive Plan and if there was a conflict they would just amend the Comprehensive Plan. Suddenly, however, in the face of mounting evidence of land use decisions motivated by race and familial status, the City argues that there must be strict adherence to an immutable Comprehensive Plan. The evidence demonstrates otherwise.

In addition to the evidence of discriminatory intent, it is undisputed that the City's land use policies, which the City argues justify the Spring Run Village decisions, have an adverse impact on African Americans and perpetuate long-standing patterns of segregation in the City. Under the fair housing laws, those policies are impermissible unless they further a legitimate, bona fide governmental interest and the City can show that no alternative would serve that interest with less discriminatory effect. Not only do the land use policies not serve a legitimate interest, but the City does not even attempt to argue that there are no less discriminatory ways to achieve their asserted purposes. Indeed, City officials admit that the City's land use goals could be served without the current substantial limitations on affordable housing opportunities, which have the effect of excluding and otherwise harming African Americans.

As discussed in detail below, the record, developed through extensive discovery that included the taking of nearly thirty depositions and the production of tens of thousands of pages of documents,

3

reveals that the blocking of the Spring Run Village project by denying the application and rezoning the land was discriminatory and that the City and its officials are liable under federal and state fair housing laws for their actions.  The Andersons should be permitted to build Spring Run Village, which is consistent with the land use the City has long envisioned for the property, and the City can take a major step toward ensuring that many African Americans and families with children can find homes within their means and not be isolated in historically segregated neighborhoods in the center of the City.

## FACTUAL BACKGROUND

I.      **Saratoga Springs, New York**

       A.      **Saratoga Springs Is a Nearly All-White City With an Affordable Housing Crisis.**

Saratoga Springs, New York is a city of just over 26,000 persons located thirty-five miles north of Albany, New York.  Ninety-three and a half percent of the residents are white and only slightly over three percent are African American.  (Ex. 25, Report of Dr. Alan Parnell, Feb. 28, 2007 ("Parnell Report") at Table 1a.)

African Americans in Saratoga Springs have, on average, substantially lower incomes than white residents.  In Saratoga Springs, the median family income of African Americans is $35,288 while the median family income of whites is $61,105.  (Ex. 25, Parnell Report at Table 2.)  As a result, a disproportionate percentage of African-American families live in affordable housing in the City.  (Ex. 53, 1987 Master Development Plan for the City of Saratoga Springs ("1987 Comp. Plan") at 1.7; Ex. 60 2000 Consolidated Plan for the City of Saratoga Springs ("2000 Consol. Plan") at D 3902, 3953; Ex. 24, The Saratoga Springs Comprehensive Plan, adopted July 17, 2001 ("2001 Comp. Plan") at D 311; Ex. 63, 1999 Entitlement Action Plan for the City of Saratoga Springs, May 14, 1999 ("1999 Entitlement Action Plan") at PL 1878-79; Ex. 79, Consolidated Annual Performance and Evaluation Report for the City of Saratoga Springs, July 1, 2004 to June 30, 2005 ("2004 CAPER") at D 9-10; Ex. 95, 2004 Entitlement Action Plan for the City of Saratoga Springs, April 20,

2004 ("2004 Entitlement Action Plan") at PL 494-498, 515-516, 540; Ex. 26, 2006 Entitlement

Action Plan for the City of Saratoga Springs, Apr. 11, 2006 ("2006 Entitlement Action Plan") at PL

9297.) The affordable housing available in the City, however, is vastly inadequate. (Ex. 27,

Affordable Housing Task Force Report, *A Call to Action: Affordable Housing in the City of Saratoga*

*Springs*, June 2003 ("A Call to Action") at 11-15.) The absence of affordable housing, combined

with the rapidly rising housing costs in the City has created significant financial burdens for the

City's low- and moderate-income families. (Ex. 27, A Call to Action at 11-15.)

As Saratoga Springs' own studies establish, "[o]ver one-half of City 'low & moderate-income

households (earning less than 80% of area median) spend more than 30% of their total income on

housing. And nearly 25% of low- and moderate-income households spend more than one-half of

their total income on housing." (Ex. 27, A Call to Action at 12 (emphasis in original). In 2000,

Saratoga Springs estimated that it needed over 2,200 housing units to meet the needs of its very low-,

low-, and moderate-income residents. (Ex. 60, 2000 Consol. Plan at D 3966.) Over the last few

years, that need has grown. In 2006, "[t]he City documented 2700 current households in need of

more affordable housing." (Ex. 90, Inclusionary Zoning Ord. Develop. Committee Memo. To Mayor

Keehn and City Council, Apr. 6, 2006 ("IZOD Comm. Memo., Apr. 6, 2006") at 3.)

Given the demographics of the City, the burdens created by the lack of affordable housing

affect a much greater percentage of African-American and other minority families than whites – a

fact long recognized by City officials. (Ex. 91, Mayor A. Dake Letter to C. Sullivan, HUD, June 27,

1995) (noting that "there does appear to be disproportionate needs exhibited for housing and

community development assistance among Black, Native American and Asian/Pacific Islander

residents"); Ex. 26, 2006 Entitlement Action Plan at D 9297-9300 (identifying disproportionate

housing needs exhibited among Saratoga Springs minority households). In Saratoga Springs, 51.4%

of African American families with incomes between $19,000 and $34,999 have high rent burdens

(defined as spending more than 30% of family income on rent), while only 38.3% of comparable

white families have high rent burdens. (Ex. 25, Parnell Report at 6 & Table 5.)

5

These burdens have contributed to the unique phenomenon of a decrease in the African-American population over the last two decades while the rest of the city has grown.  (Ex. 25, Parnell Report at Table 1a; Ex. 32, S. Minkoff, *Profile of Change: Analysis of Census Data from 1980 to 2000*, August 2003 ("Profile of Change")).

The burdens caused by the lack of affordable housing are also disproportionately borne by families with children.  (Ex. 27, A Call to Action at 12 (concluding that the lack of affordable housing "further impacts renter households with larger families as nearly 55% of large renter households (5+ persons) spend more than 30% of their total income on housing").)

For decades, African Americans in Saratoga Springs have been concentrated in the downtown area where the City's few affordable housing units are located.  (Ex. 26, 2006 Entitlement Action Plan at D 9348-50 (City-created maps showing "concentrations" minority households and low-moderate-income residents); (Ex. 91, A. Dake Letter to C. Sullivan, HUD, June 27, 1995 (identifying census areas of minority concentration)); Ex. 53, 1987 Comp. Plan (recognizing that "[t]he concentration of minorities is generally in the downtown and west side neighborhood"); *see also* Ex. 15, McCabe Dep. at 125-26 (acknowledging concentration of affordable housing in downtown and Westside neighborhoods).)  The concentration of African Americans and other minorities in the downtown area has left the outer areas of the City virtually all-white and the city has a *high* level segregation.  (Ex. 25, Parnell Report at 3-4.)

**B.      Saratoga Springs Has Pursued and Implemented Policies That Have Precluded and Discouraged the Construction of Affordable Housing Opportunities.**

Despite the affordable housing crisis and Saratoga Springs' explicit recognition that "[t]he lack of available affordable housing has significant implications for continuing . . . economic stability and maintaining community diversity," (Ex. 27, A Call to Action at 4; Ex. 5, Benton Dep. at 53 (acknowledging need for affordable housing in Saratoga Springs)), the City has utterly failed to promote or encourage the construction of affordable housing, particularly in the outer areas where creating affordable housing opportunities would have the greatest effect on eliminating patterns of

segregation. To the contrary, the City has explicitly and knowingly implemented and maintained zoning and land use policies that preclude or discourage the development of affordable housing. This has led to a predictable result: virtually no construction of affordable housing.

Since 1994, over two thousand residential units were built in Saratoga Springs, but only *seventeen* were units affordable to low- and moderate-income families and not reserved for seniors. (Ex. 9, Brunelle Dep. at 23-24.) Since 1990, "the vast majority of residential building permits have been issued for single-family homes," which the City has recognized are "prohibitive" to affordable housing. (Ex. 27, A Call to Action at 12.) Meanwhile, numerous applications for developments with affordable housing units have been submitted to the City, but have been prevented by City policies or decisions. One of the most significant of these proposals was Spring Run Village, the development designed and pursued by the Anderson family.

## II.    The Andersons' Spring Run Village Proposal

### A.    The Andersons' Spring Run Village Proposal Presented A Unique Opportunity to Create Affordable Housing Opportunities in Saratoga Springs.

The Anderson family owns three parcels of land in an area of Saratoga Springs that has been termed by the City as the Southern Weibel Avenue District ("SWAD"), which is located adjacent to I-87 ("The Northway") between Union Avenue and Lake Avenue at the intersection of Gilbert Road and Weibel Avenue. (Ex. 28, S. Towne Letter to B. Bristol, Nov. 19, 2004 at 3 (Map of Southern Weibel Avenue District).) The total SWAD area consists of 123.33 acres and the Andersons' parcels account for 115.32 acres or 93% of it. (Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 9-10.)

In 2002, the Anderson family – Gail Anderson, her three children, Susan, Willard, II, and Gregory, and their company, The Anderson Group – began pursuing a residential project with an affordable housing component they called Spring Run Village. The Spring Run Village site is adjacent to a Stewart's gas station and convenience store on Lake Avenue, a major artery into the downtown. (Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 10 (identifying 1.25 acre parcel in the SWAD area owned by Stewart's Shops Corporation.)

7

Spring Run Village was designated as a mixed condominium and rental development with fifty to sixty units maintained as rentals that would be affordable to low- and moderate-income families.  (Ex. 30, Spring Run Village Special Use Permit Application, Oct. 26, 2004 ("Spring Run Village Application, Oct. 26, 2004".)  The plans for the development incorporated Smart Growth and New Urbanist Design concepts, which included walkable neighborhoods, preservation of open space and natural beauty, and proximity to varied shopping and recreation amenities.  (Ex. 12, Ingersoll Dep. at 15-16, 29, 82-83; Ex. 2, Anderson, Gregory Dep. at 84; Ex. 30 Spring Run Village Application, Oct. 26, 2004.)  Spring Run Village preserved the wetland habitat in the area and sixty percent of the parcel was maintained as greenspace.[1]  (Ex. 3, Anderson, W. Dep. at 245-46.)  The Spring Run Village proposal received the unanimous endorsement of Saratoga County's Workforce Housing Partnership.  (Ex. 9, Brunelle Dep. at 25-26; Ex. 69, D. Brunelle Memo to WHP Steering Committee, Nov. 18, 2004 at D 1060-61.)

The fifty to sixty affordable units in Spring Run Village would not only help meet the significant need for affordable housing in the city, but because those affordable units would be disproportionately occupied by African Americans, would also help alleviate some of the racial segregation in the City.  The Spring Run Village site is in a census tract with 2,650 whites and only nineteen African Americans. (Ex. 32, Profile of Change at 15.)  This census tract covers a vast area comprising the entire east side of the city.  (Ex. 32, Profile of Change at 18.)  This area has seen significant residential development with over 800 units being built, but virtually all single-family homes, the majority of which are further from downtown than the Spring Run Village site.  (Ex. 32, Profile of Change at 15; Ex. 86, Summary of Completed Major Residential Developments, March 2005.)

---

[1] The Spring Run Village development was designed for the 44-acre parcel owned by the Andersons in the SWAD area. (*See* Ex. 31 J. Stacey, ACO Property Advisors, Inc. Ltr. To A. Anderson, Jan. 13, 2004 ("ACO Opinion of Value") at 6 (map showing Andersons' SWAD parcels, including "Parcel 2" which is the Spring Run Village site).  The Andersons own adjacent parcels of 71.3 and 42.7 acres that they did not plan to develop and one of which is mostly constrained wetlands that could not be developed. (Ex. 31, ACO Opinion of Value at 1, 6 (identified as "Parcel 1" and "Parcel 4").

**B.**     **When The Andersons Began Plans to Build Spring Run Village, It Was A "Preferred" and "Encouraged" Use.**

When the Anderson family began developing the Spring Run Village plans, the site was zoned as a "special development area" where the preferred uses were "office parks, large offices, and high density residential with surrounding recreational areas, senior housing apartments and assisted care facility." (Ex. 34, Zoning Ordinance of the City of Saratoga Springs, Chapter 240 at Art. II, pp.13-14, 24-25.)  As a high-density residential development with a small commercial component, Spring Run Village was a preferred use that the City "encouraged" for the area.  (Ex. 34, Zoning Ordinance of the City of Saratoga Springs at Art. II, pp.13-14, 24-25.)  In fact, for the preceding decade, the City's Comprehensive Plans had envisioned commercial and/or high-density residential uses in the area. (Ex. 33, 1999 Comprehensive Plan  for the City of Saratoga Springs ("1999 Comp. Plan") at 4.2.5; Ex. 53, 1987 Comp. Plan at 11.8, 11.12.)

At the same time that the Anderson family was conceptualizing Spring Run Village, the City was re-examining aspects of its zoning ordinance in the wake of 2001 amendments to the City's Comprehensive Plan.  The Comprehensive Plan is a document that sets forth the City's visions for land use in the city and provides guidelines for specific land use policies that will achieve that vision. The 2001 Comprehensive Plan, like the preceding 1999 Comprehensive Plan, described an overall land use vision of creating a "City in the Country" in Saratoga Springs.  (Ex. 24, 2001 Comp. Plan at 3; Ex. 33, 1999 Comp. Plan at 1 (entitled "Growing a City in the Country").)

The 2001 Comprehensive Plan did not articulate a specific vision for the SWAD area, where the Spring Run Village site was located, but instead stated that "[a] consultant should be retained to assist with the preparation of [sic] land use for the area . . . .  The plan should be developed with significant public participation.  It should address design standards, traffic calming actions, road realignment and mixed land uses." (Ex. 24, 2001 Comp. Plan at 54.)  In accordance with the instruction of the Comprehensive Plan, a committee was appointed to study the land use options for the SWAD area, the so-called Weibel Avenue - Gilbert Road Study Advisory Committee, which

9

began its work in late 2002.[2]

Meanwhile, the City also created a Zoning Ordinance Review Committee to implement the specific zoning guidelines suggested in the 2001 Comprehensive Plan. After numerous meetings, consultations, and research, the Zoning Ordinance Review Committee presented over one hundred pages of recommended amendments to the zoning ordinance. For the SWAD area, the Zoning Ordinance Review Committee recommended that no zoning changes be made until the Weibel Avenue - Gilbert Road Study Advisory Committee could finish examining potential land use plans for the area. (Ex. 36, Zoning Ordinance Review Committee, Summary of Proposed Amendments to Saratoga Springs Zoning Ordinance ("Summary of Proposed Amendments") at D 2031.)

C.     **The City Rezones the Andersons' Property In Response to Their Proposal to Include Affordable Housing Units in Spring Run Village.**

Initially, City Council members agreed that the 2001 Comprehensive Plan called for studying the SWAD area before taking any zoning action. (Ex.37, Mayor K. Klotz Letter to S. Touhey, Sept. 16, 2002 (noting his understanding that the Zoning Ordinance Review Committee was going to recommend that the study of the area be completed before any final zoning action is taken by the City Council and that he believed this recommendation would be consistent with the direction of the Comprehensive Plan).) However, on May 16, 2003, one of the Andersons' children, Susan Touhey, presented their vision of Spring Run Village to the Weibel Avenue - Gilbert Road Study Advisory Committee. (Ex. 21, Touhey Dep. at 64-65; Ex. 38, Weibel Avenue/Gilbert Road Study Area Advisory Committee Meeting Agenda/Notes, May 16, 2003.) Susan's presentation included describing the affordable housing component of the development. (Ex. 21, Touhey Dep. at 65.)

Four days later, the City Council adopted all of the Zoning Ordinance Review Committee's recommendations for amendments to the Saratoga Springs zoning ordinance, with one exception:

---

[2] The 2001 Comprehensive Plan described the area to be studied as "the Gilbert Road/Weibel Avenue intersection area." (Ex. 24, 2001 Comp. Plan at 54.) Ultimately, the committee appointed to conduct the study examined land use options for the SWAD and some neighboring areas. (Ex. 35, Weibel Avenue/Gilbert Road Study Area Advisory Committee, *Lake Avenue Country Gateway: Visions and Recommendations*, October 2003 ("Weibel Avenue/Gilbert Road Study Report") at 15 (study area map).)

instead of waiting for the land use study for the SWAD area, the City Council decided to immediately "downzone" the area to "Rural Residential-1" ("RR-1"), which allows only one housing unit for every two developable acres. (Ex. 39, City Council Minutes, May 20, 2003 at 7.); Defs. Statement of Material Facts ¶ 64. Most significantly, the zoning change prevented the development of Spring Run Village, which overnight went from a "preferred" and "encouraged" use to a prohibited use.

In fact, the downzoning eliminated any possibility of the construction of any affordable housing units, which is not viable under the City's RR-1 zoning classification. (Ex. 78, S. Raphael Report, February 27, 2007 at 2-3; Ex. 9, Brunelle Dep. at 44-45; Ex. 24, 2001 Comp. Plan at 25; Ex. 60, 2000 Consol. Plan at D 3902).) The Spring Run Village site is a forty-four-acre parcel with approximately 10 acres of constrained wetlands. Under the RR-1 zoning, which requires a minimum base density requirement of 0.5 units/acre, only seventeen units of housing could be constructed. (Ex. 71, Spring Run Village Special Use Permit Application, December 15, 2004, at D 234 (noting 10.33 acres of constrained wetlands); *see also* Ex. 96, Supplemental Discussion of the EAF – Rezoning of SWAD, Sept. 3, 2004 at 465 (stating that only 49 homes can be built on entire 123 acres of SWAD.) Defendants reference "clustering," but that would not change the base density and would only allow the possibility of locating each of the seventeen permitted units on the Spring Run Village site on lots less than two-acres. (Ex. 36, Summary of Proposed Amendments at D 1927; Ex. 23, Welti Dep. at 167-68 ("Knowing what we know about the value of land and homes in Saratoga, we weren't counting on [clustering]" to lower housing prices) .)

In the area around the SWAD, vacant two-acre lots have assessed values around $200,000. (Ex. 25, Parnell Report at 7.) Under RR-1 zoning, the only realistic possibility of development of the Anderson's property would be the over half million dollar homes that were being built on large lots in neighboring areas. (Ex. 25, Parnell Report at 7 Ex. 39, City Council Minutes, May 20, 2003 at 5 (McCabe expressing support for downzoning SWAD area because fourteen, million dollar homes could be built there).) Few, if any, African Americans could afford such homes. A total of six Saratoga Springs African-American households make between $150,000 and $200,000 and no

11

African American households earn more than $200,000.  (Ex. 25 Parnell Report at 7.)  The downzoning, hastily done, within days of hearing of the Anderson family's plans for affordable and rental housing, virtually guaranteed that almost all Saratogians that moved into any development on the land would be white.

The Mayor explicitly admitted that the rezoning of the SWAD and Spring Run Village site, which was contrary to the Zoning Ordinance Review Committee's recommendation, was in response to "strong sentiment from the community."  (Ex. 39, City Council Minutes, May 20, 2003 at 7.)  That strong sentiment included thinly veiled references to the likely racial composition of a development on the Anderson property and explicit references to the number of children that would move there.  (Ex. 39, City Council Minutes, May 20, 2003 (residents suggesting that allowing development of the Anderson property would turn Saratoga Springs into a place like Albany and would lead to an increase in crime; increase the burden on schools; and that the Council should "think about the children and not zone this with a high density use.").

> **D.      When the New York Supreme Court Reversed Saratoga Springs' Last-Minute Rezoning, the Andersons Restarted Efforts to Design and Build Spring Run Village.**

The Andersons challenged the rezoning of the SWAD area and on May 10, 2004, New York Supreme Court Judge Nolan annulled the rezoning, finding that the City had failed to comply with the State Environmental Quality Review Act ("SEQRA").  (Ex. 40, *In the Matter of Gail Anderson*, Order, May 10, 2004 ("Judge Nolan Decision"))  The Court reinstituted the previous "special development area" zoning classification.  (Ex. 40, Judge Nolan Decision)

With Spring Run Village again a preferred use under the applicable zoning ordinance, the Anderson family resumed its efforts to develop the Spring Run Village.  Beginning in late May 2004, the Andersons retained an architect, engineers, obtained the assistance of affordable housing experts, and designed Spring Run Village.  (Ex. 12, Ingersoll Dep. at 19-20; Ex. 41, LA Group Retainer, June 15, 2004.)

**E.      The Saratoga Springs City Council Moves to Downzone the Andersons' Again Immediately After the Anderson Family's Presentation on the Affordable Housing Component of Spring Run Village.**

On July 29, 2004, the Andersons presented their plans for Spring Run Village and, in particular, its affordable housing component, to the County's Workforce Housing Partnership. (Ex. 12, Ingersoll Dep. at 37-39.)  The Workforce Housing Partnership had a City Planning Board member and City employee on its Board and within hours of the Andersons' presentation, the City Planner told the Deputy Mayor that "something was up" on the Anderson family's property and that the City "needed to get going on the rr-1 [sic] rezoning." (Ex. 42, M. Ingersoll Email to W. Anderson, July 29, 2004; Ex. 12, Ingersoll Dep. at 40-41.)  Once again, faced with the prospect of the Anderson family building a residential development with fifty to sixty units of housing affordable to low- and moderate-income residents, the City immediately began efforts to prevent the development.

The City quickly approved the hiring of a consultant to do a SEQRA analysis of the proposed downzoning – the step the City skipped in its first hasty downzoning of the property. (Ex. 43, City Council Minutes August 11, 2004 at 3.)  Initially, it appeared that there was some prospect that the City would adopt a zoning change for the SWAD area that would allow Spring Run Village to proceed when the Council sought an advisory opinion from the Planning Board on rezoning only a portion of the SWAD area to RR-1 and leaving the Spring Run Village site as a special development area. (Ex. 44, S. Towne Letter to Planning Board Members, October 15, 2004.)  However, as Planning Board member Lewis Benton describes it, "the community turned up the heat" and the City abandoned the possible compromise because "it wouldn't pacify the public." (Ex. 45, L. Benton Email to Planning Board Members, Jan. 30, 2005 at 1-2.)

The community's objections included references to the number of children and the type of people that would live in Spring Run Village.  For example, one resident during the October 5, 2004 City Council meeting in describing her position said "I mean, again, it's our town.  It's our children.  It's our schools.  It's our infrastructure.  We need you people to protect it… [i]t's going to be a lot of transient people that are going to come into the area so you're going to have

13

transient employment, transient residents and ultimately, what's the future?" (Ex. 54, Transcript, City Council Meeting, Oct. 5, 2004 ("10/5/04 City Council Tr."))

In response to the City Council's request for an advisory opinion to rezone only a portion of the SWAD area, the Planning Board returned an opinion to the City Council suggesting that the City Council downzone the entire SWAD area, including the Spring Run Village site. (Ex. 46, Planning Board Minutes, Nov. 3, 2004 at 7-11.) Despite the Planning Board's opinion, at least one City Council member continued to push for a compromise that would allow the Andersons to develop Spring Run Village. (Ex. 47, City Council Minutes, Nov. 16, 2004 (City councilmember Towne suggesting downzoning only a portion of the SWAD area).) But the opposition was too great, and led by Councilmember McCabe, the City Council held a "surprise" vote – the vote was made during a budget workshop being held at precisely the same time the Planning Board was holding a hearing on the pending Spring Run Village application – to seek the required advisory opinion from the Planning Board on rezoning the entire SWAD. (Ex. 70, City Council Minutes, Nov. 17, 2004 at 4; Ex. 7, Bornemann Dep. at 213 (City Planner stating that it is "very unusual" for the City Council to meet on same night as the Planning Board).)

Councilmember McCabe admits that his sole source of information regarding downzoning the SWAD area came from neighboring residents, one of whom later admitted that she did not want affordable housing in her neighborhood because she would not want "those people," "spics" and "Negroes" living near her. (Ex. 12, Ingersoll Dep. at 100-101; see also Ex. 15, McCabe Dep. at 68-69.) Others residents explicitly objected to the number of children that would move into the development. Some neighbors used thinly veiled code words when objecting to Spring Run Village development and urging the City Council to rezone the property. References to drug addicts, increased crime, "those people," and to Saratoga Springs turning into Albany or New York City were made throughout the process. (Ex. 9, Brunelle Dep. at 68.)

On December 8, 2004, in response to the City Council's request, the Planning Board issued an opinion supporting the rezoning of the entire SWAD area, including the Spring Run Village site.

(Ex. 29, Planning Board Minutes, Dec. 8, 2004.)  Before rezoning the property, however, the City

Council had to obtain an opinion from the County.  (Ex. 88, G. Bornemann Email to S. Towne, Dec.

20, 2004.)  On January 31, 2005, the County issued a unanimous opinion opposing the rezoning.

(Ex. 48, City Council Meeting Minutes, Feb. 1, 2005 at 5.)  Nonetheless, on February 1, 2005, the

City Council voted to rezone the entire SWAD to RR-1, again precluding any possibility of the

development of Spring Run Village or any other affordable housing.  (Ex. 48, City Council Minutes,

Feb. 1, 2005 at 5.)

F.    **The Saratoga Springs Planning Board Made Every Effort to Ensure That the Anderson Family's Spring Run Village Proposal Would Not Be Approved.**

While the City Council pursued its efforts to rezone the SWAD area, the Andersons continued

their plans to develop Spring Run Village.  In September, 2004, the Andersons submitted an

application to Saratoga Springs.  The Planning Board responded with a series of delaying tactics to

avoid consideration of the Spring Run Village application until the City Council could complete its

downzoning.

As a special development area, any development of the Spring Run Village site required a

special use permit from the Planning Board.  Ex. 34, Zoning Ordinance of the City of Saratoga

Springs at Art. II, pp.13-14, 24-25.)  Following the special use permit process, the Andersons

submitted the Spring Run Village application to the City Planner for a "completeness review."  (Ex.

49, Spring Run Village Application, Sept. 23, 2004.)  After two reviews, the Spring Run Village

Application was submitted to the Planning Board and scheduled for a public hearing.  (Ex. 50, Spring

Run Village Application, October 13, 2004; Ex. 30, Spring Run Village Application, Oct. 26, 2004.)

On November 17, 2004, the Planning Board began a public hearing on the Spring Run Village

application.  The hearing was stopped, however, when the Assistant City Attorney announced that the

City Council had taken the vote, as described above, to seek an advisory opinion from the Planning

Board to rezone the SWAD area to RR-1.  (Ex. 51, Planning Board Minutes, Nov. 17, 2004 at 6.)

Before the hearing was interrupted, however, the community residents made their views on the

15

project clear.  During the Planning Board public hearings, community members stated that the

Spring Run Village site was not a place where affordable housing should be located and people

of "that type" should not live there.  (Ex. 12, Ingersoll Dep. at 94.)  Residents also opposed

Spring Run Village before the Planning Board based on the number of children that would live

in Spring Run Village, saying "these people have a lot of kids" and will "flood the school

district."  (Ex. 12, Ingersoll Dep. at 95.)

On December 8, 2004, the Andersons appeared before the Planning Board again seeking a

decision on the Spring Run Village application.  The Planning Board rejected the application on a

manufactured technicality about the requirement of a connecting road if there was a commercial

aspect to the project, a "requirement" that even the City Planner noted was open to "interpretation."

(Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 15-16; Ex. 12, Ingersoll Dep. at 90-91.)[3]  Indeed,

the Anderson family's proposal contemplated realigning the dangerous Gilbert Road/Lake Avenue

intersection, fulfilling the function that would have been served by the connecting road, but the

Planning Board still rejected it.  (Ex. 12, Ingersoll Dep. at 88-89.)

Again, the community residents expressed their discriminatory opposition to the development

based on who would live in the affordable housing units in the development.  Multiple residents

stated their belief that the SWAD and Spring Run Village site was the wrong area for affordable

housing.  (Ex. 29, Planning Board Meeting, Dec. 8, 2004 Transcript ("I believe this is the wrong

place for affordable housing"); Ex. 29, Planning Board Meeting, Dec. 8, 2004 Transcript ("Are we

going to do the same eventually, if somebody has a foot in the door, with a change in the

zoning or if it's not that RR1, are we going to see affordable housing?").)

When the Andersons resubmitted their application, having resolved the through road

technicality by removing the commercial component of the development, the Planning Board refused

---

[3] In fact, a through road would likely have been an impossibility given the wetlands it would have to cross.  (Ex. 31, ACO Opinion of Value at 1, 6 (identifying the percentage of wetlands in and "Parcel 4" which a through road would have to cross); (Ex. 52, G. Bornemann, *List and Analysis of Possible Amendments to the Comprehensive Plan*, July 6, 2001 ("G. Bornemann, Analysis of Possible Amendments to 2001 Comp. Plan") at 33679-80 (noting Comprehensive Plan Review Committee's conclusion that road extension was neither desirable nor feasible).)

to put it on its next two agendas; instead delaying consideration of the application until February 2, 2005, after the City Council meeting set for downzoning the property. (Ex. 56, R. Bristol Email to P. Lynch, Jan. 6, 2005.)

On February 2, 2005, the Planning Board concluded that it need not consider the Spring Run Village application because of the City Council's rezoning of the property to RR-1 the previous night. (Ex. 57, Planning Board Minutes, Feb. 2, 2005 at 2.)

Consistent with the Planning Board's conclusion, when the City rezoned the SWAD area RR-1, Spring Run Village was no longer a possibility on the Anderson's property and their attempts to build affordable housing had been scuttled. Spring Run Village suffered the same fate as numerous other previous and subsequent proposals to build affordable housing in Saratoga Springs. None has been successful and the low- and moderate-income residents of Saratoga Springs, who are disproportionately African American and families with children, continue to face the significant housing costs caused by the inadequate supply of affordable housing in the city. The Spring Run Village site remains vacant with the only development prospect being half-million dollar or more homes that would be virtually guaranteed to be occupied by whites.

## LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56(c)); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165,170 (2d Cir. 2006) (citation omitted). All reasonable inferences must be drawn in favor of the nonmoving party. *See Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986) (citation omitted); *see also SEC. v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005). "A 'genuine'
dispute over a material fact only arises if the evidence would allow a reasonable jury to return a
verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)
(citation omitted). However, "[c]onclusory allegations, conjecture and speculation ... are insufficient
to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

## ARGUMENT

Defendants make four basic arguments in response to Plaintiffs' discrimination claims.
First, Defendants make the threshold argument that The Anderson Group does not have standing to
bring its claims. Second, Defendants argue that Plaintiffs have not adduced sufficient evidence for a
trier to fact to find that Defendants violated the Fair Housing Act under a disparate impact or
disparate treatment theory. Third, Defendants assert that the individual Defendants are immune.
Fourth, Defendants assert that Plaintiffs have failed to state a claim under the New York Human
Rights Law. None of these arguments has merit. Defendants fail to acknowledge the vast majority of
facts adduced in this matter and their scant legal analysis is fatally flawed.

Plaintiffs will address, in turn, the legal and factual defects in each of these four
arguments. In addition, Plaintiffs will discuss the undisputed facts establishing that the zoning and
land use policies challenged here have a disparate impact in violation of the Fair Housing Act and
entitle Plaintiffs to judgment in their favor on that claim.

## I.    The Anderson Group Has Standing to Bring Its Fair Housing Act Claims Under Controlling Supreme Court Precedent.

Defendants' assertion that that The Anderson Group does not have standing to challenge the
discriminatory rezoning of the SWAD area and denial of the Spring Run Village application is
contrary to the plain language of the Fair Housing Act and decades of controlling Supreme Court
precedent.

A.    **Standard for Establishing Standing Under The Fair Housing Act.**

The Fair Housing Act permits any "aggrieved person" – defined as anyone who "claims to have been injured by a discriminatory housing practice" – to bring an action under the Act. 42 U.S.C. §§ 3602(i)(1), 3613(a)(1)(A).  This definition confers standing as broadly as is permitted by Article III of the Constitution.  *See, e.g., Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103-04 n.9 (1979).  To establish standing under that standard the plaintiff must make three showings. First, a plaintiff must establish that the challenged action caused him "injury in fact."  *Village of Arlington Heights v Metro. Housing Dev. Corp.*, 429 U.S 252, 260-61 (1977) ("*Arlington I*"). Second, although the injury may be indirect, it must be "fairly traceable" to the defendant's conduct. *Id.*  Third, the plaintiff must show his injuries are likely to be redressed by a favorable decision.  *Id.* at 262.

Developers challenging discriminatory zoning decisions that prevent their plans to build homes that would be disproportionately occupied by members of a protected class have frequently been granted standing.  For example, in *Arlington Heights I*, there could be "little doubt" that the plaintiff developer met the constitutional requirements for standing where it sought to build racially integrated low and moderate income housing but was prevented from doing so by the defendant's zoning policies.  *Id.*  at 261-62.  Similarly, in *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988), a group that was sponsoring an affordable rental housing project successfully challenged the Town's discriminatory zoning polices that prevented the group from pursuing the project.

B.    **The Anderson Group Readily Meets the Standing Standard Under the Fair Housing Act.**

It is undisputed that The Anderson Group, as the developer of the Spring Run Village site was injured.  The Anderson Group expended substantial time and thousands of dollars in costs and resources creating the plans and preparing the applications for Spring Run Village and was denied the income that would have come from developing and managing the project.  (Ex 3, Anderson, W. Dep.

at 123-24 (describing categories of damages to The Anderson Group as a result of being prevented from developing Spring Run Village); Ex.2, Anderson, Gregory Dep. at 340; Ex. 58, LA Group Invoice to The Anderson Group (ledger reflecting payments of over $38,000 to LA Group for design of Spring Run Village).) These undisputed injuries meet the first requirement of standing.

Second, these injuries are fairly traceable to Defendants' conduct. Absent the Defendants' rezoning the SWAD area and denying the Spring Run Village application, The Anderson Group would have been able to develop Spring Run Village. As in *Arlington Heights*, the Defendants' actions here create a bar to building Spring Run Village. *See Arlington Heights*, 429 U.S at 261. The mere fact that there is no guarantee that Spring Run Village would be built even with non-discriminatory zoning in place does not change the analysis. *See id.* (granting developer standing even though it "would still have to secure financing, qualify for federal subsidies, and carry through with construction"). The Supreme Court has recognized that "all housing developments are subject to some extent to similar uncertainties" but where the development proposal is sufficiently detailed and specific, it eliminates "any need for the Court to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." *Id.* at 261-62. The Spring Run Village Proposal was very specific and Plaintiffs had made substantial progress in furthering the project.

Third, a favorable decision here will redress The Anderson Group's injuries by lifting the discriminatory zoning that is a complete obstacle to the development of Spring Run Village. Absent the restrictive zoning, The Anderson Group would continue its efforts to build the development.

**C.    Defendants' Focus on The Anderson Group's Legally Enforceable Rights is Misplaced.**

Defendants' assertion that The Anderson Group does not have a "legally enforceable right" to develop the Spring Run Village site does not alter the standing analysis. First, there is no evidence of an absence of such a right. It is undisputed that The Anderson Group and Gail Anderson, who is both the owner of the land and a partner of The Anderson Group, agreed that The Anderson Group would

20

develop the parcel.  (Ex. 1, Anderson, Gail Dep. at 61; *see also* Ex. 30, Special Use Permit

Application, October 26, 2004 (listing both Gail Anderson and The Anderson Group as applicants for

special use permit).)  The Anderson Group's efforts to develop Spring Run Village were made

pursuant to that agreement.

      Second, even if there were not a "legally enforceable right," The Anderson Group would still

have suffered the injury of its unrecouped costs and denial of the ability to develop Spring Run

Village.  Those injuries would still be a result of Defendants' discriminatory zoning actions, which

precluded the development and an injunction removing the discriminatory zoning would redress the

injuries.

      The facts establish that The Anderson Group has standing to challenge Defendants'

discriminatory rezoning of the SWAD area and denial of the Spring Run Village application.

Accordingly, we now consider the basis for The Anderson Group and Gail Anderson's Fair Housing

Act claims.

## II.    Plaintiffs' Fair Housing Act Claims Are Amply Supported by the Facts Adduced in Discovery.

### A.    A Violation of the Fair Housing Act May Be Established By Showing Disparate Treatment or Disparate Impact.

      An act violates the Fair Housing Act if it is motivated by animus against a protected

characteristic or has a disparate impact on a protected group because a disproportionate percentage of

the protected group is affected or because it perpetuates segregation.  *See Huntington*, 844 F.2d at

934-5, 937.  Defendants' actions here violated the Fair Housing Act under each of these theories,

which we now address in turn.

### B.    Standard for Considering Plaintiffs' Disparate Treatment Claims

      Summary judgment is rarely appropriate where discriminatory intent is at issue.  *See, e.g.,*

*Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  Any examination of intent

or motivation, which requires assessing the totality of the relevant facts shown by all available direct

and circumstantial evidence and assessments of credibility, typically falls within the province of the

jury. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289-90 (1982) (holding that "discriminatory

intent is a finding of fact" to be made by the trier of facts); *see also Anderson*, 477 U.S. at 255

("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge.").

Claims of discrimination supported by circumstantial evidence typically proceed under the

familiar *McDonnell Douglas* burden-shifting framework. Under this framework, the plaintiff first

has the burden of presenting sufficient evidence to permit a finding of a *prima facie* case or inference

of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of

Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). If the evidence allows an inference of discrimination,

the defendant must present evidence of a legitimate, non-discriminatory reason for the challenged

actions. *See Burdine*, 450 U.S. at 248, 252. The plaintiff may then show that the reason offered by

the defendant was merely a "pretext" for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

**C.     The Evidence Supports an Inference of Discrimination**

> **1.     The Standard for Determining Whether a Plaintiff Can Meet the Burden
> of Establishing an Inference of Discrimination**

The standard for establishing an inference, or *prima facie* case, of discrimination is

necessarily flexible and varies with the facts presented in different cases. *See Burdine*, 450 U.S. at

253 n.6. As noted by the Supreme Court, "[t]he *prima facie* case method established in *McDonnell

Douglas* was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible,

orderly way to evaluate the evidence in light of common experience as it bears on the critical

question of discrimination.'" *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)

(quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Simply put, an inference of

discrimination can be established under the *McDonnell Douglas* framework if a plaintiff

demonstrates that a set of acts, if otherwise unexplained, is more likely than not based on the, at least

partial, consideration of an impermissible factor.[4] *Furnco Constr. Corp.*, 438 U.S. at 577.

In the context of discrimination by a municipality in a housing-related action, an inference of discrimination is frequently shown through an inquiry into the following factors: 1) discriminatory impact; 2) the historical background of the decision; 3) the sequence of events leading up to the challenged decision; 4) departures from normal procedural sequences; and 5) departures from normal substantive criteria. *Arlington Heights I*, 429 U.S. at 265-68; *see also Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565 (2d Cir. 2003); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.1995) (applying *Arlington* factors to determine discriminatory intent in FHA claim); *Sunrise Development, Inc. v. Town of Huntington, New York*, 62 F. Supp. 2d 762 (E.D.N.Y. 1999). As noted by the *Tsombanidis* Court, the *Arlington* factors are not "exclusive or mandatory but merely a framework within which a court conducts its analysis." *Tsombanidis*, 352 F.3d at 580 (2d Cir. 2003). Courts have repeatedly rejected defendants' attempts to analyze each fact in isolation and have mandated that all evidence proving discriminatory intent be considered as a whole. *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002).

Plaintiffs now turn to the specific evidence in this case that permits an inference of discrimination.

### 2. Plaintiffs Have Presented Substantial Statistical Evidence of Discrimination

The first category of evidence that supports an inference of discrimination in this case is the statistical evidence regarding the impact of Defendants' decisions to rezone the SWAD area to RR-1 and deny the Spring Run Village application. The statistical evidence shows that a disproportionate number of the families affected by Defendants' actions are African-American.

A significant disparity in the statistical picture is sufficient standing alone to support an inference of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977)

---

[4] *See, e.g., Arlington Heights I*, 429 U.S. at 265 (holding that plaintiff need only establish that the protected characteristic was *one* factor in the challenged decisions and is not required "to prove that the challenged action rested *solely on . . .* discriminatory purposes") (emphasis added).

(holding that statistics alone can prove intentional discrimination); *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1468 n.15 (6th Cir. 1990) (same); *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984) (holding that statistical evidence can create an inference of disparate treatment); *see also Arlington Heights I*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.").

> **i.    The Statistical Evidence Establishes A Significant Racial Disparity among those Affected by Defendants' Actions.**

Defendants' actions prevented the Andersons from building Spring Run Village, which would have included fifty to sixty units affordable to low- and moderate-income families. It is undisputed that African-American families would be disproportionately overrepresented in such units. Under federal standards, families qualify for federally subsidized housing units if they earn less than 80% of the area median income, which in the Saratoga Springs area is $39,760. In the Albany-Schenectady-Troy metropolitan statistical area, 67.2% of African-American families earn less than $39,760 while only 29.3% of white households earn less than $39,760. The differences are similar in Saratoga Springs where 56.7% of African-American families earn less than $39,760 and only 26% of white families earn less than $39,760. (Ex. 59, Fairley Report at 8, 9, App. 2.)

Under Defendants' preferred measure of discrimination – the odds ratio – there is a significant difference between African-Americans and white families who qualify for affordable housing in the Saratoga Springs area. (Ex. 59, Fairley Report at 8-9.) Courts have not established a precise threshold odds-ratio that establishes a significant difference in the fair housing context, but the 3.7 odds ratio for the Saratoga Springs market and the 5.0 odds ratio for the Albany-Schenectady-Troy metropolitan statistical area are indisputably significant and far greater than the 1.2 or five-fourths rule frequently used in the employment discrimination context.[5] (Ex. 11, Fairley Dep. at 84-85

---

[5] Based on Defendants' own expert's data, the racial composition of families with incomes under $39,760, *i.e.*, eligible under federal income guidelines for affordable housing in Saratoga Springs and the Albany metropolitan statistical area, is as follows:

(Defendants' expert acknowledging the use of the five-fourths rule in the employment context).)

Not only do significantly greater percentages of African-American families qualify for affordable housing, but they also have a greater need for affordable housing. (*See, e.g.*, Ex. 91, Saratoga Springs Mayor A. Dake Ltr. to HUD, June 27, 1995) (noting that "there does appear to be disproportionate needs exhibited for housing and community development assistance among Black, Native American and Asian/Pacific Islander residents."); (Ex. 5, Benton Dep. at 47-48 (acknowledging that minorities are disproportionately represented in low- and moderate-income households in Saratoga Springs).) As described by Mayor Klotz:

> Q    Do you recall that -- ever seeing analyses
> showing that racial and ethnic minorities faced
> greater housing-cost burdens in the City as compared
> to white households?
>
> ****
>
> A    I don't have specific memories of
> Particular documents, but that's a general -- a
> general trend in the country, that I'm aware of,
> that the City didn't escape.

(Ex. 13, Klotz Dep. at 19.)

---

**Saratoga Springs**

| Race of Families | Eligible for Affordable Housing | Ineligible for Affordable Housing | Total | Percent Eligible |
|---|---|---|---|---|
| African-American | 89 | 68 | 157 | 56.7% |
| White | 1,440 | 4,090 | 5,530 | 26% |
| Total | 1,529 | 4,158 | 5,687 | |

**Albany MSA**

| Race of Families | Eligible for Affordable Housing | Ineligible for Affordable Housing | Total | Percent Eligible |
|---|---|---|---|---|
| African-American | 7,432 | 3,626 | 11,058 | 67.2% |
| White | 35,419 | 85,423 | 120,842 | 29.3% |
| Total | 42,851 | 89,049 | 131,900 | |

(Ex. 59, Fairley Report at 8, 9, App. 2.) The odds ratio for comparing the likelihood that an African American vs. a white family from Saratoga Springs would occupy an affordable housing unit is 3.7 (89/68)/(1440/4090). The odds ratio for comparing the likelihood than an African American vs. a white family from the Albany metropolitan statistical area would occupy an affordable housing unit is 5 (7,432/3,626)/(35,419/85,423). The odds-ratios are calculated by Dr. Fairley's method of comparing the proportion of eligible and ineligible African-American families to the proportion of eligible and ineligible white families.

25

Simply put, a significantly greater percentage of low- and moderate-income African-American families pay more than 30% of their income for housing than the percentage of low- and moderate-income white families that pay more than 30% of their income for housing. As a result, "[t]here is clearly a greater need for affordable housing among African-American families" (Ex. 25, Parnell Report at 6), and in the absence of sufficient affordable housing, the number of African Americans in the City has declined over the last two decades. (Ex. 32, Profile of Change at 4, 8) (report of City of Saratoga Springs presented to the City Council and Planning Board noting the decrease in black population); (Ex. 7, Bornemann Dep. at 9-10; Ex. 5, Benton Dep. at 41 (acknowledging knowledge of the declining African-American population in Saratoga Springs).)

This evidence establishes that the City's actions that preclude Spring Run Village and its affordable housing component disproportionately affected African Americans, supporting an inference of discrimination. As Defendants' own expert testified, the small numbers of African Americans in Saratoga Springs "would be consistent with some segregation policy on the part of the whole city to keep out African Americans . . . ." (Ex. 11, Fairley Dep. at 113.).

### 3.    The Evidence Shows that The City Capitulated to Discriminatory Opposition to the Affordable Housing Component of Spring Run Village.

A central issue considered by courts examining the second *Arlington Heights I* factor – the historical context of the challenged decision – is whether the challenged decision was made in the context of discriminatory opposition from neighbors and other residents. The Second Circuit has made clear that "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys. Inc. v. City of White Plains,* 117 F.3d 37, 49 (2d Cir. 1997). As another District Court has simply stated:

> "*a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.* A ... discriminatory act would be no less illegal simply because it enjoys broad public support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."

*Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Com'n of Town of Fairfield*, 790 F.

Supp. 1197 (D. Conn 1992) (emphasis in original) (quoting *Association of Relatives and Friends of*

*AIDS Patients,* 740 F. Supp. 95, 105 (D.P.R.1990)); *see also Sunrise Development, Inc.*, 62

F.Supp.2d at 762 (concluding that the defendants were likely swayed by discriminatory animus

present in the community because local residents were "quite vocal" in their opposition to

development and criticized the "appearance and activity" of the development and asserted that it

would "alter the residential character" of the community); *Support Ministries for Persons with AIDS,*

*Inc. v. Village of Waterford, N.Y.,* 808 F. Supp. 120, 134 (N.D.N.Y. 1992) (holding that zoning

officials who "bowed to political pressure" by those with animus against people with alcohol- and

drug-related disabilities violated Fair Housing Act); *Cmty. Housing Trust v. Department of Consumer*

*and Regulatory Affairs,* 257 F. Supp. 2d 208 (D.D.C. 2003) (finding that government officials'

decision to classify group home as a particular use with greater regulatory requirements was

motivated at least in part by community's discriminatory opposition to the home).

### i.      Every Relevant City Decision Was Made in the Context of Discriminatory Opposition.

Every one of Saratoga Springs' decisions related to rezoning the SWAD area and denying the

Spring Run Village application occurred in the context of virulent community opposition.  That

opposition was largely motivated by discriminatory animus toward the classes of people likely to live

in the development.[6]

Nancy Goldberg, one of the members of the public who lives near the Spring Run Village

area and advised Councilmember McCabe as he led the effort to rezone the SWAD area stated her

views clearly:  She did not want affordable housing in her neighborhood, because she would not want

"those people," "spics" and "Negroes" living near her. (Ex. 12, Ingersoll Dep. at 100-101; *see also*

Ex. 15, McCabe Dep. at 63, 68-69, 90-92, 108-09 (Councilmember McCabe admitting that the only

---

[6] Blatant discrimination against African Americans is undoubtedly present in the area.  One City official testified regarding a Klu Klux Klan rally ten miles outside of Saratoga Springs.  (Ex. 18, Mirling Dep. at 13.)

information he received from any source about the rezoning of the Spring Run Village site and surrounding area was from Ms. Goldberg and other neighbors); Ingersoll Dep. at 58 (recounting Commissioner McCabe's statement that he would have to check with his "support group" or "neighbors" before he discussed Spring Run Village further).) Ms. Goldberg is now the chair of the Saratoga Springs Zoning Board of Appeals and is the vice-chair of the current Comprehensive Plan committee. (Ex. 12, Ingersoll Dep. at 99.)

Ms. Goldberg's opposition to affordable housing was shared by City officials. As Planning Board member William McTygue expressed his opinion in deposition, "[t]he [Spring Run Village] applicant, as I recall, was offering up the notion that the project would be again affordable. *Based on that alone*, I believe that I was desirous of continuing with a land use pattern that had existed for many many years . . . . " (Ex. 17, W. McTygue Dep. at 79) (emphasis added).) Residents of the City had similar views: "I believe this is the wrong place for affordable housing" and "if it's not that RR1, are we going to see affordable housing?" (Ex. 55, 12/0/04 Planning Bd. Tr.) As Planning Board member William McTygue described the public's opposition: "Q: [D]id any of public opposition relate to the type of residents who would live in the Anderson's development? . . . A: Only that the project is promoted as affordable housing." (Ex. 17, McTygue, W. Dep. at 70.)

Why the specific opposition to affordable housing? Ms. Goldberg described it clearly, because of the type of people that would live there. Some residents tried to disguise their prejudices by using thinly veiled code words and phrases to describe their opposition to the kind of people that would live in the Andersons' development. (Ex. 54, 10/5/04 City Council Tr.) (resident, in describing her opposition to the project to the City Council, stating "It's going to be a lot of transient people that are going to come into the area so you're going to have transient employment, transient residents and ultimately, what's the future?"). Another resident drew an analogy to Albany and noted that there would be an increase in crime if the SWAD area was not rezoned. (Ex. 39, City Council Minutes, May 20, 2003 at 2.) Others feared that the residents of affordable housing would be from

28

New York City and would be drug addicts.  (Ex. 9, Brunelle Dep. at 68.) [7]

Residents opposing the Andersons' affordable housing proposals explicitly discussed their concerns over the number of children that would live in the development.  (Ex. 9, Brunelle Dep. at 68 (noting opposition to Spring Run Village based on number of children that would live there); Ex. 17, McTygue, W Dep. at 74-75 (recalling opposition to projects based on the number of children they would attract).).  As one resident expressed it, "I mean, again, it's our town.  It's our children.  It's our schools.  It's our infrastructure.  We need you people to protect it."  (Ex. 54, 10/0/04 City Council Meeting Tr.)  Another noted the likely increased load on schools and urged the City Council to "think about the children."  (Ex. 39, Minutes of May 20, 2003 City Council Meeting at 2; *see also* (Ex. 55, 12/8/04 Planning Bd. Tr.)(resident suggesting to the Planning Board that the schools could not support new construction in the SWAD area).) [8]

### ii.    The City Council and Planning Board Bowed to the Community's Discriminatory Opposition.

It is undisputed that when the City Council rezoned the SWAD area it was simply responding to the strong community opposition.  As Mayor Klotz described his support of downzoning the SWAD area in 2003, "given the strong sentiment from the community this would be a good solution…."  (Ex. 39, City Council Minutes, May 20, 2003 at 7; *see also* Ex. 13, Klotz Dep. at 79-80.)  When the Council downzoned the area again in 2005, Council member Thomas McTygue stated that "the residents should be proud.  The vote tonight in favor of RR-1 zoning is due to their pressure…."  (Ex. 48, City of Saratoga Springs Council Meeting Minutes, Feb. 1, 2005 at 6; *see also id.* (Mayor Lenz stating "[t]he citizens deserve to have their voice heard").)  Councilmember Towne

---

[7] Courts have routinely recognized that the use of similar words or phrases serve as "'camouflaged racial expressions" that give rise to an inference of discrimination.  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding that in context where black residents might move into racially segregated town, residents' expressions of dislike towards such "'new' people" was among "strong testimonial evidence" of racial bias); *Resid. Adv. Bd. v. Rizzo*, 564 F.2d 126, 144 (3d Cir. 1977) (citing statements by mayor such as his intent to "preserve the City's neighborhoods" as evidence of discriminatory intent); *Atkins v. Robinson*, 545 F. Supp. 852, 872 (E.D. Va. 1982); *United States v. City of Birmingham*, 538 F. Supp. 819, 825 (E.D. Mich. 1982) (holding that statements about "those people" and their effect on property values was intended to refer to African Americans).

[8] Although residents raised the specter of a flooding of the schools, the City Planner testified that the "school district has given clear indication to the Planning Board and to the city that they are capable of handling impacts . . . that occur."  (Ex. 7, Bornemann Dep. at 237-38.)

similarly described one of his three reasons for voting to rezone the SWAD area as "responsiveness to the community." (Ex. 22, Towne Dep. at 180.) Or as Planning Board member Lewis Benton described it, the Mayor sought to rezone the Anderson property to RR-1 in 2004-2005 because "the community turned up the heat," which drove the Mayor to abandon a possible compromise that would have allowed the Andersons to build Spring Run Village because "it wouldn't pacify the public." (Ex. 45, L. Benton Email to Planning Board Members, Jan. 30, 2005 at 1-2.)[9]

It is also undisputed that the Planning Board's rejection of the Spring Run Village application was in response to community opposition. (Ex. 17, McTygue, W. Dep. at 67 ("I think the Board's action . . . was as a result of expressed public opposition to development . . . "); *see also* (Ex. 8, Bristol Dep. at 81-82 ("[p]ublic interest, I found over time, has offered some really good ideas, that they are not as dumb as sometimes as people treat them to be. They really know, so they get listened to").) Indeed, Planning Board member McTygue admits that he did not "spend a lot of time diving in and trying to understand the implications of changing or not changing the zoning out there…knowing full well that the community would weigh in on this . . . . " (Ex. 17, McTygue, W. Dep. at 63-65.)

> iii.     **When City Officials Bowed to Community Opposition, They Knew it Was Based on Discriminatory Animus Towards the Likely Residents of Affordable Housing.**

Saratoga Springs officials were well aware that public opposition to affordable housing, upon which they relied, was consistently motivated by discriminatory animus. For example, when a City committee, made up of City officials, employees, and volunteers finalized a draft City ordinance related to affordable housing, it removed references to the Fair Housing Act and the Section 8 program because they "have served to further citizen concerns about subsidized occupancy." (Ex. 106, M. Franke Email March 29, 2006). As the City describes it, affordable housing in Saratoga Springs carries a "stigma" and that is an obstacle to the creation of affordable housing opportunities in the City. (Ex. 27, A Call to Action at 18 (noting need to "destigmatize/affordable/low moderate

---

[9] It is also notable that the decision to make the 2001 Comprehensive Plan amendments, which Defendants assert is the basis for the rezoning of the Anderson family's property rezoning, was *solely* a response to community pressure. (Ex. 13, Klotz Dep. at 39-40.)

labeling").) Or as articulated in a 2000 report, "[a]nother concern presenting a barrier to affordable housing is the perception that persons of low and moderate income will have a negative impact on the safety, character, and property values of a neighborhood." (Ex. 60, 2000 Consol. Plan at 32.) As the *Sunrise* court noted in similar circumstances, where municipalities are swayed by residents' stereotypical notions about a protected class, including the notion that "their presence lowers property values," it suggests discriminatory intent. *Sunrise*, 62 F. Supp. 2d at 775.

Nonetheless, City officials bowed to the discriminatory opposition to affordable housing. Indeed, Planning Board member Lewis Benton described Mayor Lenz, in a different context, as "a Mayor that capitulates to racial discrimination rather than condemning it." (Ex. 61, L. Benton, *Letter to Editor*, Saratogian, Aug. 9, 2005.) When the Andersons proposed building affordable housing in Saratoga Springs, *all* of the City officials capitulated to racial discrimination rather than condemning it.

### iv. The City Has Consistently Yielded to Community Opposition to Affordable Housing that is Based on Stereotyped Notions of the Likely Residents.

The community opposition to affordable housing was not unique to Spring Run Village. To the contrary, every proposed affordable housing proposal has met with significant public opposition and Saratoga Springs officials have consistently yielded to that opposition. Indeed, developers have identified "neighbors very vocal concerns" about affordable housing as a major obstacle to constructing affordable housing in the city. (Ex. 62, Summary of Meeting w/ Builders and Developers, Sept. 14, 2004.) Or as the City itself describes the power of public opinion regarding affordable housing, "[g]iven the present-day power that coalescing residents have to control the development process (regardless of justification or accuracy of information), it is imperative that the City, and public and private non-profit groups, act to sufficiently educate the residents on the socio-economic/demographic realities of the City." (Ex. 63, 1999 Entitlement Action Plan for the City of Saratoga Springs, May 14, 1999 at 1881.) That powerful opposition is motivated by stereotyped notions of affordable housing, including that affordable housing would be occupied by "drug addicts"

31

and "undesirables" and that it would affect life in Saratoga Springs.  (Ex. 9, Brunelle Dep. at 46-47.)

The influence of the affordable housing opponents has prevented many affordable housing projects.  For example, when the Saratoga County Economic Opportunity Council sought to rehabilitate a former rooming house called Tom's Lodge into offices and affordable housing units, the community opposition was intense because community members thought the project would attract "drug dealers from New York City."  (Ex. 9, Brunelle Dep. at 84-85.)  One City Council member, Thomas McTygue, who also voted to rezone the Anderson family's property, called the Economic Opportunity Council and "suggested" that they abandon the project because of this opposition to it.  (Ex. 9, Brunelle Dep. at 87-88.)

When the Saratoga Housing Authority and Omni Development proposed an affordable housing development in the downtown area, neighbors objected to having "Section 8" residents in the neighborhood, feared the increase in crime and drug and alcohol abusers, and thought it would change the character of their neighborhood.  (Ex. 66, IDA Hearing Tr. at 3760-61; Ex. 87, R. Zacek, WSNA, Letter to S. Towne, March 19, 2005 (neighborhood opposition group letter objecting to affordable housing leading to "ghettoized" neighborhoods).)  This proposal was withdrawn by the developers after they could not get the necessary approvals from the Zoning Board of Appeals.  (Ex. 9, Brunelle Dep. 27-28, 31-32.)

The developers of the Excelsior Park tried to include an affordable housing component to the project, but the Planning Board made the affordable units "impossible to build."  (Ex. 19, Pfeil Dep. at 36-38.)  G & R Development also proposed a project with an affordable housing component, but the Planning Board returned two unfavorable advisory opinions, expressing that this project with affordable housing in the outer areas was the "wrong project in wrong spot" (Ex. 64, Planning Board Minutes, July 28, 2004; Ex. 65, Planning Board Minutes, January 19, 2005.)   After a public hearing the City bought the property as open space, forever precluding the construction of affordable housing there.  (Ex. 9, Brunelle Dep. at 31; Ex. 15, McCabe Dep. at 50.)

v.     **The City Has Stymied Various Initiatives to Promote Affordable Housing in the City.**

Consistent with City officials bowing to public pressure to keep affordable housing out of Saratoga Springs because of the people it would bring to the City, the City ignored its own vision for land use policies as described in the Comprehensive Plan and eliminated a "density bonus" for developers that included an affordable housing component in their projects. Under the Comprehensive Plan, a developer in an RR-1 zone could build more units per acre (the comprehensive plan stated that it should be a 20% density bonus) than would otherwise be allowed in that zone if the developer included affordable housing in the project. The zoning ordinance adopted by the City Council, however, did not include a density bonus for affordable housing. Notably, the city adopted a density bonus for the reservation of open space.

When a committee recently presented the draft inclusionary zoning ordinance, which would mandate affordable units to be included in larger developments, to the City Council, it simply took no action. The reason: "because of intense public pressure from the community to oppose it." (Ex. 9, Brunelle Dep. at 79; *see also* Ex 92, M. Gough Email to T. McTygue, Mar. 16, 2006 (Commissioner McTygue encouraging community opposition to IZOD).) That opposition like the opposition to other affordable housing proposals in the City is based on stereotyped notions about affordable housing – a belief that affordable housing will bring "people in from outside the city who are undesirables." (Ex. 9, Brunelle Dep. at 82.)

* * *

The evidence clearly supports a finding that the City's decisions regarding Spring Run Village and the SWAD area were driven by intense public opposition. That opposition was based on discriminatory animus toward the minorities and children that would occupy the affordable housing component of the development. The same discriminatory opposition has precluded various affordable housing proposals and initiatives to promote affordable housing. This historical context of the City's consistent capitulation to this discriminatory opposition stands in direct contravention of

the fair housing laws and is sufficient, standing alone, to support a jury finding that the City's actions

in denying the Spring Run Village application and rezoning of the Anderson family's property violate

the Fair Housing Act.

          **4.**      **The City's SWAD Area and Spring Run Village Decisions Were a Product
of a Suspect Sequence of Events and Numerous Departures from Normal
Procedures.**

          **i.**      **Departing from Its Own Process, the City Rezoned the SWAD in
2003 in Immediate Response to the Andersons' Plans to Build A
Development With Affordable Housing.**

Understanding the City's rezoning of the SWAD area and denying the Andersons permission

to build on the Spring Run Village site requires an examination of the 2001 amendments to the

Comprehensive Plan.  In the previous Comprehensive Plan, the City's articulated vision for the

SWAD area was to advance the "siting of a large mixed-office campus-style development and high-

density residential land uses."  (Ex. 33, 1999 Comprehensive Plan at 4.2.5; *see also* Ex. 34, Zoning

Ordinance of the City of Saratoga Springs at Art. II, pp.13-14, 24-25).)  In 2001, however, the City

decided to re-examine this vision, but could not reach consensus on a new plan for the SWAD area.

Accordingly, in the 2001 Comprehensive Plan amendments, the City created a *process* for developing

a land use plan for the SWAD area.  "A consultant should be retained to assist the City with the

preparation of land use plan for the area near the intersection of Gilbert Road and Weibel Avenue.

…[The plan] should address design standards, traffic calming measures, road realignment, and mixed

land uses."  (Ex. 24, 2001 Comp. Plan at 358).

Consistent with that process the City formed the "Weibel Avenue - Gilbert Road committee"

to study the various land use options for the area.  (Ex. 4, Behan Dep. at 64-65.)  Initially, the City

recognized that it must await this committee's study before establishing any new zoning for the area.

(Ex. 37, Mayor K. Klotz Letter to S. Touhey, Sept. 16, 2002 (stating the Comprehensive Plan called

for the Weibel Avenue –Gilbert Road to complete its study before any final action is taken by the

City Council regarding the SWAD area); Ex. 36, Summary of Proposed Amendments (Zoning

Ordinance Review Committee's recommendation that any zoning change be deferred until enough

time had elapsed to allow Weibel Avenue – Gilbert Road Committee to complete its study).)

However, on May 16, 2003, one the Andersons presented the Andersons' vision for the property to the Weibel Avenue – Gilbert Road Committee, including the proposed affordable housing component. (Ex. 21, Touhey Dep. at 64-65; Ex.38, Weibel Avenue/Gilbert Road Study Area Advisory Committee Meeting Agenda/Notes, May 16, 2003.)  Four days after the presentation to the committee (which included a City official and a City employee) the City departed from the process it had created specifically for considering the land use options for the SWAD area, and before the Weibel Avenue – Gilbert Road Committee had issued any sort of report, rezoned the SWAD area to RR-1.

The rezoning of the SWAD was the City Council's *only* departure from its own Zoning Ordinance Review Committee's recommendations for implementing the Comprehensive Plan amendments. (Defs.' Statement of Material Facts ¶ 64.)  For the SWAD area, the Zoning Ordinance Review Committee had recommended that City follow the articulated process and allow the Weibel Avenue – Gilbert Road Committee to finish its study before rezoning the area.  The City accepted every other of approximately 130-pages of recommendations from the Zoning Ordinance Review Committee, but in an effort to forestall the Andersons from taking any action to implement their vision for their property, which included affordable housing, the City Council rejected the Zoning Ordinance Review Committee's recommendation and at the "last minute" rezoned the SWAD area. (Ex. 39, City Council Minutes, May 20, 2003; Ex. 67, G. Bornemann Emails to J. Viggiani, Aug. 31 and Sept. 1, 2004 (describing City Council's zoning decision as "last minute").)  The City's sudden change in direction occurred the moment officials discovered the Andersons' affordable housing plans.  As described by the *Sunrise* court, "'[a] sudden and dramatic change to an existing zoning ordinance in response to a particular land-use application in a hasty effort to conform local zoning law to so-called fundamental Township land-use policies bespeaks pretext.'" *Sunrise*, 62 F. Supp. 2d at 775 (quoting *Assisted Living Assoc. of Moorestown v. Moorestown Township*, 996 F. Supp. 409, 436 (D.N.J. 1998)).