ii.     **The City Initiates a Second Process to Rezone the SWAD Area Again Immediately After Learning of the Andersons' Affordable Housing Plans.**

On May 10, 2004, a year after the City's last minute rezoning of the SWAD area, New York Supreme Court Judge Nolan found that the rezoning violated SEQRA and reinstituted the previous special development area zoning. (Ex. 40, Judge Nolan Decision.) The City took no immediate action to rezone the area again and did not appeal the decision. On the other hand, within three weeks of the court's decision, the Andersons restarted their efforts to design and build Spring Run Village and its affordable housing component. (Ex. 41, LA Group Retainer, June 15, 2004; Ex. 12, Ingersoll Dep. at 19-20 (discussing meeting with Anderson family on May 27, 2004 in regard to possible land planning services for a development of mixed-use housing types, including affordable housing).)[10]

On the morning of July 29, 2004, the Anderson family made a presentation to the Saratoga County Workforce Housing Partnership regarding its plan for affordable housing at Spring Run Village (one of the members of the Partnership was Saratoga Springs Planning Board member Louis Schneider). That afternoon, the Deputy Mayor reported that City Planner Geoff Bornemann, had heard "that something was up on [the Andersons'] property and that the city needed to get going on the rr-1 rezoning . . . ." (Ex. 42, M. Ingersoll Email to W. Anderson, July 29, 2004.)[11] When the City Council met on August 11, 2004, it voted to begin the process to downzone the Anderson property. (Ex. 43, City Council Minutes, Aug. 11, 2004 at 3.)

---

[10] Defendants suggest that the Anderson family "rushed" between June and September to get a proposal submitted before the City Council could rezone the property. This finds *no* support in the record. Indeed, the only citation Defendants make in support of this unfounded assertion is to affidavits noting that the Anderson family resubmitted an application in December 2004, a week after the Planning Board rejected its first application. *See* Def.'s Mem. at 14 n.6. There is absolutely no evidence that one hundred days to create a proposal to build a development like Spring Run Village is particularly fast. The evidence, however, indisputably demonstrates that the Anderson family's actions were entirely inconsistent with a rush to submit an application before the City Council could rezone the property. After all, the Anderson family met with every City Council member to inform them of their plans to build Spring Run Village. (Ex. 12, Ingersoll Dep. at 36-37, 47, 53-60.)

[11] By omitting portions of the text, Defendants entirely misconstrue this email and attempt to confuse its meaning. The email, between Mike Ingersoll and Willard Anderson states in the entirety of the body: "Andy, we are on with mike Lenz at 11:00 next tues. (3rd) at his office…his deputy told me she just got an e-mail from Geoff Bournemann saying he was told something was up on your property and that the city needed to get going on the rr-1 zoning……someone from our meeting probably told him something prior to our meeting today…the deputy mayor is going to let me know more on the source if she can find out….mike" (Ex. (91) Email from Ingersoll to W. Anderson, July 29, 2004.)

In a complete perversion of the actual chronology of events, Defendants suggest in their brief that the Anderson family renewed its pursuit of Spring Run Village only after it discovered the City was seeking to rezone the property. This finds *no* support in the record. The actual and undisputed chronology is that the Court reinstated the special development area zoning on May 10, 2004. (Ex. 40, Judge Nolan Decision.) The Andersons restarted efforts to design and build Spring Run Village as early as May 27, 2004. (Ex. 12, Ingersoll Dep. at 13-15.) In June and July, 2004 the Anderson family entered into contracts with a landscape architect and an architect to design Spring Run Village. (Ex. 41, LA Group Retainer, June 15, 2004.) Meanwhile the City took no action to rezone the property until after July 29, 2004 when City officials heard about the Anderson family's affordable housing presentation to the Workforce Housing Partnership. (Ex. 43, City Council Minutes, Aug. 11, 2004 at 3.)

As the City Council began the process to rezone the Anderson family's property it appeared that some members of the Council might support a compromise where all of the SWAD area except the Spring Run Village parcel would be rezoned. (Ex. 68, City Council Minutes, Oct. 5, 2004 at 3-4.)

The City Council sought an advisory opinion from the Planning board on that proposal, but residents forcefully opposed it at the public hearing. (Ex. 46, Planning Board Minutes, Nov. 3, 2004 at 9-10.) When the Planning Board returned an advisory opinion recommending rezoning the entire SWAD area, the City Council, departing from normal procedure, tabled the issue until a budget workshop being held the next day, which coincided with the night the Planning Board intended to consider the Andersons' Spring Run Village proposal. (Ex. 47, City Council Minutes, Nov. 16, 2004 at 9-13; Ex. 7, G. Bornemann Dep. 213 (City Planner stating that it is "very unusual" for City Council to meet on same night as Planning Board.) Then, as described by the executive director of the Saratoga County Economic Opportunity Council:

> The city council succumbed to the pressure of the neighbors and reversed their decision
> to support the Anderson Project . . . .  This was a surprise, unexpected vote they took
> during a budget meeting.  No supporters of the proposal had the opportunity to be present
> and speak.

(Ex. 69, Brunelle Memo to WHP Steering Committee, Nov. 18, 2004.)  At this unpublicized meeting, the City Council voted to seek an opinion from the Planning Board to rezone all of the SWAD area, including the Spring Run Village site, to RR-1.  (Ex. 70, City Council Minutes, Nov. 17, 2004; Ex. 15, McCabe Dep. at 166; Ex. 9, Brunelle Dep. at 117.)

On December 8, 2004, the Planning Board returned the now-expected opinion approving of rezoning the entire SWAD area.  (Ex. 29, Planning Board Minutes, Dec. 8, 2004.)  The City Council was required to obtain an opinion from the County, which on January 31, 2005, opposed the rezoning.  (Ex. 7, Bornemann Dep. at 37.)  Nonetheless, on February 1, 2005, the Council voted to rezone the entire SWAD area to RR-1, effectively precluding any viable development with affordable housing.  (Ex. 48, City Council Minutes, February 1, 2005.)

Significantly, by the time the City Council sought to rezone the SWAD area a second time, the Weibel Avenue – Gilbert Road Committee, the committee formed by the City specifically to examine land use options in and around the SWAD area had completed its report, but City Council members did not even consider its recommendations.  (*See, e.g.*, Ex. 14, Lenz Dep. at 107-108; Ex. 15, McCabe Dep. at 69, 154.)  That report included four possible land use options for the area, including an option that would allow special uses such as "multiple-family dwellings," which would include Spring Run Village. (Ex. 35, Weibel Avenue/Gilbert Road Study Report at 31-33.)

Just as in May 2003, the City's decided to rezone the Spring Run Village site to RR-1 within days of learning of the Andersons' plans to develop a residential community with an affordable housing component.  Again, the City ignored the procedure for considering rezoning the area and did not even contemplate the land use options presented by the committee formed by the City for the specific purpose of studying the area.  The circumstances in *Sunrise* were similar.  There, the Town of Huntington established a Citizen's advisory Committee to study the housing for the elderly and persons with disabilities.  *Sunrise*, 62 F. Supp. 2d at 766.  The Town then proceeded to pass an ordinance eliminating "as of right" zoning for congregate care facilities, which provide daily living assistance to its residents, most of whom are seniors.  *Id.* at 766, 768.  When the Town passed the

ordinance, however, it disregarded the Citizen Advisory Committee's recommendations, which the court concluded evinced discrimination.  *Id.* at 776.

iii.     **The Planning Board Departed from Its Normal Procedures to Delay Consideration of the Spring Run Village Application.**

When the Andersons submitted their application to develop Spring Run Village to the Planning Board, the Planning Board took every opportunity to delay consideration of the application. First, the City Planner forced the Anderson family to go through multiple "completeness reviews," which is an uncommon practice and delayed the scheduling of the public hearing on the application. (Ex. 12, Ingersoll Dep. at 36.)

Second, the City Council scheduled a vote on initial steps related to the possible rezoning of the Spring Run Village site and surrounding area at the exact same time that the Planning Board held its public hearing on the Spring Run Village application.  (Ex. 47, City Council Meeting Minutes, Nov. 16, 2004 at 9, 13.)  The moment the City Council completed its preliminary vote, the Planning Board chair took the unprecedented step of stopping the public hearing on the Spring Run Village application.  (Ex. 12, Ingersoll Dep. at 96-98.)  As described by Dennis Brunelle of the Saratoga County Economic Opportunity Council:

> Several [Workforce Housing Project] members were waiting to speak for the project at the planning board meeting when the board chairman received a note about this surprise vote.  The planning board chair immediately closed all further discussion about the project except to schedule a public hearing on December 21, 2004.  We asked for the opportunity to speak and the chair refused to grant us this opportunity.

(Ex. 69, D. Brunelle Memo to WHP Steering Committee, Nov. 18, 2004.)

Third, when the Andersons got the Spring Run Village application back on the agenda at a subsequent Planning Board meeting, the Planning Board manufactured a technicality upon which to reject the application.  (Ex. 12, Ingersoll Dep. at 89.)  The technicality was based on a zoning ordinance guideline for the SWAD area stating that any office uses in the area would require an extension of Weibel Avenue to Union Avenue.  (Ex. 34, Saratoga Spring Zoning Ordinance at Art. II p. 24.)  Typically, the Planning Board did not require strict adherence to such guidelines, but instead

39

"interpreted" the guideline to see if the development proposal met them. (Ingersoll Dep. at 91; Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 15.) As a result, the normal planning board procedure would be to permit applicants to show that their plans met the goals of the guideline. With Spring Run Village, however, the Planning Board departed from its normal procedure and without any justification, denied the Andersons the opportunity to demonstrate compliance with the guideline. (Ex. 5, Benton Dep. at 101-02.)

The Planning Board did not even discuss the alternative road configuration proposed by the Anderson family in the Spring Run Village application.[12] (Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 15.) Indeed, some Planning Board members believed that the road realignment proposed by the Andersons was all that was suggested by the Comprehensive Plan. (Ex. 20, Schneider Dep. at 66.) If the Anderson family had been given the opportunity to describe the benefits of the road alignment they proposed in the Spring Run Village Plan, the Planning Board would have seen that it was precisely what the City had been seeking for years. (Ex. 17, McTygue, W. Dep. at 44-45, 46-47, 75-76 ("from a highway standpoint we always thought redesigning Gilbert Road was a good idea..."); Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 15.)

Further, when the Andersons offered to remove the commercial component of the development, which would make the through-road guideline inapplicable, the Planning Board did not follow its normal procedure of considering the amended application. (Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 16; Ex. 12, Ingersoll Dep. at 92-93 (noting that the Planning Board typically allows modifications to a proposal as part of the application approval process as part of a dialog between the Board and the applicant, but not with Spring Run Village.) Instead, the Planning Board "rejected" the application. (Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 15.) Even the Chair of the Planning Board believed that rejecting the application on these grounds was inappropriate and a departure from normal procedure. (Ex. 8, Bristol Dep. at 202.)

---

[12] The connecting road the Planning Board sought was impossible because of the wetlands it would have to cross, but the Spring Run Village proposal did include a road realignment that addressed the traffic concerns the connecting road guideline had been meant to address. (Ex. 12, Ingersoll Dep. at 88-89.)

The Anderson family revised the Spring Run Village application to address the connecting road issue and resubmitted it on December 15, 2004, but the Planning Board's delay tactics continued. (Ex. 71, Spring Run Village Application, Dec. 15, 2004.) The Planning Board refused to place the Spring Run Village application on one of the January Planning Board meeting agendas as would be customary, but instead scheduled it for February 2, 2005, the day after the City Council had scheduled a vote on rezoning the SWAD area. (Ex. 73, P. Lynch Letter to R. Bristol, January 5, 2005.) In response to the Anderson family's request to be placed on an earlier agenda, which were not full agendas, the Planning Board chair accused the Andersons of being "schoolyard bullies." (Ex. 56, R. Bristol Email to P. Lynch, Jan. 6, 2005.)

Finally, after February 1, 2005, when the City Council took the unusual step of downzoning the Spring Run Village site while the Spring Run Village application was pending, (Ex. 12, Ingersoll Dep. at 98-99), the Planning Board's delay tactics were no longer necessary. As a result, the day after the City Council's downzoning, the Planning Board decided to "cancel" the application because the City Council decided to downzone the parcel. (Ex. 81, Planning Board Minutes, Feb. 2, 2005; Ex.7, Bornemann Dep. at 68 ("[t]he Planning Board made the decision they could no longer review it").)

\* \* \*

Consideration of the evidence demonstrating discriminatory motive under the framework established in *Arlington Heights I*, demonstrates that there is substantial evidence supporting an inference of intent. The statistical picture is clear: affordable housing is disproportionately occupied by African Americans and families with children in Saratoga Springs and the City's actions that prevented the construction of Spring Run Village kept a disproportionate percentage of African Americans and families with children from finding affordable housing in city. The historical context of the City's decisions shows consistent virulent opposition to affordable housing and the "type" of people who live in it. It is undisputed that the City capitulated to that opposition time and time again as it made decisions regarding Spring Run Village and the SWAD area.

The sequence of events leading to each of the City's decisions reveals a simple pattern. The City discovered that the Anderson family sought to build a residential development with an affordable housing component and immediately commenced efforts to prevent the development. The City departed from its normal procedures in virtually every decision related to Spring Run Village and the SWAD area. Similarly, the City ignored applicable substantive criteria when making land use decisions related to Spring Run Village and the SWAD area, and instead just bowed to public pressure. Having presented sufficient evidence for a trier of fact to infer discrimination, we now consider the evidence demonstrating that the City's explanation for its actions is pretextual.

> **D.** **The Evidence Establishes that the City's Sole Explanation for Downzoning the SWAD Area and Denying the Spring Run Village is Pretextual.**

The statistical evidence and the evidence regarding the historical context, the sequence of events, and departures from procedures surrounding Defendants' decisions related to the SWAD area and Spring Run Village, as described above, not only allow an inference of discrimination but also demonstrate that Defendants' asserted justifications for their decisions are pretextual. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (holding that trier of fact may determine that defendants' explanation is a pretext for discrimination based upon the evidence presented in support of plaintiffs' *prima facie* case and inferences drawn therefrom); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985) (holding that pretext may be proven through comparative evidence, statistical evidence, and direct evidence of discrimination). In addition, as Plaintiffs now discuss, the evidence also shows that Defendants' asserted justification is also contradicted by the record.

> **1.** **The Comprehensive Plan Did Not Require the Rezoning of the SWAD Area or the Denial of the Spring Run Village Application.**

In their brief, Defendants present one explanation for rezoning the SWAD area: "bringing [sic] City's zoning code in compliance with the 2001 Comprehensive Plan . . . ." Defs.' Mem. of Law at 25; Ex. 15, McCabe Dep. at 102-03, 134-35 (confirming that the sole basis he sought and voted for the rezoning of the Anderson family's property was to ensure consistency with the Comprehensive Plan and that he had no independent opinion regarding the actual zoning of the

42

area).)  That explanation is false.[13]

As an initial matter, the Defendant City Councilmembers' own testimony disputes the concept that the Comprehensive Plan required the SWAD rezoning.  For example, Mayor Lenz described the Comprehensive Plan as "guidelines" to "identify future land use within the City of Saratoga Springs." (Ex. 14, Lenz Dep. at 21.)  Councilmember McCabe, who led the effort to rezone the Anderson family's property, similarly describes the Comprehensive Plan as a "theme" (Ex. 15, McCabe Dep. at 89-90.)  Councilmember Curley calls the Comprehensive Plan's central "City in the Country" concept a "cliché" upon which no City official would base a vote.  (Ex. 10, Curley Dep. at 66.)

In addition, Defendants' explanations for their actions continue to shift.  This alone suggests pretext.  See, e.g., *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132-33 (2d Cir. 1987) (shifting explanations for challenged actions provides evidence of pretext).  The clearest example is the affidavits submitted by Defendants in support of their Motion for Summary Judgment.  Defendants, who in deposition three months ago could not remember the basis for their decisions or had a different explanation for their reasons now carefully articulate the "Comprehensive Plan" defense. (*Compare* Ex. 22, Towne Dep. at 101 (stating that he was not sure whether he believed the Comprehensive Plan required the zoning change), *with* Towne Aff. at ¶ 4 ("recogniz[ing] the importance under State Law for the City to maintain a zoning code that was consistent with the City's Comprehensive Plan"); *compare* Ex. 14, Lenz Dep. at 100-101, 106-107 (testifying that he could not recall having an opinion on whether the comprehensive plan even required downzoning the entire SWAD), *with* Lenz Aff. ¶ 14 (stating that he voted to request an advisory opinion about downzoning the entire SWAD from the Planning Board because the "May 20, 2003 efforts of the City Council to

---

[13] At least one Council member simply refused to give any justification for rezoning the SWAD area.

> Q:   Can you give any justification,
>       sitting here today, for any of the actions you've
>       ever taken related to the Andersons' property at
>       Gilbert Road and Lake Avenue?
>
> A:   No.

(Ex. 16, McTygue, T. Dep. at 51.)

bring the City's Zoning Code back in compliance with the City's 2001 Comprehensive Plan had to be completed"); *compare* Ex. 16, McTygue, T. Dep. at 36-38 (testifying that that he had no recollection of making any decisions based on the 2001 Comprehensive Plan), *with* McTygue, T. Aff. ¶¶ 3, 14 (asserting that his decision to rezone the Andersons' property was based on his desire to be consistent with the 2001 Comprehensive Plan). These inconsistent explanations for rezoning the SWAD and preventing Spring Run Village bespeak pretext.

In addition, numerous other facts demonstrate that compliance with the Comprehensive Plan was not the real reason for rezoning the SWAD area. First, the 2001 Comprehensive Plan does not require rezoning the Anderson family's property, but instead clearly states that various land use options for the area must be studied. Second, in the past, the City has tolerated inconsistencies between the zoning code requirements and Comprehensive Plan. Third, the Comprehensive Plan is not absolute and the City has frequently amended the Comprehensive Plan in response to particular zoning or land use requests that were inconsistent with the Plan. Fourth, the City's decisions related to Spring Run Village and the SWAD area were inconsistent with a variety of Comprehensive Plan requirements related to affordable housing. Finally, City Council members who voted for the rezoning did not believe that strict compliance between the Comprehensive Plan and zoning ordinance was required. We now discuss, in turn, each of these bases for rejecting Defendants' sole explanation for rezoning the SWAD area.

> **i.     The Comprehensive Plan Only Requires that the SWAD Area Be Studied.**

The SWAD area specifically appears in two places in the 2001 Comprehensive Plan. First, the "Implementation" Chapter of the 2001 Comprehensive Plan lists three "Immediate Actions (To be initiated immediately following adoption of the amendments to this plan)" including:

> 3.     Prepare master plan for area [sic] Gilbert Road/Weibel Avenue intersection Area
>
> A consultant should be retained to assist the City with the preparation of [sic] land use plan for the area near the intersection of Gilbert Road and Weibel Avenue. The plan should be developed with significant public participation. It should address design

standards, traffic calming actions, road realignment and mixed land uses.
(Ex. 24, 2001 Comp. Plan at 54.)  This provision unmistakably calls for a study of the Gilbert Road/Weibel Avenue area, where the Anderson property is located, before any land use plan or zoning ordinance is adopted by the City.

Second, the SWAD area appears in two maps attached to the Comprehensive Plan.  The maps outline a "development plan" and a "country overlay area."  On those maps, every parcel of land in the City is given a suggested land use designation and the SWAD area is in the "Conservation Development District" area.

City officials reviewing these two references to the SWAD area concluded that any zoning of the SWAD area should await the Weibel Avenue – Gilbert Road study.  For example, the Zoning Ordinance Review Committee, which was charged with implementing the 2001 Comprehensive Plan recommended that any zoning action on the area be deferred at least seven months, until a master plan for the area could be completed by the study committee.  (Ex. 36, Summary of Proposed Amendments, Zoning Map Amendments, at D 2031; Ex. 37, Mayor Klotz Ltr to Susan Touhey, Sept. 16, 2002.)  Even when the City Council approved the rezoning, the Council recognized that the zoning required by the Comprehensive Plan should be dependent on the report of the study group examining the possible land uses of the area.  (Ex. 39, City Council Minutes, May 20, 2003, at 7.)

If the Comprehensive Plan maintained some requirement for the SWAD area, it was that it be studied, not zoned.  In fact, the City Council explicitly flouted the only clear requirement of the Comprehensive Plan regarding the SWAD area when it did not wait for or consider the Weibel Avenue – Gilbert Road Committee report when rezoning the SWAD area in 2003 and 2005. Considering this factual context, it is simply not credible that the City was following some perceived requirement of the Comprehensive Plan when it rezoned the SWAD area.

45

ii.    **Historically, the City Has Not Required Absolute Consistency Between the Comprehensive Plan and the Zoning Ordinance.**

Defendants assert that they were *required* to make the zoning ordinance and the Comprehensive Plan consistent.  Historically, however, the City recognized no such requirement.  For example, and most pertinent here, from 1987 to 1999, the SWAD area was zoned Conservancy or Rural-Residential-1, which only allowed residential uses.  (Ex. 74, Summary of Land Use Regulations and Issues Related to the Anderson Property.)  At the same time, however, the Comprehensive Plan called for "an office park."  (Ex. 53, 1987 Comp. Plan, at 11.8, 11.12.)  Despite this clear, at least twelve-year, inconsistency, no effort was made to amend the Comprehensive Plan or the zoning ordinance.

Only when the compliance with the Comprehensive Plan served the City's need to cover actions to exclude affordable housing and the protected classes that would live in it, did some consistency requirement between the Comprehensive Plan and the zoning ordinance become important.  Commissioner McTygue, for example, could not recall ever making a zoning decision based on the Comprehensive Plan in his thirty years as a council member.  (Ex. 60, McTygue, T. Dep. at 36-38).  It is also worth noting that after rezoning the SWAD, the City has not engaged in any other effort to ensure that the Comprehensive Plan and zoning ordinance are consistent, (Ex. 15, McCabe Dep. at 107), further suggesting that "consistency" is merely a one-time pretextual justification for rezoning the SWAD.

iii.    **The City Has Regularly Considered Amending the Comprehensive Plan Where Necessary for A Particular Project or Proposal.**

The City's explanation for rezoning the SWAD area is based on the indisputably faulty premise that the Comprehensive Plan is an absolute, immutable document.  To the contrary, the City regularly considered and approved amendments to the Comprehensive Plan where necessary for particular land use applications.  (Ex. 75, Record of Zoning Map Amendments.)

In fact, when the downzoning of the Anderson family's property was before the Planning Board, the City Planner specifically noted that the Comprehensive Plan could be amended for

46

particular land use proposals.  (Ex. 29, Planning Board Minutes, Dec. 8, 2004, at 10; Ex. 46, Planning

Board Minutes, Nov. 3, 2004, at 8.)  The Chair of the Planning Board agreed, noting that if the

Comprehensive Plan and zoning ordinance were not in compliance "the City Council could revise the

Comprehensive Plan *or* bring existing zoning in compliance with the Comprehensive Plan." (Ex. 46,

Planning Board Minutes, Nov. 3, 2004, at 8) (emphasis added).)  When it came to the SWAD,

however, the City did not even consider amending the Comprehensive Plan and instead falsely

suggested that Comprehensive Plan requirements were beyond examination.

<blockquote>

iv.     **The City Council's Rezoning of the SWAD Area Was Contrary to the Comprehensive Plan's Guidelines for Promoting Affordable Housing Opportunities.**

</blockquote>

One more fact demonstrating the falsity of the City's Council claim that rezoning the SWAD

was required by the Comprehensive Plan is that the rezoning interfered with the affordable housing

aspects of the Comprehensive Plan.  One of the "Immediate Action" items of the Comprehensive

Plan was to "incorporate recommendations to encourage affordable housing consistent with this

plan . . ., [including] higher density rezoning where appropriate and consistent with this plan." (Ex.

24, 2001 Comp. Plan at 53.)  The City's 2003 rezoning changes, including the rezoning of the SWAD

area, *lowered* the allowable density for 505 acres and increased it for only 125 acres, and it did not

include density bonuses for developments with an affordable housing component.  (Ex. 76,

Relationship Between Land Use Laws and Workforce/Affordable Housing, at 375.)

This result is directly inconsistent with the Comprehensive Plan directive to increase

allowable densities to encourage affordable housing.[14]  Defendants now assert by affidavit that the

2003 zoning amendments actually increased allowable densities for 898 acres.  *See* Bornemann Aff.

at ¶ 34.  This is contrary to Mr. Bornemann's earlier statements and is inconsistent with the

"environmental assessment form" prepared by the City at the time of the rezoning.  According to the

environmental assessment form, "[t]ogether, the proposed text and map amendments primarily

---

[14] The 2001 Comprehensive Plan also called for a density bonus the Conservancy Development District or RR-1 zone for developments with an affordable housing component, a recommendation that was never implemented.  (Ex. 24, 2001 Comp. Plan, at 46.)

*maintain or reduce* development densities…." (Ex. 36, Summary of Proposed Amendments, 6.0 SEQR Documentation, at 13-14 (emphasis added).)

The City's new interpretation is primarily based on an erroneous assertion that the creation of so-called "transect zones" increased densities. *See* Bornemann Aff. at ¶ 34. The transect zones, which notably are all in the downtown area, did not increase base densities, but instead merely provided "revised design standards and guidelines" for existing special development areas. (Ex. 36, Summary of Proposed Amendments, 6.0 SEQR Documentation, at 13-14; Ex. 36, Summary of Proposed Amendments & Art. II, at 16 (discussing new "design standards" created for the transect zones).) The transect zones are simply what used to be called impact areas or special development areas and do not even define an allowable density. (Ex. 23, Welti Dep. at 153.) Instead, the transect zones are defined by design standards and guidelines and development in the transect zones is dependent on Planning Board approval, which is the same requirement that existed for developments in these areas when they were special development areas. (Ex. 36, Summary of Proposed Amendments, Art. II, at 16.) Further, regardless of what name applies to them, the simple fact remains that affordable housing has been "priced out" of the transect zones. (Ex. 23, Welti Dep. at 156.)

These facts demonstrating that compliance with the Comprehensive Plan was not the actual reason for the City's rezoning of the SWAD area are more than sufficient for a trier of fact to find that Defendants' sole articulated reason for rezoning SWAD area, twice, is pretextual.

### 2.    The Rezoning of the SWAD Area Was Not Mandated by Any "Consistent" Land Use Treatment of the Area.

Defendants indirectly suggest that a reason for rezoning the SWAD area was to maintain the consistent land use treatment of the area as a low density, rural area. *See, e.g.*, (Ex. 29, Planning Board Minutes, Dec. 8, 2004 (Planning Board Chair Robert Bristol asserting that "the record was very clear and consistent about [the property's] place in the community"); Ex. 46, Planning Board Minutes, Nov. 3, 2004 (Planning Board Member Benton asserting that "history has consistently

called for the area to be in a rural category . . .").)

These officials' recitation of the land uses that have been historically permitted and encouraged in the SWAD is incorrect and cannot be a legitimate basis for their decisions to support rezoning. From 1987 until 2001, the City's Comprehensive Plans called for the area to have commercial and/or high-density residential uses. (Ex. 33, 1999 Comp. Plan at 4.2.5; Ex. 53, 1987 Comp. Plan at 11.8, 11.12.) In addition, from 1971 until 1990, the zoning ordinance allowed higher density residential development with minimum lot acreage of .25 acres per housing unit if water and sewer were extended to the area. (Ex. 74, Summary of Land Use Regulation and Issues Relating to the Anderson Property at 1.) In addition, the area had always been considered as a location for commercial uses. (Ex. 23, Welti Dep. at 104.) Indeed, the Spring Run Village site is adjacent to a Stewart's gas station and convenience store. (*See* Ex. 29, Planning Board Minutes, Dec. 8, 2004 at 10 (identifying 1.25 acre parcel in the SWAD area owned by Stewart's Shops Corporation).)

The history of the Spring Run Village site and surrounding area certainly did not call for limiting the zoning of the property to low-density residential options as certain City officials now argue in an attempt to justify their actions.

\* \* \*

The facts adduced readily permit a jury to find an inference of discrimination and Defendants' explanation for rezoning the SWAD area is simply not supported by the record and can be found to be pretext. Accordingly, Plaintiffs' disparate treatment claims must be submitted to a jury.

### E. The Undisputed Facts Establish that Defendants' Land Use Policies Used to Justify Rezoning of the SWAD Area and Denying the Spring Run Village Application Have A Disparate Impact on African Americans.

The undisputed facts establish that Defendants' land use policies preclude the development of affordable housing in Saratoga Springs and as a result, have a disparate impact on African Americans. Those policies include the policies used to justify the rezoning of the Anderson's property and denial of the Spring Run Village. Accordingly, judgment should be entered in Plaintiffs' favor on their disparate impact claim.

49

1.    **Standard for Proving A Disparate Impact Claim Under the Fair Housing Act.**

A disparate impact claim under the Fair Housing Act may be proven under either of two distinct theories:  (1) that a policy, practice, or act has an "adverse impact," or (2) that a policy, practice, or act "perpetuates segregation."  *See Huntington*, 844 F.2d 926, 937 ("The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by perpetuation of segregation.").  The two theories, though distinct, are generally examined together because they are considered under the same basic framework.

Under *Huntington*, a court examining a disparate impact claim based on an "adverse impact" or a "perpetuation of segregation" first determines whether a plaintiff has established that the "challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.'" *Id.* at 934 (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974).  In an "adverse impact" analysis, this initial burden of showing a discriminatory effect may be met by establishing that members of a protected class are disproportionately harmed by challenged practice.  In a "perpetuation of segregation" analysis, this burden can be met by establishing that the challenged practice tends to reinforce patterns of segregation by excluding minorities from predominantly white areas.  *Huntington*, 844 F.2d at 929.

Once a plaintiff has shown a discriminatory effect either through an "adverse impact" or a "perpetuation of segregation" analysis, or both, the defendant must show that "its actions furthered, in theory and practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* at 936 (citing *Rizzo*, 564 F.2d at 149).

Two additional factors are then considered in the balance between the discriminatory effect of the challenged act and the justification for the challenged act: (1) if any evidence of discriminatory intent is presented, that evidence weighs heavily on the plaintiff's side of the ultimate balance, and (2) where a plaintiff seeks to require a governmental defendant to eliminate some obstacle to housing and not to require the defendant to build housing, the defendant has to establish a more substantial

50

justification for the challenged act. *Huntington* 844 F.2d at 936.  Importantly, a disparate impact

claim allows a plaintiff to establish a violation of the Fair Housing Act without showing "that the

decision complained of was made with discriminatory intent." *Huntington*, 844 F.2d at 934.

Plaintiffs now consider the undisputed facts of this case under this disparate impact

framework.

### 2.   The City Admits That Its Land Use Policies Limit the Creation of Affordable Housing in General and Particularly in the Exclusively White Areas Outside of Downtown.

As an initial matter, the City admits that its zoning policies generally limit the opportunities

for the construction of affordable housing, particularly in the predominantly white outer areas.

Saratoga Springs' articulated land use vision is a "City in the Country" concept, which allows an

intensively developed urban core and an outlying area comprised of open lands, a landscape or rural

character and low density residential development. (Ex. 24, 2001 Comp. Plan, at 1.)  The City has

long recognized that this land use concept limits the creation of affordable housing. (Ex. 96,

Supplement to EAF and Evaluation of Impacts Rezoning of SWAD to RR-1, at D 454 (recognizing a

policy tradeoff between City's chosen path of preserving open space and creating affordable

housing); Ex. 77, Supplemental Discussion of the EAF Inclusionary Zoning Amendments, April 6,

2006, at 6 (same); Ex. 24, 2001 Comprehensive Plan at 23 (acknowledging that City's "land use

policies" may create obstacles to the development of affordable housing.); Ex. 76, Relationship

Between Land Use Laws and Workforce/Affordable Housing, at D 375-76 (listing Saratoga Springs'

land use laws as a disadvantage to the construction of affordable housing.)[15]  The obstacles to

constructing affordable housing under the City's land use regulations are essentially insurmountable

in the outer areas of the City. (Ex. 18, Mirling Dep. at 104-05 (describing his belief that affordable

---

[15] As described above, the City has accomplished virtually nothing to offset its policy decision to favor open space over affordable housing by favoring affordable housing in other decisions.  In fact, where given the opportunity, the City has compounded the tradeoff.  For example, the City has purchased numerous parcels of land for the preservation of open space, (Ex. 4, Behan Dep. at 18; Ex. 15, McCabe Dep. at 50-53.) including a parcel where a developer had proposed a significant number of affordable housing units. (Ex. 7, Bornemann Dep. at 103, 105-06.) Notably, despite a Comprehensive Plan directive to do so, the City has done nothing to "[m]ake greater use of City-owned and acquired properties for affordable housing." (Ex. 24, 2001 Comprehensive Plan at 25.)

housing cannot be built in a RR-1 zone that allows only one unit per two acres); Ex. 60, 2000 Consol. Plan, at D3902 (documenting that average construction costs of single-family houses and even the vast majority of new multifamily construction in the city are "prohibitive to affordable housing").) As described by Planning Board member Robert Israel, the Comprehensive Plan "talks about workforce housing in the city core, not in the suburbs." (Ex. 65, Planning Board Minutes, Jan. 19, 2005, at 11; *see also id.* (Planning Board member Ohlin expressing agreement with Israel's statements).) Planning Board member William McTygue stated in his deposition that: "the opportunities in the outside district [for affordable housing] are limited just because of the zoning . . . traditionally that has not been an area of focus for opportunities of expanded or higher density development...." (Ex. 17, McTygue, W. Dep. at 93-95.)

The essential reason that the City's land use policies limit the construction of affordable housing in the outer areas is the low density zoning in the area. (Ex. 77, Supplemental Discussion of the EAF Inclusionary Zoning Amendments, Apr. 6, 2006, at 3 (noting that "areas surrounding the city may face a more limited development potential under RR-1 which is a zoning district broadly applied to the city's "Outer District" or "country areas").) The little land that is zoned in a manner that could permit multi-family affordable housing is located in the urban core where there is no available land and affordable housing and minorities are already concentrated. (Ex. 48, City Council Minutes, Feb. 1, 2005 (developer noting that there is no place in the downtown area to construct high-density affordable housing); Ex. 100, WHP Minutes, Jan. 24, 2005 (recounting City Planner's observation that no big vacant parcels exist, and the opportunities for affordable multi-family developments are in the downtown urban core); Ex. 76, Relationship Between Land Use Laws and Workforce/Affordable Housing (City Planner noting limits on building residential developments in outer portions of city but suggesting that residential opportunities are available in the inner core); Ex. 13, Klotz Dep. at 54-55 (noting that higher allowable densities ease the construction of affordable housing and that under the City's Comprehensive Plan, those higher densities are allowed in the urban core.)

As a result of the City's land use policies, virtually no affordable housing has been

52

constructed in the City in recent years.[16]  Only seventeen units, excluding those reserved for seniors, have been built since 1994.  (Ex. 9, Brunelle Dep. at 22-24.)  In the same time period, approximately 2300 market-rate units have been constructed.  (Ex. 9, Brunelle Dep. at 22-24.)  The prospects of the creation of additional affordable housing are dim.  Only 250 acres, or 1.3% of the land in Saratoga Springs, are zoned for multi-family buildings.  (Ex. 77, Supplemental Discussion of the EAF Inclusionary Zoning Amendments, April 6, 2006, at 9.)

As described next, the effect of these land use policies that limit the construction of affordable housing is clear:  they have an adverse impact on African Americans and perpetuate the segregation of African Americans.

### 3.    The Undisputed Evidence Establishes that The City's Land Use Policies That Prevent and Discourage the Construction of Affordable Housing Have an Adverse Impact on African Americans.

Courts considering the extent of the adverse impact of a practice challenged under the Fair Housing Act typically compare (1) the percentage of all persons affected by the practice to (2) the percentage of the protected class affected by the practice and measure the ratio of that difference. *See, e.g.*, *Huntington*, 844 F.2d at 938; *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 741 (8th Cir. 2005).

In this context, the persons predictably affected by Saratoga Springs' policies that preclude affordable housing are those who are located in the housing market and would qualify for affordable housing.  The parties agree that the geographic area from which most residents would be drawn for a development in Saratoga Springs would be either Saratoga Springs or the Albany-Troy-Schenectady Metropolitan Statistical Area.  (Ex. 59, Fairley Report at 3.)  Further, the parties agree that the maximum income cutoff for families who would qualify for affordable housing are those that meet

---

[16] Defendants weakly assert that they have increased affordable housing opportunities by spending federal Community Development Block Grant funds to rehabilitate buildings in the downtown area.  The City's own reports clearly indicate that those efforts have had the opposite effect.  After discussing the attention and investment in the Beekman Street area, the City notes one of the fruits of that labor:  "a *decrease* in the percent of low- and moderate-income households in this block group."  (Ex. 79, 2004 CAPER, at 23-24 (emphasis added).  Defendants also reference a "Workforce Housing Trust Fund" created by the City.  Of course, not a dollar of money from the trust fund has been spent to assist in the construction or rehabilitation of affordable housing.  (Ex. 6, Birge Dep. at 57.)

the federal government standard of families earning less than 80% of the area median income, which in Saratoga Springs for a family of four is $39,760. (Ex. 59, Fairley Report at 4.)

Approximately 27% of all Saratoga Springs families earn less than $39,760 and therefore qualify for affordable housing. On the other hand, approximately 57% of African-American families in Saratoga Springs earn less than $39,760 and therefore qualify for affordable housing. In the Albany-Troy-Schenectady Metropolitan Statistical Area the difference is similar: 32% of all families and 67.2% of African American families earn less than $39,760 and therefore qualify for affordable housing. (*See supra* at n.5.)

The racial disparity is significant for both geographic areas. The odds-ratio, which measures the odds that an African American family is going to be affected by Defendants' policy as compared to the odds that a non-African American family is going to be affected by Defendants' policy, is 3.7 for Saratoga Springs and 5.0 for the Albany-Troy-Schenectady Metropolitan Statistical Area. (*See supra* at n.5.) In other words, the odds that a Saratoga Springs African American family would occupy an affordable housing unit in the City is 3.7 times greater than the odds that a white Saratoga Springs family would occupy an affordable housing unit. This ratio demands a finding of adverse impact. *See, e.g., Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154 (S.D.N.Y. 1989) (finding disparate impact where the "odds of being excluded by the triple income test are 2.5 times greater for minority persons than non-minority persons.")

The differences in the percentages of African Americans and non-African-Americans affected by Defendants' exclusion of affordable housing is similar to or greater than the differences in other cases where courts have found disparate impact. In *Huntington*, the Second Circuit found a disparate impact where 7% of all families were likely to be affected by the challenged decision, but 24% of black families were likely to be affected. 844 F.2d at 938. In *Keith*, the Ninth Circuit found a disparate impact based on evidence that two-thirds of the persons affected by the challenged act were minorities and therefore that the act had twice the rate of adverse impact on minorities than it had on whites. *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988). In *Arlington II*, African Americans

represented 40% of those likely affected by the Village's refusal to rezone certain property to permit construction of federally subsidized low-income housing but only 18% of the population. *See* 558 F.2d at 1286.

### 4.     Defendants' Responses to Plaintiffs' Undisputed Showing of the Adverse Racial Impact Are Meritless.

Defendants raise four challenges to Plaintiffs' showing of adverse impact. None of the challenges is persuasive and the clear adverse impact on African Americans remains undisputed.

### i.     Plaintiffs' Appropriately Analyze the Effect of Excluding Affordable Housing on African Americans.

Defendants cannot dispute the fact that eliminating affordable housing opportunities disproportionately affect African Americans and therefore assert that the Court should examine the percentage of individuals affected by eliminating both affordable and market-rate units. Defendants' suggested analysis is flawed for a number of reasons.

Plaintiffs challenge Defendants' policies, as described above, that prevent affordable housing, including those policies that Defendants assert led to the rezoning of the SWAD area and the denial of the Spring Run Village application. As Plaintiffs have shown, market-rate units have been and continue to be built in the City. (*See, e.g.*, Ex. 9, Brunelle Dep. at 22-24 (comparing the 2300 market rate units and 17 workforce affordable units built in the City since 1994.) Further, it is undisputed that Defendants' actions do not prevent Plaintiffs from construction market-rate units in the SWAD area. (Ex. 96, Supplement to EAF and Evaluation of Impacts Rezoning of SWAD to RR-1, at D454 (stating that the rezoning of the Anderson property to RR-1 is geared primarily for single-family residences).) Those who can afford market-rate units may still live in the SWAD area under Defendants' zoning.

Indeed, Defendants' rezoning did more than just prevent the Spring Run Village project, it prevents the Anderson family from ever pursuing an affordable housing development in the SWAD area. (*See, e.g.*, Ex. 96, Supplement to EAF and Evaluation of Impacts Rezoning of SWAD to RR-1, at 454 (acknowledging that rezoning action "may limit future options to create additional affordable

housing in this subject area"); Ex. 78, Raphael Report at 2-3; Ex. 9, Brunelle Dep. at 44-45.)

Accordingly, there is no basis to include the effect of eliminating market rate units in the analysis of the effect of Defendants' land use policies – while opportunities for constructing affordable units have been curtailed, opportunities for constructing market rate units remain.

### ii.     Plaintiffs Appropriately Rely on 2000 Census Data.

Defendants suggest that Plaintiffs' statistical analyses are somehow flawed because the predicate 2000 Census data is outdated.  There is no basis for this assertion.  First, Defendants do not consider the fact that a relatively short period of time passed between the release of the 2000 data in the summer of 2001, *see http://www.census.gov/population/www/censusdata/c2kproducts.html*, and the first of the events challenged in this case, which occurred in May 2003.  Less than two years elapsed between the release of the census data and Defendants' first actions that precluded affordable housing in the SWAD area.

Second, Census data is unquestionably the most reliable source of information regarding the demographics of the City, and even today, the City itself relies on 2000 census data in its reports to the federal government regarding the racial impact of its funding activities.[17]  Ex. 26, 2006 Entitlement Action Plan.)  Plaintiffs appropriately rely on 2000 Census data, which is the "most recent compilation available."  *Bronson*, 724 F. Supp. at 155.

### iii.    Plaintiffs' Analysis of the Predicted Percentage of African-American Residents in Spring Run Village is Consistent With Controlling Precedent.

Defendants assert that any prediction of the number or percentage of African Americans that would live in Spring Run Village is too speculative.  Defendants fail to recognize that courts regularly make such predictions based on the precise information presented by Plaintiffs here.

Defendants first assert that no prediction of the demographics of the Spring Run Village development can be made because there is no guarantee that the project would be built.  As the

---

[17] Of course, Defendants' expert here also relied on 2000 census data to argue that there would be no adverse racial impact if all housing opportunities were eliminated in the SWAD area.  (Ex. 59, Fairley Report, at 7.)

Supreme Court has recognized, all housing developments halted by a defendant's discrimination before they are built are subject to some extent to certain uncertainties, but that does not prevent courts from predicting the likely residents of such projects in the absence of a defendant's discrimination. *Arlington I*, 429 U.S. at 261-62.

For example, in *Huntington*, numerous uncertainties remained regarding plaintiffs' proposed project. They only had an option to purchase the property, had not received the subsidies necessary to build the project, and still had site-specific design issues to resolve. *Huntington*, 844 F.2d at 931, 940; *see also Arlington I*, 429 U.S. at 261-22. Nonetheless, the court, relying on census data predicted the composition of the residents if the building had been permitted to be built.

Defendants next argue that it is impossible to predict who precisely would have applied to live in Spring Run Village. When a defendant's policies prevent a development from ever being constructed, precise applicant flow data is simply not available. Courts, therefore, use the best available data to determine the likely applicant pool. *See Huntington*, 844 F.2d at 938 (making a comparison of the percentages of whites and African Americans whose incomes qualified them for subsidized housing and the percentages of whites and African Americans who needed affordable housing); s*ee also Charleston Hous. Auth.*, 419 F.3d at 741; *Keith*, 858 F.2d at 484; *Arlington II*, 558 F.2d at 1286.

Defendants simply cannot dispute the fact that under the widely accepted methods for predicting the composition of residents, affordable housing units in Saratoga Springs, including in Spring Run Village, will likely be occupied by a disproportionate number of African Americans.

> **iv.    The Factual Findings in the *Eastampton* Case Have No Relevance to the Actual and Predictable Impact of Saratoga Springs' Land Use Decisions.**

Finally, Defendants cite *Eastampton Center* for the proposition that the Saratoga Springs land use policies and decisions challenged here do not limit housing opportunities for African Americans. Def.'s Mem at 21-22. The case has no application here. In *Eastampton*, a familial status discrimination case, the plaintiffs sought to build a multi-family residential development that would

have resulted in a twenty-five percent increase of the total housing stock in Eastampton, but which had no particular income or other residency requirements. *Eastampton Center, L.L.C. v. Township of Eastampton*, 155 F. Supp. 2d 103, 109 (D.N.J. 2001). Accordingly, the proposed development in *Eastampton* was likely to be occupied by the same percentage of families with children as any other housing in the city. *Id.* at 118-19. The Eastampton ordinance merely limited the total number of residential units that could be built in the city. It did not, as the land use policies and actions challenged here do, limit particular forms of housing that would be disproportionately occupied by a protected class. Indeed, the *Eastampton* plaintiffs did not even *argue* that the challenged ordinance "in any way restrict[s] families with children from residing in housing units located in Eastampton." *Id.* at 118, 120.

Further, and in contrast to the undisputed evidence presented here that African Americans face disproportionate and significant housing cost burdens in Saratoga Springs, the *Eastampton* plaintiffs did not "present any evidence which suggests that there is a housing shortage for families with children in Eastampton." *Id.* at 120.

* * *

The undisputed facts demonstrate that the City's policies that exclude affordable housing opportunities, including the Spring Run Village project, have an adverse impact on African Americans. As discussed next, those same policies tend to perpetuate the City's already high level of segregation.

### 5. The City's Policies Limiting The Construction of Affordable Housing, Particularly in the Outer Areas, Perpetuate Segregation.

#### i. Saratoga Springs is Highly Segregated.

In Saratoga Springs, African Americans are concentrated in small areas around the downtown area. The City recognizes that there are two areas of "particular" concentration of non-whites. (Ex. 79, 2004 CAPER at 9-10, 34-36.) "The City's small minority population primarily reside in the tracts just outside the downtown area...." (Ex. 32, Profile of Change at 5.) As stated by the City in 1999,

"[g]reater than 42% of the City's total households qualify as low and moderate income (0-80% of MSA median figure) with poverty, minority, and low/moderate income concentrations located in the Westside and downtown neighborhoods." (Ex. 66, 1999 Entitlement Action Plan, at 1878-79, 1896 (noting three block groups with minority concentrations, all in the downtown area).)  Twelve years earlier, the City made an identical finding: "[t]he concentration of minorities in the City is generally in the downtown area and Westside neighborhood." (Ex. 53, 1987 Comp. Plan at 1.7.)

On the other hand, the SWAD area, where the Anderson family proposed Spring Run Village, has virtually no African Americans. (Ex. 32, Profile of Change at 15, Table 6.)  As simply stated in the City Planner's analysis of City demographics, "[t]he minority population is very low in the outer tracts." (Ex. 32, Profile of Change at 5.)

The City's conclusions regarding the concentrations of African Americans are confirmed by mathematical analyses of segregation in the City.  By the generally accepted measure of segregation, the Dissimilarity Index, there is a *high* level of segregation of African Americans in Saratoga Springs. (Ex. 25, Parnell Report at 3-4.); *see Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 320 (4th Cir. 2001) (noting use of dissimilarity index to determine if school system was segregated).  The Dissimilarity Index for Saratoga Springs is 61.2, which is considered a high level and means that 61.2% of African Americans would have to move in order to achieve an even racial distribution. (Ex. 25, Parnell Report at 3-4.)  That level of segregation is caused by the undisputed concentration of African Americans and other minorities in the downtown area and the fact that the "outer" areas of the City, where the construction of affordable housing is limited, is virtually all-white.[18] *See* (Ex. 79,

---

[18] Defendants' expert report is not to the contrary. Dr. Fairley did not present any mathematical analysis of the level of segregation in Saratoga Springs, but admitted in his deposition that he did a calculation of the Dissimilarity Index and reached a number similar to Dr. Parnell's. (Ex. 11, Fairley Dep. at 125.) In fact, Dr. Fairley further stated in his deposition that he should have noted in his report "that there's a very tiny percent of all the census blocks in the city have much of a percentage of African Americans." (Ex. 11, Fairley Dep. at 90.) Dr. Fairley admits that he did not do an "extensive" analysis of segregation levels in Saratoga Springs. (Ex. 11, Fairley Dep. at 119-120.) As Dr. Fairley explains: "And this issue, perpetuation of segregation would be -- well, it wasn't as -- it wasn't focused. It wasn't as much a focus of the suit as disparate impact. And I spent most of my time on disparate impact. So some of this is a little bit of an outline. A couple of these points are not flushed out with detail." (Ex. 11, Fairley Dep. at 129.) That purely qualitative analysis is insufficient to rebut either the City's own admissions regarding concentrations of minorities or Dr. Parnell's extensive mathematical analysis of segregation.

2004 CAPER at 9-10, 34-36; Ex. 32, Profile of Change at 8-18 (tables and maps of racial composition of Saratoga Springs census tracts.)

Despite these undisputed high levels of segregation, City officials can point to no actions to address racial concentration or the overlapping concentrations of affordable housing. *See, e.g.*, (Ex. 15, McCabe Dep. at 121 (acknowledging that the City has taken no actions to address segregation of minorities in the City since he has been on the Council); Ex. 13, Mayor Klotz Dep. at 33 (stating when asked to describe City actions taken to encourage the construction of affordable housing in different areas of the City that "I don't know that I can speak to specific actions other than just general discussion and general encouragement.").)

### ii.   Limiting the Scant Affordable Housing Opportunities to the Downtown Area Perpetuates Segregated Living Patterns.

With African Americans disproportionately living in affordable housing in Saratoga Springs, City policies that generally preclude the construction of affordable housing in the nearly all-white outer areas of the city perpetuate segregation.  The rezoning of the SWAD and denial of the Spring Run Village application are illustrative. The number of affordable housing units proposed by the Anderson family was over the three times the total number of affordable housing units built in the entire city in the last decade. (Ex. 9, Brunelle Dep. at 22-24, 53.)  A significant portion of those units would be occupied by African Americans, in a census tract that currently has only 19 African Americans.  (Ex. 32, Profile of Change at 15, Table 6.)

The facts are similar to those considered in *Huntington* where the Court found perpetuation of segregation because the "proposed project would begin desegregating a neighborhood which is currently 98% white" and defendant's "refusal to permit projects outside the urban renewal zone with its high concentration of minorities reinforced racial segregation in housing." *Huntington*, 844 F.2d at 929.

The undisputed evidence establishes that Defendants' land use policies that limit the construction of affordable housing and were specifically used to justify the rezoning of the SWAD area and deny the Spring Run Village application had a "discriminatory effect" on African Americans under both the "adverse impact" and "perpetuation of segregation" analyses.  Accordingly, Defendants have the burden of justifying their policies and establishing that no less discriminatory alternatives would achieve their purposes.

### 6.     Defendants Have Made No Showing That No Less Discriminatory Alternatives Would Achieve Their Land Use Purposes.

Defendants assert that their land use policies, which have the effect of limiting affordable housing opportunities further the City's legitimate policy of seeking to preserve open space.  Defs.' Mem. at 25.  As described above, Plaintiffs have shown this explanation is false.  In addition, however, even assuming that "open space" or "City in the Country" is a legitimate, bona fide justification for the City's policies, Defendants must show that that no alternative would serve that interest with less discriminatory effect.  *See Huntington*, 844 F.2d at 936.  Defendants, however, have failed to make *any* showing that no alternative would serve its land use interests with less discriminatory effect.  In fact, Defendants admit that the City's open space interests could be served while allowing high-density residential developments in the outer areas of the City including the SWAD area.

That evidence begins with Defendants' own testimony and their admissions that high-density residential zoning, which would promote affordable housing, would not interfere with Saratoga Springs' open space or City in the Country concept.  As articulated by City Council member Curley:

Q:     Is higher density residential development in the non-downtown area, how would that affect the city in the country concept?

A:     I guess that would be the opinion of every individual that thought about it. Shouldn't have any impact on it at all if it was looked at correctly, developed properly, and fit in with everything legally.  I don't believe there would be any impacts on the city in the country.

Ex. 10, Curley Dep. at 54.  Councilmember McCabe agrees, also noting that if done properly, high-density residential would not be in conflict with the City-in-the Country concept.  (Ex. 15, McCabe Dep. at 152.)  Simply put, these Defendants clearly state that the City in the Country concept and open space considerations do not mandate restricting high-density residential uses, where affordable housing is a possibility, to the inner core of the city.  Allowing those uses outside the inner core would be a far less discriminatory alternative, making for greater opportunities for affordable housing and breaking the long-standing patterns of segregation in the city.

It is also undisputed that the City in the Country and open space concepts did not require the rezoning of the SWAD area.  When the Gilbert Road/Weibel Avenue Committee completed its study of the area with the purpose of examining land use options for the Anderson family's property and surrounding area that would be consistent with the land use concepts of the Comprehensive Plan, (Ex. 4, Behan Dep. at 64-65.), it found four possible land use options.  One of the land use options included allowing special uses such as "multiple-family dwellings."  (Ex. 35, Weibel Avenue/Gilbert Road Study Report at 31-33 (discussing third land use option for Gilbert Road/Weibel Avenue area that would be consistent with the Comprehensive Plan's City in the Country concept).)

Further, as Defendants admit in their statement of undisputed facts, the 1999 Comprehensive Plan, which called for high density residential and commercial uses in the SWAD area, was "focused on maintaining the rural character of the area."  Defs.' Statement of Undisputed Facts at ¶ 48.  In other words, in the City's 1999 view, the "rural character" of the SWAD area could have been maintained under the previous zoning classification where Spring Run Village was a preferred use.

Michael Welti, who served on both the 2001 Comprehensive Plan Committee and the 2003 Zoning Ordinance Review Committee, which formulated and implemented the City in the Country concept, acknowledged that designating the SWAD area as a Conservancy Development District and allowing only low-density residential uses was not the only means to preserve the City in the Country concept.  (Ex. 23, Welti Dep. at 98-99.)  The City Council simply did not consider whether there would be means to preserve the concepts of the Comprehensive Plan without the discriminatory

effect of excluding affordable housing opportunities.  (Ex. 18, Mirling Dep. at 94, 124 (testifying that City Council did not consider the effect of the 2001 Comprehensive Plan on minorities or families with children).)

Significantly, the City has already developed and adopted an open space plan that identifies and classifies areas to be preserved for open space.  That plan does not include the Spring Run Village site as one to be preserved as open space. [19]  (Ex. 4, Behan Dep. at 116; *see also* Ex. 15, McCabe Dep. at 71-72 (admitting that the Anderson family's property is not considered to be in the Saratoga Springs green belt, particularly in the northern area of the property where the Andersons sought to construct Spring Run Village).)

As a result, contrary to Defendants' suggestion, Plaintiffs are not developers trying to force to Saratoga Springs to approve their development despite a *conflict* with the City's vision for its growth. Defs.' Mem. at 22 (quoting *Eastampton*, 155 F. Supp. 2d at 121).  Spring Run Village was not in conflict with the City's land use vision.  As Defendants and their representatives admit, a development like Spring Run Village could be constructed without interfering with the "City in the Country" concept, the rural character of the area, or the desired open space.  Allowing Spring Run Village and other affordable housing proposals to proceed in the outer areas of the City would undoubtedly have a far less discriminatory effect than current policies and Defendants' have not produced a shred of evidence to the contrary.

7.      **The Remaining Arlington Heights Factors Support A Finding In Plaintiffs' Favor on Their Disparate Impact Claims.**

The two remaining factors in the disparate impact analysis only further support Plaintiffs' disparate impact claim.  Any evidence of intent "weigh[s] heavily on the plaintiff's side of the ultimate balance."  *Huntington*, 844 F.2d at 936.  As described above, Plaintiffs have presented ample evidence that the City's land use policies used to justify their decisions to rezone the SWAD area and deny the Spring Run Village application were motivated by consideration of the fact that African

---

[19] Notably, in 1994, the City estimated that 70% of the city was open space.  (Ex. 80, Estimate of Open Space Acreage.)

Americans and families with children are more likely to live in affordable housing.

The final factor considered by courts in a disparate impact analysis is "whether the plaintiff is suing to compel a governmental defendant to build housing or only to require a governmental defendant to eliminate some obstacle to housing that the plaintiff itself will build." *Huntington*, 844 F.2d at 936. This factor simply recognizes that where a plaintiff challenges the disparate impact of an act that creates an obstacle to housing opportunities the defendant faces a greater burden to justify the act than where the plaintiff challenges the disparate impact of an entity's refusal to construct housing. Here, Plaintiffs merely seek permission to construct housing on their property and do not seek to compel Defendants to build housing.

* * *

The undisputed facts establish that Defendants' land use policies that they cite as justifying the rezoning of the SWAD area and denial of the Spring Run Village application have a disparate impact on African Americans. Accordingly, judgment should be entered in favor of Plaintiffs on that claim. Of course, if the Court were to find the undisputed facts did not establish a disparate impact, it is clear that there are, at a minimum, disputed facts that when construed in the light most favorable to Plaintiffs permit a finding of impermissible disparate impact.

## III.    The Individual Defendants Are Not Entitled to Immunity.

### A.    Legislative Immunity Does Not Attach to the City Officials' Actions.

Defendants repeat their claim, first raised in their Motion for Judgment on the Pleadings, that the individual defendants are entitled to legislative immunity, a claim that this Court has already rejected. As fully briefed in Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings (R. 39, at 15-17), and reincorporated here, the Defendants' denial of the Spring Run Village special use permit application and the downzoning of the SWAD area were specifically directed at the Andersons in a concerted effort to deny them the ability to build Spring Run Village. None of these actions, which targeted a specific proposal by the Anderson family, are legislative in nature. *Harhay v. Town of Ellington*, 323 F.3d 206, 211 (2d Cir. 2003); *Brennan v.*

64

*Straub*, 246 F. Supp. 2d 360, 364 (S.D.N.Y. 1995) (*quoting Hill v. City of New York*, 45 F.3d 653,

600 (2d Cir. 1995)); *Moore v. Trippe*, 743 F. Supp. 201, 207-08 (S.D.N.Y. 1990).

First, Defendants do not contest that, as a matter of law, the denial of the Spring Run Village

special use permit application is a purely administrative act for which no legislative immunity

attaches. *See* Ds. Mot. Summ. J. at 31; *see also Crymes v. DeKalb County*, 923 F.2d 1482, 1485

(11th Cir. 1991); *Jim Sowell Const. Co. v. City of Coppell*, 82 F. Supp. 2d 616, 617 (N.D. Tex. 1998);

*Brennan*, 246 F. Supp. 2d at 364. Rather they rely solely on the baseless *factual* claim that the

Andersons "voluntarily" withdrew their application. *See* Ds. Mot. Summ. J. at 31. This claim is

directly contradicted by the actual transcript of the Planning Board meeting, in which the Planning

Board Chair Bristol clearly states that the Planning Board decided to "cancel" the application because

the City Council decided to downzone the parcel the previous day. (Ex. 81, 2/2/2005 Planning Bd.

Tr.; Ex. 7, Bornemann Dep. at 68 ("The Planning Board made the decision they could no longer

review it").) Defendants' own witnesses confirm that the Planning Board could not consider the

application because of the zoning change. (Ex. 7, Bornemann Dep. at 68; Ex. 5, Benton Dep. at 129.)

There is simply no basis to conclude that the Andersons withdrew the Spring Run Village application

in February 2005.

Notably, Defendants do not even address the Planning Board's decision to "reject" the Spring

Run Village application in December 2004. As described above, this decision was baseless and

represented a major departure from the process typically followed and criteria normally considered

by the Planning Board when presented with a special use permit application. Moreover, the Planning

Board's delay in considering the permit application, which allowed the City Council sufficient time

to downzone the parcel, is by itself tantamount to a denial of the application. *See Sunrise Develop.*

*Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 769 (E.D.N.Y. 1999).

Second, despite Defendants' protestations to the contrary, the evidence strongly supports

Plaintiffs' contention that the City Council's decision to downzone the SWAD was directly aimed at

obstructing and, ultimately, defeating the Andersons' efforts to provide much-needed affordable

housing.  It is undisputed that the vast majority (over 90%) of the SWAD area is owned by the

Andersons.  Indeed, when Councilmember McCabe made his first motion to downzone the area, the

title of the agenda item was "Anderson Property – referral to the Planning Board" and Mr. McCabe

stated that the "*Anderson parcel* should be zoned RR-1" and the Assistant City Attorney explained

that the City had "engaged the services of Behan and Associates to evaluate the *Anderson property*."

(Ex. 82, City Council Minutes, Sept. 21, 2004 at 8.)

In addition, the evidence shows that several individual Defendants actively participated in the

opposition efforts.  Defendant Ohlin, despite being a decisionmaker on the Andersons' pending

application, directly contacted Dennis Brunelle, the head of the County Economic Opportunity

Council, to discourage him and an advocacy group from supporting the Anderson proposal.  (Ex. 83,

N. Ohlin Email to D. Brunelle and B. Pasciullo, November 2, 2004; Ex. 9, Brunelle Dep. at 68-70

(recounting conversation with Ohlin in which she expressed opposition to Anderson proposal).)

Defendant McCabe, who lives near the Spring Run Village site, discussed the SWAD rezoning when

addressing a neighborhood organization that opposed the Spring Run Village project.  (Ex. 15,

McCabe Dep. at 158-60.)

These facts support a finding that City officials were targeting the Andersons and that no

legislative immunity should attach.[20]

By intervening in and interrupting the normal procedure for considering the special use

permit, delaying the consideration of the permit until after the decision to downzone the SWAD area,

*see, e.g., Scott v. Greenville County*, 716 F.2d 1409, 1423 (4th Cir. 1983) (finding no legislative

immunity where members of County Council interrupted process of approving developer's permit

application pending rezoning of land), and actively participating in the opposition to the Spring Run

Village proposal, each individual Defendant acted outside of his or her legislative capacity and acted

---

[20] *See, e.g., Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20, 23-24 (1st Cir. 1992) (holding that genuine issue of material fact precluded grant of legislative immunity where parties contested whether passage of facially neutral ordinance was directed at a specific set of individuals); *Brennan*, 246 F. Supp. 2d at 364 (holding that preparation and passage of legislation that affected single individual is not protected by legislative immunity); *Moore*, 743 F. Supp. at 207-08 (holding that legislative immunity is lost where town board passed code that affected only a single group of people).

in concert to deny the Andersons' special use permit application.  Such administrative acts are not protected by immunity. Legislative immunity cannot attach for these actions that were specifically directed at defeating the Andersons' proposal.  *See, e.g.*, *Acevedo-Cordero*, 958 F.2d at 23-24; *Brennan*, 246 F. Supp. 2d at 364; *Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772, 794 (D. Md. 2001) (no legislative immunity for Council members who refused to vote on resolution endorsing construction of rehabilitation facility); *Moore*, 743 F. Supp. at 207-08.

### B.    The Individual Defendants Are Not Entitled to Qualified Immunity

The individual Defendants claim that they are entitled to qualified immunity.  The Supreme Court, however, has carefully limited this defense to cases where, unlike here, a reasonable officer would lack "fair warning" that his actions violate the law, even in cases involving "novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The Second Circuit has held that "[t]he defendant bears the burden of pleading and proving the affirmative defense of qualified immunity." *Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 819 (1982)).  Defendants do not dispute that they had "fair warning" under the law.

Indeed, the liability of city officials under the Fair Housing Act for zoning decisions and permit denials that were motivated with a discriminatory purpose or that have a disproportionate impact or a segregative effect on protected classes has been well established and repeatedly affirmed as the law of this Circuit for nearly twenty years. *See, e.g.*, *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.1995); *Huntington*, 844 F.2d at 934-35.

Given the well-established nature of the law, Defendants' claim to qualified immunity is reduced to (1) rearguing that they were not motivated by a discriminatory intent, and (2) arguing that, as a matter of law, a disparate impact claim can never give rise to individual liability because intent is not an element of the claim.  (Ds. Mot. Summ. J. at 32-33, 34-35.)

First, Defendants' claim that they were not motivated by discriminatory intent is clearly a factual assertion that, as described above, is rebutted by the record.  Where, as here, a reasonable jury could believe that city officials are motivated by discriminatory intent, "a defendant's motion for

summary judgment on the basis of qualified immunity must fail." *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003) (citation omitted).

Second, with respect to Plaintiffs' disparate impact and/or perpetuation of segregation claims, Defendants simply misstate the law.[21] Defendants have no support for their claim that qualified immunity automatically shields municipal officials from every cause of action where intent is not a requirement. In fact, the Second Circuit has denied qualified immunity on disparate impact claims under the Fair Housing Act. *See Catanzaro v. Weiden*, 140 F.3d 91, 96 (2d Cir. 1998). There is no question that Defendants had fair warning that they violated the Fair Housing Act by taking unjustified acts that have a disparate impact on minorities. *See, e.g., Huntington*, 844 F.2d at 934-35. Each of the Defendants was well-aware of the great need for affordable housing in the city; a history of urban renewal that dislocated African Americans from the city; a present and past history of stigmatization of residents living in affordable housing; the overconcentration of affordable housing in the downtown area; the disproportionately minority population in the same neighborhoods; the small and declining African-American population in the city; the disproportionate need for affordable housing among families with children; explicit and camouflaged expressions of discrimination against minorities and families with children by the public; and large-lot zoning's exclusionary effect of preventing the construction of affordable housing, which is disproportionately occupied by minorities and families with children.[22]

---

[21] Defendants are also wrong to suggest that an impact claim is mutually exclusive of an intent claim. A disparate impact claim does not *require* evidence of intent, but evidence of intent is certainly one factor that supports a finding of impact. *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1293 (7th Cir. 1977).

[22] (*See, e.g.*, Ex. 84, W. Anderson Email to City Council Members and Planning Board Members re: HUD Complaint, Jan. 18, 2005; Ex. 98, The Anderson Group's HUD Complaint, Jan. 18, 2005 (noting overconcentration of affordable housing); Ex. 99, The Anderson Group's HUD Complaint, Jan. 26, 2005 (noting discriminatory impact of proposed downzoning on racial minorities and families with children; Ex. 7, Bornemann Dep. Vol. II, at 8-11 (testifying that census data showing trend of decreasing African-American population in city were presented to Planning Board and City Council); Ex. 5, Benton Dep. at 52-53, 68-69 (acknowledging that Planning Board received presentation on Affordable Housing Task Force Report, which emphasizes need for affordable housing, identifies overconcentration of affordable housing and minorities, and identifies low-density zoning as barrier to affordable housing); Ex. 5, Benton Dep. 40-41 (acknowledging knowledge of census data and that he would "certainly know" that African-American population in city is declining); Ex. 5, Benton Dep. 43-44 (stating that he is aware of disproportionately minority neighborhoods.); Ex. 53, 1987 Comp. Plan at 1.7 (recognizing that city's land use zoning policies "present costly hurdles in the development of affordable housing"); Ex. 60, 2000 Consol. Plan at 3902, 3953 (submitted to HUD and approved by City

Despite this notice, each individual Defendant continued the City's ongoing policies and practices of blocking efforts to build affordable housing in Saratoga Springs. Each Defendant has failed to provide any explanation of how large-lot zoning and the denial of the Andersons' permit application are the least discriminatory means to achieve compliance with the 2001 Comprehensive Plan. Each individual Defendant failed to minimize the discriminatory impact of their actions, thereby violating clearly established law. None, therefore, is entitled to qualified immunity.

## IV.  Defendants are Liable Under the New York Human Rights Law for Making Housing Unavailable on the Basis of Race.

Finally, Defendants suggest that New York law does not prohibit municipalities from passing zoning ordinances with the purpose or intent of discriminating on the basis of race. Ds. Mot. Summ. J. 1. This argument merely rehashes Defendants' Motion for Judgment on the Pleadings and Plaintiffs fully briefed this purely legal issue in response to that Motion and Plaintiffs reincorporate the argument and analysis here. *See* R. 39 at 20-23.

Defendants' interpretation of the law is simply untenable. Section 296 of the New York Human Rights Law broadly prohibits housing discrimination. N.Y. Exec. L. § 296.5(a). Defendants invite this Court to rely on the narrowest construction of the statute, an invitation that the New York courts and legislature have consistently rejected. The legislature explicitly mandated that the antidiscrimination provisions of the Human Rights Law "shall be construed liberally for the accomplishment of the purposes" of ending discrimination. N.Y. Exec. L. § 300. As noted by a New

---

Council, documenting that construction costs are prohibitive to affordable housing, concentrations of minorities); Ex. 24, 2001 Comp. Plan at 7 (noting problem of overconcentration of affordable housing in Westside neighborhood); Ex. 63, 1999 Entitlement Action Plan at PL1878-79 (submitted to HUD and approved by City Council, documenting concentrations of minorities, poverty, and affordable housing in Westside and downtown neighborhoods); Ex. 79, 2004 CAPER at 9 (submitted to HUD after approval by Mayor and City Council, emphasizing overlap between low- and moderate-income population and minority concentrations in city); Ex. 95, 2004 Entitlement Action Plan at PL494-498, 515-516, 540 (approved by Mayor and City Council, emphasizing affordable housing as "highest priority," need to deconcentrate affordable housing, concentration of minorities, and disproportionate needs for affordable housing by families with children); Ex. 26, 2006 Entitlement Action Plan at PL9297 (showing disproportionate racial and ethnic needs for affordable housing); Ex. 27, A Call to Action (City taskforce report on affordable housing); Ex. 6, Birge Dep. at 143-45, Vol. II at 20-29 (confirming that submissions to HUD, which include descriptions of affordable housing and minority concentrations, and disproportionate needs for affordable housing by racial minorities, are presented to and approved by Mayor and City Council); Ex. 22, Towne Dep. at 111-114 (acknowledging he was familiar with affordable housing task force report); Ex. 10, Curley Dep. 45, 47, 82 (acknowledging that City Council was informed of overconcentration of affordable housing on west side and concentrations of minorities); Ex. 10, Curley Dep. at 77-78 (acknowledging review of HUD submissions as city council member).)

York state court, "[a]lthough the language of the statute on its face" would suggest a finding against a plaintiff in a housing discrimination case, the court rejected the defendants' narrow interpretation of Section because such an interpretation would result in a situation that "[s]urely the legislature did not intend." *DiScala v. Facilities Development Corp. for Office of Mental Retardation & Developmental*, 691 N.Y.S.2d 229, 243 (N.Y. City Civ. Ct. 1998).

Further, Section 296 has been certified by the Department of Housing and Urban Development (HUD) as "substantially equivalent" to the federal Fair Housing Act. 42 U.S.C. § 3610 (outlining requirements for certification), which clearly prohibits discrimination by municipalities. *See, e.g.*, *Huntington*, 844 F.2d at 926. Indeed, the only New York case that has addressed this issue applied the New York Human Rights Law to a town's zoning decision. *See McMinn v. Town of Oyster Bay*, 105 A.D.2d 46, 50 (N.Y. App. Div. 1984).

Plaintiffs should be permitted to proceed on their New York Human Rights Law claims.

## CONCLUSION

For the above-stated reasons, Plaintiffs' Cross-Motion for Summary Judgment on their disparate impact claims should be granted and Defendants' Motion for Summary Judgment should be denied.


Dated:  July 17, 2007


Respectfully submitted,


   /s/ Reed Colfax
Reed N. Colfax
Mary J. Hahn
John P. Relman
RELMAN & DANE, PLLC
1225 19th Street, Suite 600
Washington, DC 20036
(202) 728-1888

Peter A. Lynch
LYNCH & LYNCH
111 State Street, First Floor
Albany, NY 12207
(518) 463-1252

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2007, a copy of the foregoing Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment on Plaintiffs' Disparate Impact Claims was electronically filed using the Court's CM/ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to:

Gregg T. Johnson
Scott Quesnel
Girvin & Ferlazzo
20 Corporate Woods Blvd.
Albany, New York 12211
gtj@girvinlaw.com

_____/s/ N. Cain_____
Nicholas Cain