**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE ANDERSON GROUP, LLC** *and*
**GAIL ANDERSON**

                              **Plaintiffs,**

              **v.**                                        **1:05-CV-1369**
                                                            **(GLS/DRH)**

**CITY OF SARATOGA SPRINGS;**
**MICHAEL LENZ,** *individually and in*
*his official capacity as Mayor of*
*Saratoga Springs and Saratoga*
*Springs City Council Member*;
**SARATOGA SPRINGS CITY**
**COUNCIL; THOMAS CURLEY,**
**MATTHEW MCCABE, THOMAS**
**MCTYGUE,** *and* **STEPHEN TOWNE,**
*individually and in their official*
*capacities as Saratoga Springs*
*City Council members*; **SARATOGA**
**SPRINGS PLANNING BOARD;** *and*
**LEWIS BENTON, ROBERT**
**BRISTOL, ROBERT ISRAEL,**
**WILLIAM MCTYGUE, NANCY**
**OHLIN,** *and* **LOU SCHNEIDER,**
*individually and in their official*
*capacities as Saratoga Springs*
*Planning Board members*,

                              **Defendants.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

RELMAN & ASSOCIATES                      JOHN P. RELMAN, ESQ.
1225 19th Street, N.W.                    MARY J. HAHN, ESQ.
Suite 600                                REED N. COLFAX, ESQ.
Washington, DC 20036

LYNCH, FARRELL LAW FIRM                  PETER A. LYNCH, ESQ.
111 State St.
Albany, NY 12207

**FOR THE DEFENDANTS:**

GIRVIN, FERLAZZO LAW FIRM                GREGG T. JOHNSON, ESQ.
20 Corporate Woods Boulevard             CHRIS LANGLOIS, ESQ.
2nd Floor                                JACINDA HALL CONBOY, ESQ.
Albany, NY 12211-2350                    SCOTT P. QUESNEL, ESQ.


**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Defendants Michael Lenz,[1] Thomas Curley, Matthew McCabe,

Thomas McTygue, Stephen Towne (collectively "council defendants"),

Lewis Benton, Robert Bristol, Robert Israel, William McTygue, Nancy Ohlin,

and Lou Schneider (collectively "board defendants,") move for

---

[1] The court is aware that Michael Lenz is also being sued in his capacity as Mayor of Saratoga Springs. However, it appears to the court that none of the claims against him arise out of his executive functions. Therefore, the court treats him as one of the council defendants for all intents and purposes.

reconsideration of the court's October 18, 2007 order insofar as it denied

plaintiffs' motion to dismiss the Fair Housing Act ("FHA") claims against

them individually.  For the reasons that follow, the court partially vacates its

prior order and dismisses the claims against the council defendants in their

individual capacities.  It further dismisses the claims against the board

defendants in their individual capacities only insofar as such claims arise

out of their involvement in the downzoning of the Southern Weibel Avenue

District ("SWAD").  The court's October 18, 2007 Order is otherwise

affirmed.

## II.  Background

### A.    Anderson Development Proposal and Saratoga Springs Zoning

#### 1.    Anderson Property and 1999 Zoning Change

Saratoga Springs is a city of approximately 26,000 people situated 35

miles north of Albany.  (See Pl. SMF ¶1, Dkt. No. 83.)  The land at issue in

this litigation is referred to as the SWAD, and is located within the outlying

area of Saratoga Springs, adjacent to and east of I-87.  *Id.* at ¶11.

Since at least 1987, the Anderson family has owned 115.32 acres or

93% of the SWAD.  *Id.* at ¶¶11, 12.  In 1990, the Anderson property within

3

the SWAD was zoned Rural-Residential 1 ("RR1"),[2] which restricted

development to one housing unit per two acre lot.  *Id.* at ¶21.  In 1999 the

comprehensive plan for the City's land use policies was amended.  *Id.* at

¶¶22, 28.  This new comprehensive plan designated the SWAD as an

"impact area," which envisioned development that would include "a large

campus-style office park ... and high-density residential development with

surrounding recreational areas."  *Id.* at ¶¶22, 23, 26.  To facilitate such

development the zoning ordinance applicable to the SWAD was also

amended in 1999, identifying the tract as a "special development area"

where "office parks, large offices, and high density residential [buildings]"

were the preferred uses.  *Id.* at ¶28.

### 2.    2001 Rezoning and Subsequent Annulment

On July 17, 2001, the comprehensive plan for Saratoga Springs was

modified again.  *Id.* at *¶33.*  The plan now consisted of an intensively

developed urban core, with outlying areas comprised of open lands and

low density residential development.  *Id.*  In accordance with the revised

plan, a committee ("SWAD Land Use Committee") was appointed to study

---

[2]Prior to 1990 the area was still in effect zoned rural residential, but under a different designation.  (See Pl. SMF ¶20, Dkt. No. 83.)  An RR-1 designation allows one housing unit for every 2 acres.  *Id.* at ¶39.

4

the land use options for the SWAD.  *Id.* at ¶36.  This committee began work

in 2002.  *Id.*

In order to assist in the implementation of the new 2001

comprehensive plan, the City also appointed a Zoning Ordinance Review

Committee ("ZORC") to recommend zoning ordinance amendments.  *Id.* at

¶37.  The ZORC ultimately made numerous zoning recommendations to

the City Council, one of which was to delay the RR-1 re-zoning of the

SWAD until December of 2003, in order to give the SWAD Land Use

Committee time to conduct its investigation.  *Id.* at ¶38.  This was the only

ZORC recommendation which the City Council declined to implement,

instead rezoning the SWAD to RR-1 on May 20, 2003.  *Id.* at *¶39.*  Plaintiffs

contend that this action was in response to a potential plan Susan

Anderson Touhey presented to the SWAD Land Use Committee on May

16, 2003 for a development on the Anderson property which would include

affordable housing.  *Id.* at ¶¶14, 39, 40.

The Andersons subsequently brought an Article 78 proceeding in

New York State Supreme Court, challenging the rezoning of the SWAD.

*Id.* at ¶41.  On May 10, 2004, Judge Nolan annulled the RR-1 rezoning and

reinstated the previous high density zoning for the SWAD, finding that the

5

City had failed to comply with the State Environmental Quality Review Act ("SEQRA").  *Id.*

### 3.    Proceedings Subsequent to the Zoning Annulment

After Judge Nolan's decision, the Andersons claim they retained an architect and engineers, consulted affordable housing experts, and, by the summer of 2004, had designed a development called Spring Run Village. *Id.* at ¶42.  The original plan placed the development on a 44-acre parcel in the northern portion of the SWAD and included an office building and 259 residential units, 52 of which were designated as affordable housing.  *Id.* at ¶¶45, 46.  In July of 2004, the Andersons presented the development plan to the county workforce housing group.[3]  *Id.* at ¶44.

On September 2, 2004, the City was provided with a full SEQRA assessment supporting the rezoning of the SWAD to RR-1.  (See Def. SMF ¶95, Dkt. No. 72.)  Later that month, on September 23rd, a special use permit application to build Spring Run Village was filed with the City Planning Board on behalf of Gail Anderson and The Anderson Group ("TAG").  (See 9/23/04 Special Use Permit, Dkt. No. 87.)  Meanwhile,

_____

[3]This is the first uncontested presentation of the Anderson's development plan.  (See Pl. SMF ¶44, Dkt. No. 83.)

having received the favorable SEQRA report, the City Council voted to seek an advisory opinion from the City Planning Board regarding the potential RR-1 rezoning of all of the SWAD land except that necessary for the Spring Run Village proposal. (See Def. SMF ¶104, Dkt. No. 72.) The City Planning Board held a public meeting on November 3rd to consider the City Council's request for an advisory opinion. *Id.* at ¶110. After deliberation and public commentary for and against the partial rezoning of the SWAD, the Planning Board unanimously voted to issue an unfavorable opinion to such rezoning, and requested that the City Council consider the entire SWAD for rezoning. *Id.* at ¶¶114, 115.

The Council was informed of this unfavorable opinion and, on November 17th, voted to seek an advisory opinion from the Planning Board as to the rezoning of the entire SWAD to RR-1. *Id.* at ¶130. The City Planning Board also engaged in an initial review of the Spring Run Village special use permit application on this date. (Pl. SMF ¶47, Dkt. No. 83.)[4] However, once informed of the Council's vote by the city attorney, the Board tabled consideration of the application until a later date. (Def. SMF

---

[4]Defendants deny this by citing to the Planning Board minutes which clearly establish that the Spring Run Village proposal was considered on November 17th. (See Def. RSMF ¶47, Dkt. No. 100.)

¶¶177, 178, Dkt. No. 72.)  On December 8th, the Planning Board again considered the Andersons' Spring Run Village application and the City Council's request for an advisory opinion on the proposal to rezone the entire SWAD to RR-1.  *Id.* at ¶132.  The Board unanimously voted to recommend re-zoning the entire SWAD to RR-1.  *Id.* at ¶138.  They also rejected the Andersons' application because the Spring Run Village proposal did not contain a connector road certain board members claimed was necessary since the proposal contained an office building.  (See Pl. SMF ¶48, Dkt. No. 83.)  The Andersons removed the office building from the proposal and resubmitted their application on December 15th.  *Id.* at ¶49.   The final plan for Spring Run Village included 300 residential units, of which 60 were affordable units.  *Id.*

On February 1, 2005, the City Council voted to rezone the entire SWAD to RR-1, despite the fact that the Saratoga County Planning Board had unanimously opposed such rezoning.[5]  *Id.* at ¶¶59, 60.  As a result of the rezoning, the Andersons' proposal was no longer consistent with the zoning ordinances.  (Def. SMF ¶211, Dkt. No. 72.)  On February 2nd the

---

[5]The City is required to get an advisory opinion from the Saratoga County Planning Board before rezoning areas within Saratoga County.  (See Pl. SMF ¶58, Dkt. No. 83; Def. RSMF ¶58, Dkt. No. 100.)

Planning Board met to discuss the Andersons' resubmitted application. *Id.* at ¶210.  No one appeared before the Board for the Andersons at this meeting. *Id.* at 212.  The parties dispute whether the Planning Board therefore denied the application as inconsistent with the new zoning, or instead considered the application withdrawn.  (See Def. SMF ¶212, Dkt. No. 72; Pl. SMF ¶62, Dkt. No. 83.)

On March 1st Gail Anderson filed a second Article 78 proceeding to challenge the City's rezoning of the SWAD to RR-1.  (See Pl. RSMF ¶225, Dkt. No. 86.)  The petition was dismissed on May 18th. The Plaintiffs' filed the current action on October 28, 2005, asserting disparate treatment and impact claims under the FHA and New York Human Rights Law.  (See Def. SMF ¶¶226, 229, Dkt. No. 72.)

## B.   Evidence of Discrimination

Plaintiffs claim that in delaying and denying their special use permit application and downzoning the SWAD, the council and board defendants knowingly bowed to the discriminatory animus of the community against groups protected under the FHA.  (See Pl. Resp. MSJ Pgs. 26-32, Dkt. No. 88.)  Without rehashing plaintiffs' entire seventy page brief, evidence has been presented that:

- The African American population of Saratoga Springs has decreased while the overall population of the City has been increasing. (See, e.g., Ex. 5 at 41, Dkt. No. 84:6; Ex. 25 at Table 1a, Dkt. No. 84:26; Ex. 32 at 4,8, Dkt. No. 85:9)

- The small number of African Americans who reside in Saratoga Springs are concentrated in downtown areas, with few residing in the outer tracts. (See, e.g., Ex. 32 at 5, Dkt. No.85:9)

- In 2006, the city documented 2700 households in need of affordable housing. (See, e.g., Ex. 90 at 3, Dkt. No. 90:7)

- A significantly higher percentage of African Americans qualify for and need affordable housing in Saratoga Springs when compared to Whites. (See, e.g., Ex. 25 at 6, Dkt. No. 84:26)

- City officials knew that minorities were in disproportionate need of affordable housing in Saratoga and they recognized that a lack of affordable housing has significant implications for maintaining community diversity. (See, e.g., Ex. 5 at 47-48, 53, Dkt. No. 84:6; Ex. 13 at 19, Dkt. No. 84:14; Ex. 27 at 4, Dkt. No. 85:4; Ex. 53 at 1.7, Dkt. No. 87:8;  Ex. 91, Dkt. No. 90:8 (collectively "Ex. Group A"))

- The City and community have opposed and rejected proposals to

develop affordable housing or to enact inclusionary zoning ordinances in the past. (See, e.g., Ex. 9 at 27-28, 79, 82, 87-88, Dkt. No. 84:10; Ex. 19 at 36-38, Dkt. No. 84:20; Ex. 62, Dkt. No. 89:2; Ex. 65 at 11-12, Dkt. No. 89:5; Ex. 66 at 3760-61, Dkt. No. 89:6; Ex. 87, Dkt. No. 90:4; Ex. 92, Dkt. No. 90:9. (collectively "Ex. Group B"))

- The City has recognized that much of the public's opposition is based on the "stigma" associated with affordable housing and the low and moderate income people who would live there. (See, e.g., Ex. 27 at 18, Dkt. No. 85:4; Ex. 60 at 32, Dkt. No. 87:16. (collectively "Ex. Group C"))

- Spring Run Village would have contained 60 affordable housing units and been located in the outer tracts of the City. (See Ex. 71 at 1, Dkt. No. 89:11)

- After the May 2003 downzoning of the SWAD was overturned, the City Council initially sought a zoning opinion from the Planning Board as to downzoning only so much of the SWAD as would not be used for Spring Run Village. (See Ex. 68 at 3, Dkt. No. 89:8)

- There was substantial community opposition to the Spring Run Village proposal expressed at Council and Board hearings. Some of

11

this opposition centered on the affordable housing component, with

residents expressing concerns about transients and people from New

York City moving in, lowered property values, an increase in children,

an increase in crime, an increase in drug addicts and a need to

protect the town.[6]  (See, e.g., Ex. 9 at 68, Dkt. No. 84:10; Ex. 17 at

70, 79, Dkt. No. 84:18; Ex. 39 at 2, Dkt. No. 85:19; Ex. 54, Dkt. No.

87:10; Ex. 55 at 10, Dkt. No. 87:11 (collectively "Ex. Group D"))[7]

• The Board delayed consideration of the Andersons' special use

permit application and the Council subsequently downzoned the

entire SWAD based largely on the community's opposition to Spring

Run Village.  (See, e.g., Ex. 13 at 39-40, 79-80, Dkt. No. 84:14; Ex.

17 at 63-65, 67, Dkt. No. 84:18; Ex. 39 at 7, Dkt. No. 85:19; Ex. 48 at

6, Dkt. No. 87:3; Ex. 22 at 180, Dkt. No. 84:23 (collectively "Ex.

---

[6]The plaintiffs have also alleged that at least one member of the community advising Council member McCabe regarding the SWAD downzoning indicated to the Plaintiffs' landscape architect that she didn't want "those people," "spics" and "Negroes" living near her. (Ex. 12 at 100-01, Dkt. No. 84:13; Ex. 15 at 63, 68-69, 90-92, 108-09, Dkt. No. 84:16.)

[7]The defendants have taken issue with the court's reliance on many of exhibits presented by the plaintiffs because they were not specifically cited in plaintiffs' responsive 7.1 statement.  Rather, the plaintiffs' cite to a page span in their brief and the record cites therein in supporting certain denials.  It is claimed that this denied the defendants the opportunity to contest these facts.  While it is true that some of plaintiff's denials are in technical noncompliance with Local Rule 7.1(a)(3), the pragmatic considerations of listing a multitude of exhibits in a 7.1 statement dictates leniency.  It may be inconvenient to refer to plaintiffs' brief for record cites, but it is not "manifest injustice."

Group E"))

• There were allegedly various procedural irregularities in the consideration of zoning options for the SWAD and the administrative treatment of the Andersons' special use permit application. (See, e.g., Ex. 8 at 202, Dkt. No. 84:9; Ex. 12 at 90-98, Dkt. No. 84:13; Ex. 14 at 107-08, Dkt. No. 84:14. (Collectively "Ex. Group F"))

Defendants deny that the race, ethnicity, or familial status of potential residents of Spring Run Village had anything to do with the decision to rezone the SWAD. (See Def. SMF ¶144, Dkt. No. 72.) They claim that none of these factors were raised, discussed, or considered as related to the rezoning of the SWAD to RR-1. *Id.* at ¶¶145, 146. Rather, defendants contend that "[t]he Council's vote to re-zone the SWAD was to maintain a consistent land use policy within the City, emphasizing the City's focus on maintaining the rural character of the City's gateway entrances." (See Def. SMF ¶148, Dkt. No. 72.)

## C.    **Current Proceedings**

On June 22, 2007, Defendants filed a motion for summary judgment seeking, *inter alia*, dismissal of the FHA claims against the individual defendants. It was asserted that insufficient evidence was presented to

13

support the individual claims and that the individual defendants were

entitled to qualified and legislative immunity.  The court ruled against the

defendants on all these grounds.  Now pending before the court is a motion

for reconsideration of these rulings.

## III.  Discussion

### A.    Standard of Review

The standard of review applicable to a motion for reconsideration is

well-established, and need not be repeated here.  *See, e.g., Lust v. Joyce,*

No. 05-cv-613, 2007 WL 3353214, at * 1 (N.D.N.Y. Nov. 9, 2007).  Of

relevance to this case is the principle that a court may grant a motion for

reconsideration "to correct a clear error of law or prevent manifest

injustice."  *C-TC 9th Ave. P'Ship v. Norton Co. (In re C-TC 9th Ave.

P'Ship),* 182 B.R. 1, 3 (N.D.N.Y. 1995).

### B.    The Individual Defendants' Motion for Reconsideration

The defendants advance four principal arguments in support of their

claim that the court erred when it declined to dismiss the individual claims.

First, they contend that the plaintiffs changed their theory of the case in

relation to the summary judgment motion, such that reconsideration is

appropriate.  Second, defendants assert that the court erred when it found

14

that there was sufficient evidence presented against the council and board defendants to sustain individual FHA claims against them.  Third, defendants argue that the council and board defendants should have been granted qualified immunity.  Finally, they contend that it was improper to deny the council and board defendants legislative immunity.  The court addresses each of these arguments in turn.

### 1.   Change in Theory

Defendants' first argument seems to be based on nothing more than confusion between the parties as to what events give rise to the individual FHA claims.  Defendants contend that the plaintiffs have improperly changed their theory of the case, and now seek to hold the council and board defendants individually liable for the discriminatory impact of the City's overall land use policies.  They assert that this is improper given that the individual liability claims against the council and board defendants were originally premised on: "(1) the City's action in re-zoning a large tract of land known as the 'SWAD' on February 1, 2005, (via vote of the City Council) and (2) the Planning Board's treatment of Plaintiff's application for a Special Use Permit to construct Spring Run Village ... between September 23, 2004 and February 2, 2005."  (Dkt. No. 118:5 at 1-10)

The plaintiffs' response brief makes it clear that these are still the only two acts which give rise to the claims of individual liability. The plaintiffs are challenging the City's overall land use policies under a theory of disparate impact.  While it is true that the plaintiffs indicated at the summary judgment stage that they felt it was permissible to assert claims against individuals under a theory of disparate impact, they have indicated that they are not seeking to do so.  (See Dkt. No. 122:1 at 4-5)  Therefore, while the defendants may still feel that the plaintiffs have "changed their theory" by challenging Saratoga's land use policies, or that the plaintiffs lack standing to do so, the issue is irrelevant to the current motion for reconsideration seeking dismissal of the individual claims.[8]  As such, the court will address it no further.

### 2.    Sufficiency of the Evidence

The FHA prohibits the implementation or enforcement of housing policies or zoning ordinances in a discriminatory manner "because of race,

_____

[8]In reply to the plaintiffs' response, the defendants argue for the first time that the plaintiffs cannot challenge the City's overall land use policies under the FHA because their standing is based solely on the 2005 downzoning of the SWAD.  Therefore, according to the defendants, plaintiffs' claims must arise out of such downzoning.  (See Dkt. No. 124:1 at 10)  It is improper to raise a novel argument in a reply brief.  However, the court would be inclined to address the standing argument as a jurisdictional matter, if not for the total absence of authority cited to support it.

color, religion, sex, familial status, or national orgin."[9]  "To establish a *prima facie case* of discriminat[ory treatment] under the FHA ... the plaintiffs must present evidence that 'animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *City of Middletown*, 294 F.3d at 49 (citation omitted) (emphasis added).

The defendants contend that, under this standard, the court was in error when it held that the plaintiffs had set forth sufficient evidence to establish a *prima facie* case against the individual defendants. They note that the proposal for Spring Run Village was not presented by minorities, or as catering to minorities or families with children.  Further, it contained only 20% affordable housing.  In addition, it is contended that there is no evidence that discriminatory animus was a significant factor in the actions of the individual defendants, or that these defendants understood such

---

[9]Discriminatory treatment claims under the FHA are analyzed under the familiar *McDonnell Douglas* framework.  Under this framework the plaintiff has the initial burden of coming forward with proof of a *prima facie* case of discrimination.  See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiffs have satisfied their burden, the defendants must show "a legitimate, nondiscriminatory reason for their decision."  *City of Middletown*, 294 F.3d at 49.  If a permissible reason is proffered, the burden once again shifts to the plaintiffs to show that the reason is pretextual, allowing "the trier of fact to infer ... discrimination from the falsity of the [official]'s explanation."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000).  Because the pending motion for reconsideration implicates only the first step of this analysis, the court limits its discussion to the evidence presented in support of plaintiffs' *prima facie* case.

animus to be motivating public opposition to Spring Run Village. The

overall essence of defendants' argument is that to subject city officials to a

discrimination suit based on nothing more than a few arguably

discriminatory remarks made by members of the public at open hearings is

a dangerous proposition.  (Dkt. No. 118:5 at 12,13-22)

These are certainly valid concerns.  Direct evidence of discriminatory

treatment is admittedly absent.  However a "smoking gun" is rarely found

where such claims are asserted.  *Rosen v. Thornburgh*, 928 F.2d 528, 533

(2d Cir. 1991).  Rather, "discrimination is often accomplished by discreet

manipulations and hidden under a veil of self-declared innocence."  *Id*.  As

such, a plaintiff may establish a discriminatory treatment claim based on

"the cumulative weight of circumstantial evidence."  *Id.; Desert Palace, Inc.*

*v. Costa*, 529 U.S. 90, 99-100 (2003).  "Discriminatory intent may be

inferred from the totality of the circumstances, including the fact, if it is true,

that the law bears more heavily on one [group] than another, as well as the

historical background of the decision ..., [t]he specific sequence of events

leading up to the challenged decision ..., contemporary statements by

members of the decisionmaking body ..., and [s]ubstantive departures ...,

particularly if the factors usually considered important by the decisionmaker

18

strongly favor a decision contrary to the one reached." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Sunrise Development, Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 774-76 (E.D.N.Y. 1999) .  Where there are allegations of discrimination supported by such circumstantial evidence, "a defendant's intent and state of mind are placed in issue, [and] summary judgment is ordinarily inappropriate." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

As such, it is not merely a few ambiguous remarks about transients, protecting the town, *etc.* which support the plaintiffs' claims.  Rather, these statements are a small part of the evidence presented, becoming relevant only when viewed in conjunction with other indicators of a discriminatory undercurrent running through Saratoga's land use policies.  *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982); *Resid. Adv. Bd. v. Rizzo*, 564 F.2d 126, 144 (3d Cir. 1977); *Atkins v. Robinson*, 545 F. Supp. 852, 872 (E.D. Va. 1982); *United States v. City of Birmingham*, 538 F. Supp. 819, 825 (E.D. Mich. 1982) (all finding seemingly innocuous statements to be evidence of discrimination in light of surrounding circumstances).

19

Here, the plaintiffs have presented compelling statistics showing that African Americans are in disproportionate need of affordable housing in Saratoga Springs. (See, e.g., Ex. 25 at 6, Dkt. No. 84:26.) City officials were aware of this need, the lack of affordable housing within Saratoga and its impact on diversity. (See Ex. 90 at 3, Dkt. No. 90:7.; Ex. Group A) Despite this, there is evidence that they have repeatedly capitulated to public opposition against affordable housing proposals. (See Ex. Group B) In addition, City officials have recognized that such opposition is driven in significant part by the "stigma" attached to affordable housing and those who live there. (See Ex. Group C)

Regarding Spring Run Village specifically, there was substantial community outcry. While only 20% of Spring Run Village would have been affordable housing, a significant portion of the community's opposition to the proposal was based on this component and perceptions about the sorts of people it would attract. (See Ex. Group D) It is alleged that, in response to this public opposition, the Council "rushed" to downzone the SWAD, and that the Board manufactured reasons to delay the special use permit application. (See Ex. Group E) In addition, city officials failed to consider normally important factors before downzoning the SWAD, such as the

20

report of the SWAD Land Use Committee and the opinion of the Saratoga County Planning Board.  (See Ex. Group F)

Viewing this evidence in a light most favorable to the plaintiffs, it would not be unreasonable to infer that, in bowing to public opinion, the individual defendants understood discriminatory animus against protected groups to be a significant factor in the community's opposition to Spring Run Village.  If indeed influenced by this animus in downzoning the SWAD and delaying the Anderson's special use permit application, the individual defendants would be liable under the FHA.  "[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.  A ... discriminatory act [is] no less illegal simply because it enjoys broad public support."  *Innovative Health Sys. Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997).

As such, the court adheres to its prior finding that sufficient evidence has been presented to allow a reasonable inference of discriminatory treatment by the council and board defendants.

### 3.  **Qualified Immunity**

The court turns next to the defendants' assertion that the court erred in denying the council and board defendants qualified immunity.

21

Qualified immunity is an affirmative defense which recognizes the inherent injustice in holding a defendant liable for acts which a reasonable person would not perceive as being unlawful. "The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action– that is, 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.' A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law.'" *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007) (citations omitted).

In addition to the arguments that there was no constitutional violation, presented *supra*, the defendants assert a series of arguments as to why the conduct of the individual defendants did not violate clearly established law and was objectively reasonable. (Dkt. No. 118:5 at 12,13-22)

These arguments may not be reached here, however. The Supreme Court decision of *Saucier v. Katz*, 533 U.S. 194, 202 (2001), sets forth a

"rigid order of battle" which prohibits courts from the once common practice of finding defendants entitled to qualified immunity based on the reasonableness of their actions, without first deciding the existence of a constitutional violation.  *See also Moore v. Andreno*, 505 F.3d 203, 208 n.5 (2d Cir. 2007).  As the court has found, *supra*, that the critical element of discriminatory intent must be decided by a jury before it can be determined whether there has been a constitutional violation, the qualified immunity analysis may proceed no further.

### 4.    Legislative Immunity

Finally, the court revisits its decision to deny the individual defendants legislative immunity.

Legislators are absolutely immune from actions taken within the sphere of legitimate legislative activity.  *See State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 82 (2d Cir. 2007).  They are not, however, immune from suit for administrative acts.  *See Manzi v. DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997).  The distinction, according to the parties, is whether the challenged action targeted a specific individual, as opposed to the community at large.  This rule, as applied to zoning decisions, was articulated by the Second Circuit in *Orange Lake Ass'n Inc.*

*v. Kirkpatrick*, 21 F.3d 1214 (2d Cir. 1994).  In *Orange Lake*, the Circuit

affirmed a grant of legislative immunity for legislators who had passed

zoning ordinances affecting several tracts of land.  In doing so, the Circuit

quoted with approval the decision of the Southern District below, stating:

> [t]he court recognized that, in considering
> amendments to zoning ordinances, town boards
> ordinarily act in a legislative capacity. They do not
> do so, however, if the actions taken "impact on
> particular individuals rather than on a community,"
> or "the factors considered in adopting the legislation
> relate to specific individuals, instead of general
> policy implications."

*Id.* at 1219-20.

If this analysis remained in untempered force, the court would be

inclined to abide by its prior decision denying legislative immunity.

However, upon review of the relevant case law the court believes the

parties have misapprehended the current standard for legislative immunity.

Absent from the parties' original submissions is the Supreme Court

case of *Bogan v. Scott-Harris,* 523 U.S. 44 (1998).  In *Bogan*, a

municipality passed a budgetary ordinance, in connection with budget cuts,

which eliminated a department in which the plaintiff was the sole employee.

*Id.* at 46-48.  The plaintiff brought suit against the individual legislators

under § 1983, presenting powerful evidence that the ordinance was specifically directed at her in retaliation for exercising her constitutionally protected right to freedom of speech. *Id.* The First Circuit affirmed the lower court's denial of legislative immunity. *See Scott-Harris v. City of Fall River*, 134 F.3d 427 (1st Cir. 1997). It noted that courts within its jurisdiction had traditionally applied two tests, identical to those set out in *Orange Lake*, in analyzing legislative immunity claims:

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are "legislative facts," such as "generalizations concerning a policy or state of affairs," then the decision is legislative. If the facts used in the decision making are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on "the particularity of the impact of the state of action." If the action involves establishment of a general policy, it is legislative; if the action "single[s] out specifiable individuals and affect[s] them differently from others," it is administrative.

*Id.* at 440 (citations omitted).

The Circuit went on to hold that the lower court properly relied on the jury's findings that the legislators had impermissible, individual specific motives in passing the ordinance, and therefore correctly

25

denied legislative immunity.  *Id.* at 441.  The Supreme Court

reversed, primarily holding that the intent or motive underlying the

actions of legislators is irrelevant in determining the nature of the act.

*See Bogan*, 523 U.S. at 54-55.  Rather the question is "whether

stripped of all considerations of intent and motive" the actions "were,

in form, quintessentially legislative."  *Id.* at 55.

While the parties here ostensibly recognize this development, a

significant portion of the arguments on both sides center around the

legislative reasons for the rezoning of the SWAD.  The plaintiffs

argue "that the City Council members' decision to downzone the

SWAD was directly aimed at obstructing and, ultimately defeating the

Andersons' efforts to provide much-needed affordable housing." (Dkt.

No. 88:2 at 65; Dkt. No. 127)  The defendants counter by asserting

that the rezoning was an attempt to maintain a consistent land use

policy.  (Dkt. No. 72:66 at 28-31; Dkt. No. 126 at 1-4)  These

arguments are immaterial to the extent that they implicate the

subjective motives of the Council in passing the ordinance.

Insofar as the parties contend that the magnitude of the societal

impact of the legislature's action, as divorced from intent or motive, is

determinative of the action's classification as either legislative or administrative, *Bogan's* lessons are more subtle, but still instructive.

After finding that subjective intent was irrelevant to the analysis, the Court in *Bogan* addressed the plaintiff's request that they look beyond the formally legislative nature of the challenged act, to examine whether or not it was legislative in substance. The Supreme Court responded that the challenged ordinance was "a discretionary, policymaking decision.... 'in a field where legislators traditionally have power to act.'" *Id.* 55-56 (citation omitted). While the ordinance in *Bogan* did little more than eliminate the plaintiff's employment, the Court found that it "involved the termination of a position, which unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56.

Thus, while the Supreme Court did not overrule the *Orange Lake* principle that legislative immunity is not available for acts which impact solely on individuals, it did take an extremely restrictive view of what constitutes such individual impact when the challenged action

is otherwise legislative and implicates larger policy concerns.[10]  *See*

*also Tenney v. Brandhove,* 341 U.S. 367 (1951)*;  Biblia Abierta v.*

*Banks*, 129 F.3d 899, 904-05 (7th Cir. 1997) (applying legislative

immunity analysis subsequently approved by *Bogan*).

      As relevant here, zoning ordinances, such as those the council

defendants enacted in February 2005, generally represent

quintessential legislation.  *See, e.g., Biblia Abierta*, 129 F.3d at 904-

05; *Orange Lake*, 21 F.3d at 1219-20.  It is true that the ordinance in

question impacted significantly on property which was predominantly

owned by the Andersons.  However, the challenged zoning was, at

least facially, consistent with a greater land use policy for the City.  In

addition, zoning ordinances which restrict building density necessarily

impact on the public services the City must provide, the character of

the City, tax revenues and expenditures, *etcetera*.  The ordinance in

question will also bind future owners of property within the SWAD.

---

[10]  As such, *Bogan* and its progeny are distinguishable from cases such as *Harhay v. Town of Ellington*, 323 F.3d 206 (2d Cir. 2003) and *Brennan v. Straub*, 246 F. Supp. 2d 360 (S.D.N.Y. 2003).  In these cases, officials were not afforded legislative immunity for terminating single employees, even by a vote, because the challenged conduct was not quintessentially legislative, nor did it implicate community wide concerns.  Other cases the plaintiffs rely on such as *Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20 (1st Cir. 1992), were decided before *Bogan*, and are no longer good law to the extent they deny legislative immunity based on the alleged motivation and intent of the legislators.

*See Bryan v. City of Madison,* 213 F.3d 267, 273-74 (5th Cir. 2000)*;*

*Biblia*, 129 F.3d at 904; *Acierno v. Cloutier*, 40 F.3d 597, 610-615

(3rd  Cir. 1994) (all finding zoning of specific parcel to have a

sufficiently general impact to be considered legislative).  These are

impacts of significance to the community at large, not merely the

Andersons.

Plaintiffs have further alleged procedural "irregularities" in the

actions taken by the council defendants.  The most serious of these

allegations is that the Council scheduled a "surprise" vote which

would determine whether they would seek an opinion from the Board

as to rezoning the entire SWAD, on a date and time coinciding with a

Board hearing on the Anderson's development proposal.  (Ex. 47 at

13, Dkt. No. 87:2; Ex. 70 at 4, Dkt. No. 89:10)   On the scheduled

date, the Council unanimously voted to seek such a zoning opinion

from the Board.  (Ex. 70 at 4, Dkt. No. 89:10)  The plaintiffs claim that

the city attorney was then "dispatched" to inform the Board in the

midst of its hearing.  (Dkt. No. 127 at 5-6)  After being so informed,

the Board stopped consideration of the Anderson's application and

tabled it for a later date. *Id.*

The plaintiffs argue that this sequence of events exhibits Council interference in the Board's process sufficient to hold the council defendants liable for the Board's delay and denial of the Anderson's special use permit application.[11]  In support of this argument the plaintiffs cite to the Fourth Circuit case of *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983), in which a city council was stripped of legislative immunity and found subject to liability for the administrative treatment of the plaintiff's development proposal.  However, the circumstances present in *Scott* are inapposite to the current situation.  In *Scott*, the denial of legislative immunity for the individual legislators was premised on their issuance of a special use permit "freeze" as to lands they were in the process of rezoning, which put a moratorium on the issuance of such permits. No such direct administrative action on the part of the Council defendants is alleged here.

In addition, while it is clear that the city attorney informed the Board of the Council's vote, and that the Board then tabled the

---

[11]It should be noted that the plaintiffs do not argue that any of the Council's allegedly procedurally defective actions are sufficient to deny the council defendants legislative immunity for their February 2005 downzoning of the SWAD.

Anderson's application, the evidence does not support a finding that

the Council "dispatched" the city attorney or instructed the Board to

delay consideration of the Anderson's application.  The deposition

testimony relied on by the plaintiffs establishes no more than that the

plaintiffs' landscape architect saw the city attorney enter the board

meeting and hand the Board members a note, after which discussion

of the Anderson proposal ceased.  (See Ex. 12 at 96-98, Dkt. No.

84:13)  Without some evidence that the Council directed this action

so as to intentionally interfere with the Board hearing, the fact that it

was "unusual" to hold a council and board meeting on the same date

is irrelevant.

The only other evidence plaintiffs point to in alleging Council

complicity in the Board's delay and denial of the Anderson's

application is that defendant McCabe "discussed the SWAD rezoning

when addressing a neighborhood organization that opposed the

Spring Run Village Project."  (Dkt. No. 88:2 at 66)  However, plaintiffs

fail to explain why this was improper or would implicate the Council in

the Board's treatment of the Anderson's application.  It is well

established that discussions with constituents and political interest

31

groups regarding potential legislation are an essential aspect of the legislative process. *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007).

In light of the above, the council defendants are entitled to legislative immunity. The Council's downzoning of the SWAD in February of 2005 was a purely legislative act, and there is insufficient evidence that they were complicit in the Board's treatment of the Plaintiffs' special use permit application. In addition, to the extent the board defendants partook in the Council's zoning decisions by voting on and issuing zoning recommendations to the Council, they are also entitled to legislative immunity. *See Bogan*, 523 U.S. at 53 ("We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions.").

This still leaves plaintiffs' individual claims against the board defendants as they relate to the Andersons' application for a special use permit. The court must agree that action taken on the special use permit by the Board was administrative in nature. It is true that the ultimate disposition of the plaintiffs' special use permit application

had implications for the public at large. However, Board action taken

on the application was not the sort of formal, quintessentially

legislative activity that legislative immunity was intended to cover.

*See, e.g., Jim Sowell Const. Co. v. City of Coppell*, 82 F.Supp.2d

616, 617 (N.D. Tex. 1998); *Kinderhill Farm Breeding Assocs. v.

Appel*, 450 F. Supp. 134, 136 (S.D.N.Y. 1978).

Defendants also argue in this context that the Board never

denied the Andersons' application for a special use permit, and thus

took no final action which could be the basis of plaintiffs' claims

against them.  The court is well aware of the disagreement between

the parties as to whether the Andersons' application was withdrawn

or denied.  However, the crux of Plaintiffs' remaining claims against

the board defendants is that they arbitrarily threw hurdles into the

permit process to delay the plaintiffs until the Council's subsequent

rezoning of the SWAD made the Anderson's proposal noncompliant.

As such, the individual claims against the board defendants must

survive in the context of their treatment of the plaintiffs' application for

a special use permit.

## IV. __Conclusion__

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the defendants' motion for reconsideration (**Dkt. Nos. 118, 126**) is **GRANTED**; and it is further

**ORDERED** that the claims against defendants Michael Lenz, Thomas Curley, Matthew McCabe, Thomas McTygue and Stephen Towne in their individual capacities are **DISMISSED** in their entirety; and it is further

**ORDERED** that the claims against defendants Lewis Benton, Robert Bristol, Robert Israel, William McTygue, Nancy Ohlin, and Lou Schneider in their individual capacities are **DISMISSED** only to the extent that they arise out of their participation in the downzoning of the SWAD; and it is further

**ORDERED** that the claims against defendants Lewis Benton, Robert Bristol, Robert Israel, William McTygue, Nancy Ohlin, and Lou Schneider in their individual capacities survive to the extent that such claims are based on the administrative treatment of the plaintiffs' special use permit application; and it is further

**ORDERED** that the court's October 18, 2007 Order is otherwise affirmed; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by regular mail.

**IT IS SO ORDERED.**

March 24, 2008
Albany, New York

Gary L. Sharpe
U.S. District Judge