**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE ANDERSON GROUP, LLC** *and*
**GAIL ANDERSON**

                         **Plaintiffs,**

              **v.**                                    **1:05-CV-1369**
                                                        **(GLS/DRH)**

**CITY OF SARATOGA SPRINGS**;
**MICHAEL LENZ,** *in his official*
*capacity as Mayor of Saratoga*
*Springs and Saratoga Springs*
*City Council Member*; **SARATOGA**
**SPRINGS CITY COUNCIL;**
**THOMAS CURLEY, MATTHEW**
**MCCABE, THOMAS MCTYGUE,**
*and* **STEPHEN TOWNE,** *in their*
*official  capacities as Saratoga*
*Springs City Council members*;
**SARATOGA SPRINGS PLANNING**
**BOARD;** *and* **LEWIS BENTON,**
**ROBERT BRISTOL, ROBERT**
**ISRAEL, WILLIAM MCTYGUE,**
**NANCY OHLIN,** *and* **LOU**
**SCHNEIDER,** *individually and in*
*their official capacities as*
*Saratoga Springs Planning Board*
*members*,

                         **Defendants.**
_____

**APPEARANCES:**                      **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

RELMAN & ASSOCIATES               JOHN P. RELMAN, ESQ.
1225 19th Street, N.W.            MARY J. HAHN, ESQ.
Suite 600                         REED N. COLFAX, ESQ.
Washington, DC 20036

LYNCH, FARRELL LAW FIRM           PETER A. LYNCH, ESQ.
111 State St.
Albany, NY 12207

**FOR THE DEFENDANTS:**

GIRVIN, FERLAZZO LAW FIRM         GREGG T. JOHNSON, ESQ.
20 Corporate Woods Boulevard      CHRIS LANGLOIS, ESQ.
2nd Floor                         JACINDA HALL CONBOY, ESQ.
Albany, NY 12211-2350             SCOTT P. QUESNEL, ESQ.

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

On October 28, 2005, plaintiffs filed this action under the Fair

Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* and N.Y. Exec. L. § 296

("NY HRL").  (Dkt. No. 1)  They alleged that, in preventing the construction

of plaintiffs' proposed housing development ("Spring Run Village" or "SRV")

- which contained 20% affordable units - defendants intentionally

discriminated against African-Americans and families with children.  It is

further contended that defendants' overarching policy of preventing the construction of affordable housing, including the affordable housing units in SRV, had a disproportionate and segregative impact on African-Americans.

On June 22, 2007, defendants filed a motion for summary judgment seeking to dismiss all of plaintiffs' claims.  (Dkt. No. 72)  The court granted defendants' motion only insofar as it sought dismissal of plaintiffs' NY HRL claims.  (See 10/18/07 Txt Order)  Defendants subsequently filed a motion for reconsideration, seeking dismissal of the claims against the individual defendants, which the court granted in part.  (Dkt. Nos. 118, 126, 135) Now pending is defendants' motion under 28 U.S.C. § 1292(b), seeking certification for interlocutory appeal of certain questions related to their motion for summary judgment.[1]  (Dkt. No. 119)  For the reasons that follow, the motion is granted.

## II.  Discussion[2]

## A.    Standard of Review for Interlocutory Appeal

---

[1]Defendants filed their motion for interlocutory appeal at the same time as their motion for reconsideration.  (Dkt. Nos. 118, 119)  The court addressed the motion for reconsideration first and separately, as it directly related to defendants' pending appeal of this court's denial of qualified and legislative immunity to the individual defendants.  (Dkt. No. 135)

[2]Familiarity with the background of the case is assumed.  The court set forth the underlying facts and circumstances in *The Anderson Group, LLC v. City of Saratoga Springs*, No. 1:05-CV-1369, 2008 WL 819755 (N.D.N.Y. Mar. 25, 2008), and will not repeat them here except as relevant to the current motion.  (See also Summ. J. Tr. at 4-12, Dkt. No. 128)

Generally, only final orders are appealable.  *See* 28 U.S.C. § 1291. However, in extraordinary circumstances, 28 U.S.C. § 1292(b) allows a district court to certify questions regarding its orders to the Court of Appeals for interlocutory appeal if: (1) the court's decision "involves a controlling question of law," (2) "as to which there is a substantial ground for difference of opinion," and (3) "an immediate appeal may materially advance the ultimate termination of the litigation."

"To determine whether the first element has been met, district courts may consider whether reversal could result in dismissal or could significantly affect the conduct of the action, or whether the certified issue has precedential value for a large number of cases."  *Wassau Business Ins. Co. v. Turner Const. Co.*, 151 F. Supp. 2d 488, 491 (S.D.N.Y. 2001) (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24-25 (2d Cir. 1990)).  To satisfy the second element, the plaintiff must establish that there is substantial reason to doubt the correctness of the district court's ruling.  *See* S. Rep. No. 2434, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 5255, 5257.  "A mere claim that the district court's ruling was incorrect does not demonstrate a substantial ground for difference of opinion."  *Wausau Business Ins. Co.,* 151 F. Supp. 2d at 491

4

(citation omitted).  "Further, the mere fact that a disputed issue is a question of first impression is insufficient to demonstrate substantial grounds for a difference of opinion." *Scott v. Dime Sav. Bank of New York, FSB*, No. 88 Civ. 2298, 1993 WL 350046, at *1 (S.D.N.Y. Sept. 7, 1993). Finally, the third element requires that the appeal would "literally accelerate the action as a whole." *Genentech, Inc. v. Novo Nordisk A/S*, 907 F. Supp. 97, 100 (S.D.N.Y. 1995) (citation omitted).  As such, it is not enough that the interlocutory appeal would not delay the action; it must "advance the time for trial or ... shorten the time required for trial." *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998).

Even if the above statutory criteria are met, the decision whether to certify a question for interlocutory appeal is within the complete and unfettered discretion of the district court.  *See, e.g., SPL Shipping Ltd. v. Gujarat Cheminex, Ltd.*, No. 06-CV-15375, 2007 WL 1119753 (S.D.N.Y. Apr. 12, 2007).

**B.    The Defendants' Motion for Interlocutory Appeal**

Defendants advance six questions related to the court's order on their motion for summary judgement, which they contend warrant certification for interlocutory appeal (Dkt. No. 119):

- Can the continuing violation doctrine be applied to extend the FHA's statute of limitations period where the "ongoing dispute" between the parties was not a dispute about housing or dwellings and the FHA prohibitions were not implicated by the "ongoing dispute?"

- Can a landowner use the FHA to challenge what they characterize as an "overall land use policy" independent of an actual or proposed dwelling, housing unit or housing development?

- Can a party sustain an FHA disparate impact claim without presenting a projection or statistical analysis of the actual housing project they proposed?

- Can a party sustain an FHA disparate impact claim based upon a descriptive analysis (i.e.: odds ratio) that ignores 80% of the actual housing proposal that was actually presented to the Defendants?

- Can a party maintain an FHA disparate [impact][3] claim against an individual planning board member or individual local legislator when a municipal zoning amendment is alleged to be the means by which the FHA was violated?

---

[3]Defendants' actual phrasing of this question challenges the propriety of a disparate *treatment* claim arising out of a zoning amendment.  This is apparently a typo, as defendants' later discussion makes clear that they actually take issue with plaintiffs' now abandoned attempt to hold the individual defendants liable under a disparate impact theory.

This last question has been mooted by the court's recent order on the defendants' motion for reconsideration, which granted the individual defendants legislative immunity for all claims arising out of their zoning decisions.[4]  (Dkt. No. 135)  The remaining questions fall into two categories: 1) Those relating to the timeliness of certain aspects of plaintiffs' action, and 2) Those relating to the sufficiency of plaintiffs' disparate impact analysis.  The court addresses each of these in turn.

### 1.    Question Related to Timeliness

In their motion for summary judgment, defendants argued that plaintiffs could not challenge events occurring prior to October 2003.  (Dkt. No. 98:36 at 14)  It was contended that such events occurred more than two years after the plaintiffs filed their complaint in October of 2005, and were thus outside the FHA's statute of limitations.  *Id.*  This argument sought by implication to bar any claim arising out of the City's May 2003 downzoning of plaintiffs' property to Rural Residential-1.  *Id.*  The court,

---

[4]The court recognizes that its order on defendants' motion for reconsideration addressed plaintiffs' disparate treatment claims only insofar as they challenged the February 2005 downzoning of plaintiffs' property and the treatment of their special use permit application.  While it is acknowledged that plaintiffs also challenge the May 2003 downzoning, the court reinforces that its grant of legislative immunity to the individual defendants extends to all zoning decisions which may give rise to plaintiffs' claims, as per the March 24th order's decretal paragraph.  (See Dkt. No. 135 at 34)

however, found that the continuing violation doctrine applied to allow

plaintiffs to challenge the May 2003 downzoning.  (See Dkt. No. 109:1 at 1;

Dkt. No. 128 at 18)

Defendants submit that this was error.  They argue that the

continuing violations doctrine cannot extend the statute of limitations to

encompass the May of 2003 downzoning because the Anderson's had not

presented a housing proposal at that time.  (Dkt. No. 119:4 at 5-8)  Rather,

they assert that the parties' May 2003 dispute was merely over the zoning

of the SWAD.[5]  *Id.*  Since the FHA only applies to discriminatory actions as

they relate to housing, not zoning decisions in general, defendants submit

that interlocutory appeal to address the propriety of the court's application

of the continuing violation doctrine is in order.[6]  *Id.*

First, this argument ignores a critical disputed fact.  Contrary to the

premise of defendants' question, plaintiffs contend that the Anderson's

proposed their "vision" of a housing development with an affordable

_____

[5]SWAD stands for Southern Weibel Avenue District.  The land which composed the SWAD is over 90% owned by the Anderson family and was the prospective site for Spring Run Village.

[6]The court notes that this argument relates more to whether the May 2003 downzoning of the SWAD implicates the FHA, than it does to whether the continuing violations doctrine is applicable.

component to the Weibel Avenue/Gilbert Road Study Area Advisory

Committee in May of 2003.  (See Ex. 21 Touhey Dep., Dkt. No. 84:22; Ex.

38 Weibel Ave Agenda Notes, Dkt. No. 85:18)  It is alleged that, in

response, the City downzoned the SWAD later that month based on

considerations of who would live in such housing.  (Ex. 39 at 7, Dkt. No.

85:19)  As such, concerns implicated by the FHA were at least arguably

present in May of 2003.

Additionally, the court does not agree that its application of the

continuing violation doctrine presents a controlling question of law.

Defendants contend that if the City's May 2003 actions cannot give rise to

plaintiff's claims, then the entire action would "likely terminate."  However,

plaintiffs also challenge the treatment of their special use permit application

from 2004 to 2005, the February 2005 downzoning of their property, as well

as the disparate and segregative impact of Saratoga's overall policy of

preventing the construction of affordable housing.  To the extent these

claims implicate post-October 2003 events, defendants have not

contended that they are outside the FHA's statute of limitations.

Accordingly, this case is distinguishable from *Shelter Inc. Realty v. City of*

*New York*, No. CV-01-7015, 2007 WL 29380 (E.D.N.Y. Jan. 4, 2007), in

9

which the continuing violation doctrine was held to be inapplicable because the only specifically challenged action therein fell outside the FHA's statute of limitations.

Defendants seem to believe that if the court prohibits a challenge to the May 2003 downzoning, plaintiffs must concede that such action was legitimate, and that all subsequent actions by the City were completely appropriate responses to this initial downzoning.  The court does not agree. That certain incidents and actions may not give rise to a claim because of the statute of limitations does not necessarily bar their admissibility as evidentiary support for timely claims.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) (plaintiff may use time barred acts "as background evidence in support of a timely claim").

Accordingly, regardless of whether plaintiffs' challenge to the May 2003 downzoning is permissible under the continuing violations doctrine, evidence of this incident and its surrounding circumstances will undoubtably be introduced to support plaintiffs' other claims arising out of post-October 2003 events.  Thus, in the court's opinion, an interlocutory appeal to address the application of the continuing violation doctrine in this action would neither terminate the case, nor significantly expedite it.

10

Therefore, the court denies defendants' motion for certification on this question.

### 2.    Questions Related to Disparate Impact Analysis

Defendants' next set of questions relate to the proper scope of a disparate impact claim, and the necessary statistical method for showing a disparate impact exists.  (Dkt. No. 119:4 at 8-14)  At summary judgment, it was abundantly clear that the parties diverged widely when it came to answering these questions.

Plaintiffs moved for summary judgment on their disparate impact claim alleging that Saratoga's overall land use policies prevented the construction of affordable housing, including those at SRV, which had a discriminatory and segregative effect on African-Americans.  (Dkt. No. 88:2 at 49-64)  In support of this motion, plaintiffs pointed to evidence that: 1) only 17 affordable housing units, excluding those reserved for seniors, had been built in Saratoga since 1994, while 2,300 market rate units had been constructed during that time, 2) 57% of African-American families in Saratoga qualified for affordable housing while only 27% of all Saratoga families similarly qualified, and 3) 67.2% of African-American families in the areas surrounding Saratoga qualified for affordable housing while 32% of

all families qualified.  *Id.* at 54.  (See also Pl. SMF ¶¶ 77-92, Dkt. No. 83)

For their part, defendants focused not on any overall policy of the city, but rather on discrete acts which prevented the construction of SRV. (Dkt. No. 72:66 at 14-24)  They argued, *inter alia*, that the focus of the disparate impact inquiry should be the May 2003 city wide rezoning - which allegedly encouraged and expanded the opportunities for affordable housing - not the SWAD specific February 2005 downzoning.[7]  Defendants also asserted that, even were the court to consider the February 1, 2005 SWAD specific downzoning in isolation, plaintiffs' disparate impact claim required analysis of whether the frustration of SRV actually or predictably had a discriminatory effect on protected groups.  It was contended that evidence showing protected groups in Saratoga and surrounding areas disproportionately qualified for affordable housing was insufficient to meet this burden.  Defendants also noted that, in formulating their disparate impact analysis, plaintiffs' expert ignored the 80% market rate units which would have been included in SRV, apparently focusing exclusively on the

---

[7]The SWAD was originally downzoned in conjunction with other city wide zoning amendments in May of 2003.  Gail Anderson successfully challenged this rezoning of the SWAD in State court due to the City's failure to conduct an adequate environmental impact review under the New York State Environment Quality Review Act analysis.  The State court reinstated the previous high density zoning for the SWAD in May of 2004, which remained in effect until the subsequent February 2005 downzoning.

loss of the 20% affordable housing units.  As such, defendants contended that plaintiffs' disparate impact analysis was fatally defective.

The court denied both parties' motions for summary judgment on the disparate impact claim, finding disputed issues of material fact which required resolution by a jury.

Defendants now present a series of questions for interlocutory appeal related to the issues discussed above. (Dkt. No. 199:4 at 8-14)  First, defendants contend that it is improper for plaintiffs to premise their disparate impact claim on the effect of the City's land use policies.[8]  Rather they contend that the scope of plaintiffs' disparate impact claim should be focused on the rezoning of the SWAD and the corresponding frustration of the SRV proposal.[9]

It is argued that certification is necessary to address this issue, as the

---

[8]It is clear that, prior to the summary judgment stage, defendants understood plaintiffs' disparate impact claims to arise from plaintiffs' frustration caused by the downzoning of the SWAD and the treatment of plaintiffs' special use permit application.  As such, defendants allege that the plaintiffs have now changed their theory of the case by challenging the disparate impact of the City's overall land use policies in lieu of the discrete acts which prevented the construction of SRV.

[9]Defendants again submit that, in light of the court's application of the continuing violation doctrine, the area of inquiry should be the impact of the May 2003 City-wide rezoning, not the SWAD specific, February 2005 downzoning. The court must admit some confusion as to the seeming inconsistency in this aspect of defendants' argument. While vehemently objecting to plaintiffs' attempt to challenge the impact of Saratoga's land use policies, defendants seek to have the jury examine the City-wide May 2003 zoning amendments, which are ostensibly the embodiment of its land use policies.

proper scope of plaintiffs' disparate impact claim has drastic implications regarding the sufficiency of their disparate impact analysis. Defendants further submit that, if they are correct in asserting that the re-zoning of the SWAD is the appropriate area of inquiry, plaintiffs must show that the corresponding frustration of the SRV proposal had a disproportionate impact on protected groups. It is contended that the odds ratio that plaintiffs rely on - showing through economic data that a disproportionate number of African-Americans in Saratoga and surrounding cities qualify for affordable housing - is insufficient to meet this burden. Rather, defendants submit that a statistical model that identifies the likely occupants of SRV is the best method to achieve a predictable indication of those who will be affected by its absence. Further, defendants again assert that plaintiffs' impact analysis is insufficient as a matter of law in that it ignores the 80% of SRV that was market rate housing. Finally, it is contended that allowing an FHA disparate impact claim to go forward upon such an analysis would allow any developer to circumvent zoning restrictions by simply attaching a minimal number of affordable units to a development proposal and establishing that minorities disproportionately qualify for such units. Upon certification, defendants would seek to have the Circuit address these

issues as well.

In response, plaintiffs argue that these questions have implications only as to their adverse impact claim, and in no way affect their disparate treatment claim or perpetuation of segregation claim. (See Dkt. No. 123:1 at 12-22) As a result, it is contended that the questions defendants seek to certify regarding the disparate impact claim do not present controlling issues of law, as required under § 1292(b). In this regard, plaintiffs note that piecemeal appeals are frowned on as judicially inefficient, which concerns are especially weighty where the Circuit would have to familiarize itself with the extensive record and briefing this case presents. Next, citing to various caselaw, plaintiffs assert that an adverse impact claim premised on the discriminatory effect of a municipality's land use policy is completely proper under the FHA, despite defendants protestations to the contrary. Plaintiffs also submit that certification of defendants' questions would not significantly streamline this case, as the evidence to which defendants object will inevitably be presented to support plaintiffs other claims. Finally, plaintiffs note that the disparate impact issues raised by the defendants do not have precedential value for a wide number of cases, further weighing against certification.

In reviewing the briefing submitted in connection with the current motion and the motions for summary judgment, the court finds that defendants' questions of law regarding plaintiffs' disparate impact claims satisfy the requirements of § 1292(b).

As to the proper scope of a disparate impact claim, plaintiffs are correct in noting that such an analysis is not limited to the discrete acts which led to the frustration of its proposal. Numerous cases have permitted challenges to neutral land use policies which have the overall effect of precluding minorities from living within the borders of a municipality. *See Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988) (recognizing that plaintiffs were challenging the discriminatory effect of town's ordinance which restricted multi-family housing to an urban renewal area); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) (striking down city zoning law which prohibited construction of multi-family housing throughout city as having disparate impact on African-Americans); *see also Reg'l Econ. Cmty. Action Prog., Inc. v. City of Middletown*, 294 F.2d 35, 52-53 (2d Cir. 2001) (disparate impact claim focuses on effect of neutral policy or practice, not specific acts). However, these cases all arose in the context of a frustrated

16

housing proposal which would have actually or predictably been significantly inhabited by protected groups. *See Middletown*, 294 F.2d at 43 (housing for recovering alcoholics); *Huntington Branch,* 844 F.2d 926 (section 8 housing where 60% of those holding section 8 certificates in municipality were minorities); *City of Black Jack*, 508 F.2d at 1186 (noting that frustrated development was "particularly designed" to move protected groups out of the center of the city, "measures were planned to" inform African-Americans of opportunity to live there, and "[t]here was ample proof that many [African-Americans] would live in the development"). As such, the application of a neutral practice or policy in these cases affected protected classes not only in general, but also by preventing the construction of a specific residential development which such classes would have disproportionately resided in. Accordingly, while it is clear that a disparate impact claim properly focuses on the overall discriminatory effect of a municipality's land use policies against protected groups, there is substantial reason to doubt whether a developer may bring such a challenge under the FHA without showing that its proposed development

would have alleviated such impact.[10]  This is especially so in a case such as this, where the plaintiffs seek to invoke the FHA to force a municipality to permit the construction of a frustrated project.  It is on this aspect of plaintiffs' case that the court shares in defendants' concerns.

This is not to say that the statistics plaintiffs rely on undoubtably fail to show that protected groups would have been disproportionately represented in SRV's affordable housing units.[11]  Plaintiffs have certainly established that African-Americans in Saratoga and the surrounding areas disproportionately qualify for affordable housing.  Courts have partially relied on similar data in analyzing disparate impact claims.  Arguably, however, such statistics do not alone predict disproportionate representation of protected groups in a development's affordable housing

---

[10]It is unclear whether plaintiffs take issue with this principle.  From plaintiffs' briefing in conjunction with summary judgment they seem to indicate that Saratoga's policy of prohibiting affordable housing within the city, including SPV's affordable units, had a disproportionate impact on minorities.  However, at oral argument plaintiffs' counsel made statements which could be construed as seeking to challenge the discriminatory impact of Saratoga's land use policies in general, without consideration of any discriminatory effect flowing from the frustration of SPV.

[11]A distinction should be made between disproportionate representation, and majority representation.  It is absolutely clear that a disparate impact claim does not require a showing that a majority of those affected by a practice or policy are in protected classes.  Rather, it need be shown only that those in protected classes are affected disproportionately when compared to non-protected classes.  *See Huntington Branch,* 844 F.2d at 938 (taking the district court to task for analyzing plaintiffs' disparate impact claim based on absolute numbers of each group affected rather than the disproportionate effect on minorities).

18

component.  Additional evidence, statistical or otherwise, is generally

presented in actions such as this, thus allowing for a stronger inference of

discriminatory effect.  For example, in *Huntington Branch*, the Circuit was

presented with a proposed section 8 subsidized housing development, the

construction of which had been frustrated through a Town's refusal to

amend a zoning ordinance.  844 F.2d at 928.  Upon addressing the

subsequent disparate impact claim, the Circuit initially cited to statistics

similar to those put forth by plaintiffs herein, noting that minorities within the

Town disproportionately needed subsidized housing when compared to all

families.  *Id.* at 938.  However, the Circuit also relied on other evidence in

ultimately concluding that the frustrated Section 8 housing would have

been significantly inhabited by minorities.  It was noted that 60% of families

holding Section 8 certificates or on the waiting list for such certificates were

minorities.  *Id.*  Further, a significant percentage (between 45% and 74%)

of those on waiting lists for other Section 8 housing developments within

the Town were minorities.  *Id.* at 938 n.11.  In light of such evidence, the

Circuit was able to predict with a greater degree of certainty than is

possible here that a significant percentage of the frustrated Section 8

development's tenants would have been minorities.  *See also, e.g., Keith v.*

*Volpe*, 858 F.2d 467, 484 (9th Cir. 1988) (finding an adverse impact where, "[o]f the persons who would benefit from the state-assisted housing because they are low income displacees, two-thirds are minorities"); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1286, 1288 (7th Cir. 1977) (town's refusal to rezone plaintiffs property to allow construction of federally subsidized low income housing was discriminatory when African Americans constituted 40% of the group eligible for such housing). Thus, while in the court's opinion plaintiffs have put forth sufficient evidence of disparate impact, it is conceded that defendants have a strong argument that the statistical data relied on by plaintiffs is insufficient as a matter of law to establish such a claim.

The court also notes that an FHA action arising out of the frustration of a proposed housing development which contains only 20% affordable housing certainly presents controlling questions about the proper impact analysis and, indeed, whether the Act even applies.

The court did not afford much weight to plaintiffs' experts' failure to consider the 240 market rate units in solely analyzing the impact of the loss of SRV's 60 affordable housing units.  It would seem that if the loss of 60 affordable housing units has a disparate impact on protected groups, it has

such an effect regardless of whether these units make up 1% or 100% of the overall proposal. Additionally, if the plaintiffs are correct in their assertion that the discriminatory impact of the overall land use policy controls, this issue would be irrelevant.

Nevertheless, the court understands that these are questions as to which there is substantial room for disagreement. First, assuming the potential demographic makeup of SRV is relevant, a disparate impact analysis which excluded the 80% market rate units in the development would certainly have the potential to misrepresent the overall impact of the development's frustration. Additionally, the FHA was by no means enacted to provide developers an avenue to override zoning restrictions by attaching a minimal number of affordable housing units to its development proposals. As such, it may be that a disparate impact challenge arising out of the frustration of such a development is simply beyond the scope of the FHA.

Finally, the court agrees that these questions facially appear to apply only to plaintiffs' disparate impact claims. However, the sufficiency of plaintiffs' disparate impact evidence and analysis would likely impact on the plaintiffs' circumstantial case of disparate treatment - which hinges in large

part on a showing of discriminatory impact - and on plaintiffs' perpetuation

of segregation claim.  As such, the court believes such questions present

controlling questions of law.  In any event, the Circuit may elect to address

the court's entire order on the parties' motions for summary judgment, as is

within their power upon interlocutory review.  Additionally, resolution of

these questions would undoubtably advance the termination of this

litigation by streamlining and synchronizing the arguments, evidence and

jury instructions presented at trial.  Accordingly, the court sees fit to certify

defendants' questions regarding the disparate impact analysis for

interlocutory appeal.

### III.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for a certificate of interlocutory

appeal pursuant to § 1292(b) (Dkt. No. 119) is **GRANTED** as to their

questions relating to plaintiffs' disparate impact claims; and it is further

**ORDERED** that the court's October 18, 2007 order is amended

accordingly; and it is further

**ORDERED** that defendants shall have ten (10) days from the entry of

this Memorandum Decision and Order to apply to the Second Circuit for

leave to proceed with the appeal; and it is further

**ORDERED** that the proceedings in the district court are stayed; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to all the parties.

**IT IS SO ORDERED.**

Dated: May 13, 2008
Albany, New York

Gary L. Sharpe
U.S. District Judge